# EXHIBIT A

1  **GUTRIDE SAFIER LLP**
   ADAM J. GUTRIDE (State Bar No. 181446)
2  SETH A. SAFIER (State Bar No. 197427)
   MARIE MCCRARY (State Bar No. 262670)
3  KRISTEN G. SIMPLICIO (State Bar No. 263291)
4  100 Pine Street, Suite 1250
   San Francisco, California 94111
5  Telephone: (415) 271-6469
   Facsimile:  (415) 449-6469
6
7  **TYCKO & ZAVAREEI LLP**
   LORENZO B. CELLINI
8  2000 L Street, N.W., Suite 808
   Washington, DC 20036
9  Telephone: (202) 973-0900
   Facsimile: (202) 973-0950
10
11 **SPANGENBERG SHIBLEY & LIBER LLP**
   STUART E. SCOTT
12 DANIEL FRECH
   1001 Lakeside Avenue East, Suite 1700
13 Cleveland, OH 44114
   Telephone: (216) 696-3232
14 Facsimile: (216) 696-3924
15
   Attorneys for Plaintiff
16
                 SUPERIOR COURT OF THE STATE OF CALIFORNIA
17
                         COUNTY OF SAN FRANCISCO
18
19 JAMIE PETTIT, an individual, on behalf of        CASE NO.  **C G C - 1 5 - 5 4 5 1 7 5**
   herself, the general public and those similarly
20 situated,                                         UNLIMITED CIVIL CASE
21     Plaintiff,                                    CLASS ACTION COMPLAINT FOR
                                                     VIOLATION OF THE CALIFORNIA
22          v.                                       CONSUMERS LEGAL REMEDIES
                                                     ACT; FALSE ADVERTISING; FRAUD,
23                                                   DECEIT, AND/OR
   PROCTER & GAMBLE COMPANY; AND                     MISREPRESENTATION; NEGLIGENT
24 DOES 1 THROUGH 50,                                MISREPRESENTATION; AND UNFAIR
                                                     BUSINESS PRACTICES
25     Defendants.
26                                                   JURY TRIAL DEMANDED
27
28

ENDORSED
F I L E D
Superior Court of California
County of San Francisco

APR 0 8 2015

CLERK OF THE COURT
BY:    MARY A. MORAN
                  Deputy Clerk

Class Action Complaint

1        Jamie Pettit, by and through her counsel, brings this Class Action Complaint against

2  Defendants Procter & Gamble Company and Does 1 through 50, inclusive, on behalf of herself

3  and those similarly situated, for violations of the Consumer Legal Remedies Act, false

4  advertising, unfair trade practices, and fraud, deceit and/or misrepresentation, and negligent

5  misrepresentation. The following allegations are based upon information and belief, including the

6  investigation of Plaintiff's counsel, unless stated otherwise.

7                                **INTRODUCTION**

8        1.      Defendants deceptively market personal hygiene moistened wipes as "flushable."

9  They charge a premium for these wipes, as compared to both toilet paper and moistened wipes

10  that are not marketed as "flushable." Despite the label, however, the wipes are not actually

11  suitable for flushing down a toilet. Specifically, Defendants' wipes do not disperse, i.e., break

12  apart, upon flushing. Instead, the wipes, when flushed as part of ordinary, consumer use, routinely

13  (1) clog and damage plumbing pipes; (2) fail to properly break down in septic tanks; (3) damage

14  septic pumps; (4) catch on screens in municipal sewage lines and must be removed from the

15  sewer system for disposal in landfills; and (5) damage municipal sewage lines and pumps, often

16  due to the proclivity of the wipes to tangle with each other, tree branches, rocks, and other non-

17  flushable items, and form large masses or ropes. Moreover, because the wipes are capable of

18  causing damage to municipal sewer systems, the mere act of flushing them is a violation of

19  section 305.1 of the California Plumbing Code, which prohibits flushing "any other thing

20  whatsoever that is capable of causing damage to the drainage system or public sewer."

21  Reasonable consumers would not pay a premium to obtain the benefits of a "flushable" wipe if

22  Defendants disclosed the risks of flushing the wipes and that flushing the wipes is in fact illegal.

23        2.      Throughout the class period, Defendants have obtained substantial profits from

24  these deceptive sales of moistened wipes marketed as flushable. This action seeks to require

25  Defendants to pay restitution and damages to purchasers of the flushable wipes, to remove the

26  word "flushable" from the product packaging and marketing, and to affirmatively inform

27  purchasers that the wipes are not suitable for flushing down a toilet.

28                                  **PARTIES**

3.     Jamie Pettit ("Plaintiff") is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Long Beach, California.

4.     Defendant Procter & Gamble Company ("P&G") is a corporation incorporated under the laws of the Delaware, having its principal place of business in Cincinnati, Ohio.

5.     The true names and capacities of Defendants sued as Does 1 through 50, inclusive, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names pursuant to section 474 of the California Code of Civil Procedure. Plaintiff will seek leave of Court to amend this Class Action Complaint when said true names and capacities have been ascertained.

6.     The Parties identified in paragraphs 4 and 5 of this Class Action Complaint are collectively referred to hereafter as "Defendants."

7.     At all times herein mentioned, each of the Defendants was the agent, servant, representative, officer, director, partner or employee of the other Defendants and, in doing the things herein alleged, was acting within the scope and course of his/her/its authority as such agent, servant, representative, officer, director, partner or employee, and with the permission and consent of each Defendant.

8.     At all times herein mentioned, each of the Defendants was a member of, and engaged in, a joint venture, partnership and common enterprise, and acting within the course and scope of, and in pursuance of, said joint venture, partnership and common enterprise.

9.     At all times herein mentioned, the acts and omissions of each of the Defendants concurred and contributed to the various acts and omissions of each and all of the other Defendants in proximately causing the injuries and damages as herein alleged.

10.     At all times herein mentioned, each of the Defendants ratified each and every act or omission complained of herein.

11.     At all times herein mentioned, each of the Defendants aided and abetted the acts and omissions of each and all of the other Defendants in proximately causing the damages, and other injuries, as herein alleged.

## JURISDICTION AND VENUE

12.     This action is brought by Plaintiff pursuant, *inter alia*, to the California Business

1 and Professions Code, section 17200, *et seq.* Plaintiff and Defendants are "persons" within the

2 meaning of the California Business and Professions Code, section 17201.

3       13.    The injuries, damages and/or harm upon which this action is based occurred in or

4 arose out of activities engaged in by Defendants within, affecting, and emanating from, the State

5 of California.

6       14.    Defendants have engaged, and continue to engage, in substantial and continuous

7 business practices in the State of California, including in San Francisco County.

8       15.    In accordance with California Civil Code Section 1780(c), Plaintiff's counsel

9 concurrently files herewith a declaration establishing that, during the class period, Defendants

10 were doing business in the county in which the action is brought. (Plaintiff's counsel's

11 declaration is attached hereto as Exhibit A.)

12       16.    Plaintiff accordingly alleges that jurisdiction and venue are proper in this Court.

13 **SUBSTANTIVE ALLEGATIONS**

14 **(1) Defendants Deceptively Market and Sell "Flushable" Wipes**

15       17.    Defendant P&G is a manufacturer and marketer of consumer goods, including a

16 variety of paper products, such as toilet paper, paper towels, feminine hygiene products, diapers,

17 and baby wipes. Its products are widely available for purchase in supermarkets, drug stores, and

18 other retailers.

19       18.    Among Defendants' products are pre-moistened cloths, known as wet wipes,

20 wipes, or moist towelettes, that can be used for personal hygiene, child care needs, pet care, or

21 cleaning. The pre-moistened wipes at issue in this case are the Charmin Freshmates® Flushable

22 Wipes ("Charmin Wipes").

23       19.    Throughout the class period, all packages of the Charmin Wipes state that the

24 wipes are "flushable," despite the fact that the Charmin Wipes have never been and continue not

25 to be suitable for flushing.

26       20.    For example, on the front of the Charmin Wipes package, Defendants advertise the

27 product as "flushable wipes."

28

-3-



On the back of the package, Defendants falsely represent that the wipes are "Septic Safe," "flushable," and "Safe for sewer and septic systems."

21.    Nowhere on the package of Charmin Wipes do Defendants disclose that the wipes: (i) are not suitable for disposal by flushing down a toilet; (ii) are not regarded as flushable by municipal sewage system operators; (iii) do not disperse, i.e. break apart, in the sewer system like toilet paper; and (iii) after they are flushed, they routinely clog and damage plumbing pipes, fail to properly break down in septic tanks, damage septic pumps, catch on screens in municipal sewage lines and must be removed from the sewer system for disposal in landfills, and damage municipal sewage lines and pumps, often due to the proclivity of the wipes to tangle with each other, tree branches, rocks, and other non-flushable items, and form large masses or ropes.

22.    Defendants intend for consumers to understand that the Charmin Wipes are a flushable product, i.e., one that is specially designed to be suitable to flush in all instances, and have consistently marketed the product in that manner throughout the class period.  For example, in marketing the Charmin Wipes, Defendants have never advised consumers that the wipes may not be suitable for flushing in certain toilets, plumbing systems, and/or municipal wastewater systems. In other words, Defendants sell the product as one that is specially designed to be suitable to flush by consumers in any home in any location, and not as a product intended to work only as promised under unique and specified circumstances.

-4-

23.     While at times, Defendants have printed in small font a disclaimer advising consumers that "for best results," they should flush only one or two wipes at a time, this disclaimer has never appeared on the front of the package, nor has it ever appeared in conspicuous location on the package. Rather, when this disclaimer appears on the packaging, Defendants place it on the back of the package, where consumers are unlikely to view it. Moreover, even when flushed in that manner – one or two at at time – the Charmin Wipes are still not flushable, as they will damage or clog pipes, septic systems, and sewage lines and pumps, and do not disperse like toilet paper.

24.     Defendants' misrepresentations appear in all their advertising for Charmin Wipes. For example, on the Charmin website, Defendants falsely inform consumers that "Charmin Freshmates wipes are flushable and safe for sewers and septic systems." *See* http://www.charmin.com/frequently-asked-questions-about-charmin-toilet-paper.aspx (last accessed March 24, 2015). Nowhere on the Charmin website do Defendants disclose that the wipes are not suitable for disposal by flushing down a toilet, are not regarded as flushable by municipal sewage system operators, do not disperse upon flushing, and that they routinely damage or clog plumbing pipes, septic systems, and sewage lines and pumps.

25.     To induce consumers into relying on the false representation that the Charmin Wipes are "flushable," Defendants' longstanding ad campaigns routinely inform consumers that the wipes are a useful part of good bathroom habit. For example, on the Charmin website, P&G states:

> Ever feel like something's missing? Find your better half with Charmin Freshmates. These flushable wet wipes provide a cleaner clean than dry bath tissue alone. When two things are so good together, why keep them apart? Pair your Charmin toilet paper with Charmin Freshmates to feel fresh and clean.

http://www.charmin.com/freshmates-flushable-wipes.aspx (last accessed March 24, 2015). Defendants also instruct their retailers to place the Charmin Wipes next to the Charmin toilet paper when displayed in stores. The result is that consumers believe that the wipes are flushable like toilet paper, when in fact, they are not suitable for flushing down a toilet.

26.     In marketing the Charmin Wipes to consumers as a product to use as part of a bathroom routine, Defendants know that consumers will be more likely to purchase the product in

1   addition to, or instead of, toilet paper if they believe the product is suitable for flushing down a

2   toilet. Thus, for the Charmin Wipes, Defendants intend for consumers to rely on the

3   representation that the product is "Flushable." Defendants further intend for consumers to rely on

4   the omissions that the Charmin Wipes are not suitable for disposal by flushing down a toilet, and

5   that the wipes are: (i) not regarded as flushable by municipal sewage system operators; (ii) do not

6   disperse like toilet paper; and (iii) after they are flushed, they routinely clog and damage

7   plumbing pipes, septic pumps, catch on screens in municipal sewage lines and must be removed

8   from the sewer system for disposal in landfills, and clog and damage municipal sewage lines and

9   pumps.

10      27.     Because consumers believe the wipes are suitable for flushing down a toilet and

11   purchase them for that convenience, Defendants are able to charge a premium for the Charmin

12   Wipes. For example, on Amazon.com, a bundle of Charmin Wipes containing 10 packages of 24

13   wipes each retails for $29.39 or 12 cents a wipe, 33% more per wipe than a comparable package

14   of Wet Ones, which are not advertised as "flushable," where consumers can buy 12 packages of

15   15 wipes each for $16.28, or 9 cents a wipe.

16      28.     If consumers knew that the Charmin Wipes were not suitable for flushing down a

17   toilet, they would not pay a premium for the product, but rather, would opt to purchase cheaper,

18   non-flushable items and dispose of them in trash cans.

19   <u>**(2) The Charmin Wipes Are Not Flushable**</u>

20   <u>**(2)(a) "Flushable" Means "Suitable For Disposal by Flushing Down a Toilet"**</u>

21      29.     As defined by Webster's Dictionary, "flushable" means "suitable for disposal by

22   flushing down a toilet."

23      30.     Many objects and materials theoretically will pass from the toilet to sewer pipes

24   after being flushed, such as food scraps, jewelry, small toys, golf balls or cotton swabs, but that

25   does not make such objects or materials "flushable." Rather, the word "flushable" means not just

26   that the object or material is capable of passing from the toilet to sewer pipes, but that the object

27   or material is *appropriate or suitable* to flush down a toilet for purposes of disposal via the sewer

28   or septic system. The concept that "flushable" means that a product safely passes from home

-6-

1    toilet to its endpoint, either by properly disintegrating in a septic tank or passing without incident

2    to the municipal sewer system, is one that is uniformly accepted by wastewater treatment system

3    operators and the wipes industry.

4        31.     For example, in 2003, Defendants' published a document entitled Protocols to

5    Assess the Breakdown of Flushable Consumer Products. There, Defendants stated that a

6    "flushable" product is one that "is able to pass through the toilet bowl and household drain line, is

7    compatible with onsite and municipal wastewater treatment systems, and disintegrates such that it

8    is not recognizable in the environment over a reasonable period of time."

9        32.     Defendants' definition of flushable is consistent with industry usage and has been

10    throughout the class period. P&G is a member of the Association of the Nonwoven Fabrics

11    Industry ("INDA"), which publishes a reference document for the industry called "Guidance

12    Document for Assessing the Flushability of Nonwoven Disposable Products" ("INDA

13    Guidelines"). Each version of the INDA Guidelines has used a definition of "flushable" that is

14    similar as the one used by Defendants. For example, in the most recent edition of the INDA

15    Guidelines, the Third Edition published in June 2013, INDA included the following:

16

17
18                         **Definition of Flushability**

For a product to be deemed flushable there must be evidence indicating that it:
- Clears toilets and properly maintained drainage pipe systems when the suppliers' recommended usage instructions are correctly followed;
- Passes through wastewater conveyance systems and is compatible with wastewater treatment, reuse and disposal systems without causing system blockage, clogging or other operational problems;
- Is unrecognizable in effluent leaving onsite and municipal wastewater treatment systems and in digested sludge from wastewater treatment plants that are applied to soil.

22

23    http://www.inda.org/wp-content/uploads/2013/06/GD3-and-Code-of-Practice_Executive-

24    Summary_June-2013-FINAL.pdf (last accessed March 24, 2015). Earlier editions of the

25    guidelines contained similar definitions.

26        33.     The Industry's definition of the term "flushable" is consistent with the generally

27    accepted consumer understanding of the word. Reasonable consumers understand "flushable" to

28    mean suitable for disposal by flushing down a toilet.

34. The State of California also accepts that the term "flushable" considers the entire process from home toilet to wastewater treatment. To ensure that only "flushable" products are flushed, the State of California has made it illegal "to deposit, by any means whatsoever, into a plumbing fixture, floor drain, interceptor, sump, receptor, or device, which is connected to a drainage system, public sewer, private sewer, septic tank, or cesspool, any ashes; cinders; solids; rags; inflammable, poisonous, or explosive liquids or gases; oils; grease; or any other thing whatsoever that is capable of causing damage to the drainage system or public sewer." California Code of Regulations, Title 24, Part 5, Chapter 3, California Building Standards, Sec. 305.1.

### (2)(b) Products That Do Not Disperse Upon Flushing Are Not Flushable

35. The only products that uniformly do not damage damage plumbing pipes and pumps, septic tanks, and/or municipal sewage lines and pumps are products such as toilet paper that disperse quickly in wastewater, i.e., break apart entirely into unrecognizable particles within a minute or two of being flushed. The benefits of a quickly dispersing product are that it will not tangle with other items in the sewer, cause clogs or damage to plumbing pipes, septic or municipal sewer pumps, or otherwise need to be removed from screens in the wastewater treatment system or filtered out of wastewater prior to treatment. On the other hand, products that do not disperse or are slow to disperse cannot safely be flushed or be considered flushable. When these materials remain in tact or in larger pieces, they are prone to tangling with one another and with other debris, forming large ropes or masses that can cause pipe blockages. In addition, larger pieces are more likely to get caught on screens and filters in the municipal wastewater system and must be removed and disposed of in a landfill. Large pieces also clog municipal sewer pumps, resulting in damage and the need for costly repairs. As a result of the potential for damage resulting from flushing non-dispersing products, any product that does not efficiently disperse in wastewater is not flushable, and is "capable of causing damage to the drainage system or public sewer," rendering it illegal to flush under California law.

36. Because products that do not disperse quickly like toilet paper can and do cause damage to septic systems and public wastewater systems, water treatment professionals and organizations unanimously agree that to be labeled "flushable," a product must disperse quickly

1  like toilet paper. These organizations have routinely criticized the labeling of non-dispersing

2  wipes, such as the Charmin Wipes, as flushable. For example, the Water Environment Federation

3  (WEF), a nonprofit association of water quality professionals, has explained which products

4  should be labeled as "flushable":

5  
> The industry reference for dispersability is two-ply toilet paper ... [which] starts
> to break apart when the toilet is flushed and is indistinguishable in the wastewater
6  
> system in a matter of seconds...Anything labeled as flushable should start to
> break apart during the flush and completely disperse within 5 minutes... Our
7  
> mantra is, 'It's not flushable if it's not dispersible' . . .

8  *See* http://news.wef.org/stop-dont-flush-that/ (last accessed February 26, 2014) (internal

9  quotations omitted). WEF further reports that consumers flush nondispersible wipes because they

10  are "mislabeled" as "flushable," when they do not disperse like toilet paper. *Id.*

11      37.    Municipal wastewater treatment operators and water protection organizations, and

12  related associations, are in agreement with WEF that the only product other than human

13  excrement suitable for disposal down a toilet is toilet paper. For example, the California

14  Association of Sanitation Agencies has stated:

15  
> Many personal hygiene wipes and cleaning products are marketed as being
> "flushable." But despite the confusing and misleading labels you should never
16  
> flush "flushable" or "disposable" products. No matter what a label says, the only
> items you should flush are human waste and toilet paper. Just because something
17  
> disappears down your toilet doesn't mean it won't cause a problem in your sewer
> pipe—or further down the line at wastewater treatment facilities. Items labeled as
18  
> "flushable" or "disposable" (even "bio-degradable" ones) can get caught on roots
> in sewer pipes and contribute to blockages, back-ups, and overflows.
19  

20      Dispose of them in the trash, not the toilet!

21  *See* http://www.casaweb.org/flushable-wipes (last accessed February 24, 2015).

22      38.    San Francisco Public Utilities Commission officials have stated that with the

23  exception of toilet paper and human waste, "Everything else should go in the trash" and should

24  not be flushed. *See* http://www.sfexaminer.com/sanfrancisco/flushable-wipes-cause-problematic-

25  backups-at-local-sewage-plants/Content?oid=2514283 (last accessed February 24, 2015).

26      39.    The East Bay Municipal Utility District states:

27  **Non-Flushable Wipes and Products**

28  *No matter if the label says "disposable" or "flushable," cleaning and personal*

-9-

*hygiene products should <u>never</u> be flushed.*

"Disposable" or "flushable" wipes and other products don't breakdown in the sewer. Instead, they get tangled and clumped in hair and debris creating massive obstructions in the sewers. **Remember... your toilet is not a trash can!**

*See* https://www.ebmud.com/water-and-wastewater/pollution-prevention/residential-pollution-prevention (last accessed February 26, 2015).

40.     The City of Carlsbad Wastewater Superintendent Don Wasko has stated:

They may be called flushable, but they can do severe damage to our sewer system . . . These cloth wipes don't break down in the sewer system the same way that toilet paper does.

*See* http://news.carlsbadca.gov/news/flushable-wipes-and-other-things-you-should-not-flush (last accessed February 24, 2015).

41.     And in Contra Costa, County, the Central Contra Costa Sanitary District has said that pre-moistened wipes are not flushable because "they don't break down as quickly as toilet paper and that's really the standard for flush-ability, as far as we're concerned." *See* http://sanfrancisco.cbslocal.com/2013/07/17/cleaning-wipes-used-in-homes-and-offices-clogging-bay-area-sewer-pipes/ (last accessed March 30, 2015).

42.     Wastewater treatment operators outside of California have issued similar statements. For example, operators of the wastewater treatment system in Pima County, Arizona, issued a release stating that, "Unfortunately, disposable wipes are rarely, if ever, biodegradable in the sanitary sewer system. They just aren't in there long enough to break down." *See* http://www.insidetucsonbusiness.com/blogs/save-yourselves-stop-flushing-flushable-wipes/article_e4db48de-312f-11e3-843e-001a4bcf887a.html (last accessed March 30, 2015).

### (2)(c) The Charmin Wipes Are Not a Flushable Product.

43.     Even though Defendants advertise the Charmin Wipes as "flushable," and intend for this representation to mean that they are suitable for disposal by flushing down a toilet without harming septic tanks or sewer systems, the Charmin Wipes are not in fact flushable.

44.     First, the Charmin Wipes are not designed to break apart or disperse in water, but rather are specially manufactured to remain strong and durable while wet. In fact, throughout the class period, the Charmin Wipes have been manufactured using a spunlaced wetlaid paper, which

1  is made by mechanically intertwining wood and pulp fibers using water jets, and thus, designed to

2  withstand months of soaking in a wet environment. A consumer who purchases the Charmin

3  Wipes will find, upon opening the package, sheets of moist paper, dampened by a coating of wet

4  lotion. Because weeks, months, or longer will pass between the time a Charmin Wipe is

5  manufactured and the time at which it is ultimately used by a consumer, the paper used to

6  manufacture it must be strong enough to sit in a still, wet environment for extremely long periods

7  of time. Thus, in selecting the paper used to manufacture their Charmin Wipes, Defendants

8  intentionally selected a paper that is strong enough to withstand months of soaking in wet

9  environment and cannot possibly efficiently disperse when placed in more water.

10  45.  Second, while Defendants acknowledge and admit that a "flushable" product must

11  be one that is compatible with wastewater treatment facilities, as well as home plumbing and

12  septic systems, Defendants have for years intentionally ignored wastewater treatment operators

13  and organizations which state that only dispersible products are flushable. Instead of using

14  standards and guidelines recommended by those actually treating wastewater, Defendants have

15  elected to test "flushability" using the flawed INDA Guidelines, which Defendants participated in

16  drafting, and which were engineered to ensure that Defendants' wipes can pass them. Thus, while

17  the Charmin Wipes may be able to pass a self-serving set of guidelines, the guidelines are heavily

18  flawed and do not adequately measure whether a product is safe for disposal by flushing down a

19  toilet.

20  46.  For example, the Charmin Wipes purportedly have passed the "Slosh Box

21  Disintegration Test" or "FG502" test appearing in the Third Edition of the INDA Guidelines.

22  The test purports to measure dispersability, as it assesses the potential for a product to disintegrate

23  when it is submerged in water and subjected to agitation. To conduct the test, the subject material

24  is placed in a box of tap water. Testers then mechanically agitate the water, and time how long it

25  takes for the test material to disintegrate. But the test is rigged so that even non-dispersible

26  products pass it: Defendants and INDA have agreed that the standard for "passing" this test is not

27  whether the product mimics the flushable and dispersible toilet paper or even that the product will

28  break down during or shortly after a flush. Rather, the test only requires that after **three hours of**

1   **agitation** in the slosh box, more than **25%** of the wipe passes through a 12.5 millimeter (roughly

2   a half inch) sieve **80%** of the time. *See* http://www.njwea.org/pdf/2013-guidelines-for-assessing-

3   the-flushability-of-disposable-nonwoven-product.pdf (last accessed March 24, 2015) (emphasis

4   added).  In other words, the test is still passed even if *after more than **three hours** of agitation,*

5   *nearly **three-quarters** of the material is **unable** to pass through the sieve.* In "real world" terms,

6   this means that wipes that pass the slosh box test can still be 75% in tact and are prone to catching

7   on screens in the wastewater treatment system, preventing wastewater from moving through

8   sewer pipes efficiently, and must be removed from the wastewater system and disposed of in

9   landfills.

10          47.     When subjected to the Slosh Box Disintegration Test, a typical piece of toilet

11  paper begins to break down as soon as the water in the slosh box begins to move, and is

12  completely dispersed within in a few seconds. *See* http://www.consumerreports.org/cro/video-

13  hub/home--garden/bed--bath/are-flushable-wipes-flushable/16935265001/22783507001/ (last

14  accessed March 30, 2015). Thus, when flushed down a toilet, toilet paper will typically break

15  apart within seconds after flushing. *Id.* The Charmin Wipes require a much longer time to start to

16  break apart, i.e., they do not efficiently disperse. However, Defendants and INDA have agreed

17  that non-dispersible products such as the Charmin Wipes can be labeled as "flushable" provided

18  they pass the much weaker Slosh Box test standard.

19          48.     Wastewater treatment operators criticize the Slosh Box Disintegration Test as it

20  does not properly mimic the force and movement of products through the wastewater system. As

21  one professional noted, the test is "a lot more turbulent than the flow that you find in a wastewater

22  pipe." http://www.nytimes.com/2015/03/15/nyregion/the-wet-wipes-box-says-flush-but-the-new-

23  york-city-sewer-system-says-dont.html?_r=0 (last accessed March 24, 2015). Another explained

24  that the Slosh Box Disintegration Test is "way more violent than you would see in a sewer" and

25  that it "is not acceptable to the wastewater industry because it is too long (three hours), too

26  aggressive, and does not replicate the flow conditions in a gravity sewer.

27  http://www.aeanj.org/aea-uploads/28932_Fall_low_res.pdf (last accessed March 24, 2015).

28  Because sewer systems typically move sewage to the plant via gravity, the water flow is more

1  gentle and therefore not as hard on the wipes as the agitating water in the Slosh Box

2  Disintegration Test, meaning that the wipes will not break down as quickly in actual conditions as

3  they do in Defendants' lab simulated tests.

4      49.     The Slosh Box Disintegration Test is further flawed because wastewater utility

5  officials say that wipes can reach a sewage treatment pump in as quickly as a few minutes, much

6  faster than the hours needed for Defendants' wipes to begin to break down. *See*

7  http://www.washingtonpost.com/local/trafficandcommuting/flushable-personal-wipes-clogging-

8  sewer-systems-utilities-say/2013/09/06/9efac4e6-157a-11e3-a2ec-b47e45e6f8ef_story.html (last

9  accessed March 30, 2015). Further, the moist lotion used in manufacturing the wipes results in

10 them traveling faster through sewer pipes than ordinary products. *See*

11 http://www.woai.com/articles/woai-local-news-119078/disposable-wipes-causing-nightmare-for-

12 san-11718265/ (last accessed February 26, 2014).

13     50.     Because the wipes are always intact after a few minutes, and largely intact even

14 after hours of agitation, they arrive at wastewater treatment facilities intact, where they create the

15 problems described below in paragraphs 57-69.

16     51.     The other tests run as part of the INDA Guidelines are similarly flawed. For

17 example, both the Slosh Box Disintegration Test described in paragraph 46 and the "Aerobic

18 Biodisintegration" FG505 test, assess the wipes' ability to disintegrate under constantly agitated

19 water. *See* http://www.njwea.org/pdf/2013-guidelines-for-assessing-the-flushability-of-

20 disposable-nonwoven-product.pdf (last accessed March 24, 2015). Since the Charmin Wipes are

21 unlikely to be subjected to the same agitating water in actual conditions as they are subjected to in

22 Defendants' lab, the tests are not reliable predictors of whether the Charmin Wipes are suitable

23 for flushing down a toilet. The result is that many of the Charmin Wipes arrive at the sewage

24 treatment plant intact or insufficiently broken down.

25     52.     The tests are further flawed in that they fail to take into account the wipes'

26 propensity for "ragging." After being flushed down the toilet, the Charmin Wipes have a

27 propensity to tangle amongst one another and with other debris, and form long ropes that can fill

28 sewer lines for tens of feet. *See*

-13-

1  http://www.hsconnect.com/page/content.detail/id/590706/Concerns-on-wipes-no-laughing-
2  matter.html?nav=5005 (last accessed March 30, 2015). The tests, however, assume that wipes are
3  passing through pipes and pumps one at a time, instead of in clumps of rags and ropes. For
4  example, while the Slosh Box Disintegration Test only considers what one wipe will do, there
5  will often be multiple wipes in a pipe at a time. The bigger the mass of wipes, the slower the
6  dispersement time. *See* http://www.washingtonpost.com/local/trafficandcommuting/flushable-
7  personal-wipes-clogging-sewer-systems-utilities-say/2013/09/06/9efac4e6-157a-11e3-a2ec-
8  b47e45e6f8ef_story.html (last accessed March 30, 2015).

9       53.     In the Third Edition of the INDA Guidelines, the FG507 test, or the Municipal
10 Pump Test, was introduced. Prior to 2013, "flushable" wipes were not even tested for their
11 compatibility with municipal sewer pumps, even though a wipe's ability to pass through these
12 pumps without causing damage, clogs, and excessive power draws, is a critical component to
13 consider when analyzing whether a product is compatible with wastewater treatment systems.

14      54.     The newly added Municipal Pump Test is flawed, however. For example, to
15 conduct that test, Defendants and INDA have agreed to only introduce one wipe every ten
16 seconds into the pump to assess whether the pump can process the wipes. *See*
17 http://www.njwea.org/pdf/2013-guidelines-for-assessing-the-flushability-of-disposable-
18 nonwoven-product.pdf, p. 18 (last accessed March 24, 2015). Because the non-dispersible
19 Charmin Wipes are likely entangle with other wipes and debris, they are unlikely to enter the
20 pump one at a time. Instead, they reach the pump in larger clumps, increasing the likelihood that
21 they will break or clog it.

22      **(3) Because the Charmin Wipes Are Not Suitable For Flushing Down a Toilet, They Wreak**
23                                        **Havoc When Flushed.**

24      55.     Consumers and municipalities all over the country have complained about the
25 damage caused when flushing the Charmin Wipes.

26      56.     On Defendants' own website, various consumers have complained about damage
27 caused by flushing the Charmin Wipes. For example on August 13, 2014, one consumer wrote:
28      **Not always flushable. Be careful.**

1    I just paid $219.78 for a sewer service to snake out a clog. It turns out that the culprit was these "flushable" wipes. I had ran out of toilet paper, and ended up

2    using a container of this product as a substitute. The plumber told me that these wipes do not dissolve in old, cast iron piping. After the bill, I had to go into the basement with bleach, a bucket, mop, dust mask and a trowel to clean up the

3    mess. Disgusting work. I would advise checking your pipes before you use this product.

4

5    http://reviews.charmin.com/1769/300005/charmin-charmin-freshmates-

6    reviews.htm?sort=reviewTextLength (last accessed March 24, 2015). On November 6,

7    2013, another wrote:

8    **be careful - they WILL clog your toilet**

9    I really like these, great for the kids and adults, however they did clog our toilet causing a flood in our basement of sewage. Roto Rooter came and fixed and could

10   point to these being the cause. They said they have this issue a lot with these (not brand specific). As my mom always says do not flush ANYTHING down the

11   toilet except TP.

12   Id. And on February 16, 2015, another consumer wrote:

13   **No safe for sewer**

14   Great for cleaning, nightmare for your sewage. Spent $300 to clear out a main line clog on my 5 month old new home because of wipes. Will never use again.

15

16   Id.

17       57.    When consumers flush non-dispersible "flushable" wipes, including the Charmin

18   Wipes, municipalities also pay a heavy cost, which are ultimately passed on to taxpayers. For

19   example, in Bakersfield, California, crews of three or four workers must regularly visit the city's

20   52 sewage lift stations to cut up the balls of wipes that clog the lift stations. If they do not, there is

21   a risk that back flow damage will spill inside homes. As a result of all the problems he has

22   observed, Mike Connor, Street Superintendent at Public Works in Bakersfield has stated "There's

23   no safe brand for disposables, none of them break down." *See*

24   http://www.turnto23.com/news/local-news/bakersfield-sewer-systems-keep-getting-clogged-

25   because-of-flushable-bathroom-wipes-092413 (last accessed March 25, 2015).

26       58.    In Orange County, California, the Sanitation District recorded 971 "de-ragging"

27   maintenance calls to remove wipes from ten pump stations in a single year at a cost of $320,000.

28   http://www.contracostatimes.com/news/ci_24156213/popular-bathroom-wipes-blamed-sewer-

clogs (last accessed March 25, 2015).

59.      The San Francisco Public Utilities Commission has documented the pipe-clogging wipes that the crews must break up:



http://www.sfexaminer.com/sanfrancisco/flushable-wipes-cause-problematic-backups-at-local-sewage-plants/Content?oid=2514283 (last accessed March 25, 2015). The City of San Francisco spends $160,000 a year to remove wipes and debris. *Id.*

60.      In 2012, thirty percent of the sewage overflows in Contra Costa County were caused by "flushable wipes." http://articles.chicagotribune.com/2013-10-08/news/ct-tl-1010-s-tinley-park-flushables-20131009_1_baby-wipes-flushable-toilet-paper (last accessed March 25, 2015). At one sanitation district in Contra Costa County, workers take apart pumps approximately 30 times a year to detangle debris. Before flushable wipes were introduced, such repairs were necessary just six times a year. *See* http://www.casaweb.org/news/unwelcome-junk-keeps-sewer-line-workers-busy (last accessed March 25, 2015).

61.      Outside of California, the story is much the same. New York City has spent $18 million in the last five years on wipe-related equipment problems, noting that the volume of

1   materials extracted from screening machines at the city's wastewater treatment plants have more
2   than doubled since 2008 due to consumers flushing non-dispersible wipes.
3   http://www.nytimes.com/2015/03/15/nyregion/the-wet-wipes-box-says-flush-but-the-new-york-
4   city-sewer-system-says-dont.html?_r=1 (last accessed March 25, 2015).

5          62.     The city of Vancouver, Washington, has been forced to spend more than $1
6   million over the last five years to respond to problems created from the increased use of
7   "flushable" wipes. *See* http://www.kctv5.com/story/23508880/flushable-wipes-clog-sewer-lines
8   (last accessed March 25, 2015). In particular, the city has spent $810,000 on new equipment,
9   $140,00 on electricity wasted through inefficiencies created by running clogged pumps, $480,000
10  in field labor to unclog pumps, and about $100,000 in engineering and administrative support.
11  *See* http://news.wef.org/wipes-in-pipes-cause-costly-problems-for-water-resource-recovery-
12  facilities/ (last accessed March 25, 2015).

13         63.     In Illinois, the Downers Grove Sanitary District spent $30,000 last year to repair a
14  pump clogged by wipes, and an additional $5,000 to install vibration monitoring equipment to
15  alert staff to new blockages. *See* http://news.wef.org/wipes-in-pipes-cause-costly-problems-for-
16  water-resource-recovery-facilities/ (last accessed March 25, 2015).  Despite this upgrade, the
17  wipes continue to accumulate in the lift station, and additional equipment may need to be
18  installed. *Id.*

19         64.     Outside of Washington, D.C., the Washington Suburban Sanitary Commission has
20  spent more than $1 million over five years installing heavy duty grinders to try to address the
21  problem. http://www.contracostatimes.com/news/ci_24156213/popular-bathroom-wipes-blamed-
22  sewer-clogs (last accessed March 25, 2015). In addition, the organization has started using a
23  modified shopping cart to catch the wipes before they reach the pumps and clog equipment,
24  which arrive intact at the treatment facility:

25

26

27

28



65.     Once at the municipal treatment plant, the wipes will clog pipes and pumps.  It can take hours to unclog them, and is very expensive.  The city of Jacksonville Beach estimates that the consumers are paying for the wipes multiple times – in plumbing costs and increased tax expenditures. *See* http://www.news4jax.com/news/officials-flushable-wipes-clog-pipes/-/475880/23740904/-/t5h2vrz/-/index.html (last accessed March 25, 2015). The city has released a photo that demonstrates the extent to which the wipes have clogged the pumps:



*Id.*

66.     In Hillsborough, Florida, the sewage treatment facility has hooked ropes to pumps that are plagued by clogs from the wipes.  Every day, teams of plant maintenance mechanics and other workers remove the wipes using the hooks, so that they can cut and untangle the wipes, which resemble "mop strings," using pliers, screwdrivers, and cutters. http://www.tampabay.com/news/humaninterest/flushable-bathroom-wipes-get-blame-for-sewer-clogs/2144911 (last accessed March 25, 2015).

67.     In San Antonio, Texas, the San Antonio Water System has said that flushable

1   wipes are clogging up sewers in ways in which sewer workers have never seen before. *See*

2   http://www.woai.com/articles/woai-local-news-119078/disposable-wipes-causing-nightmare-for-

3   san-11718265/ (last accessed March 25, 2015). Sewer workers are responding to dozens of clogs,

4   and to repair, they retrieve large "rope like mass[es]" from the pipes. *Id.*

5          68.    In Arkansas, the Jacksonville Wastewater Utility has found that wipes wreak the

6   most havoc on pumps, causing thousands of dollars in damages. Years ago, the town would

7   remove pump clogs once or twice a year, but since the flushable wipes have become popular

8   among consumers, the town must remove pump clogs several times a month. *See*

9   http://www.arkansasmatters.com/story/wastewater-treatment-facilities-waging-war-with-

10  wipes/d/story/1ZNQd1uAZECshHMb5daErA (last accessed March 25, 2015). The city spends

11  thousands of dollars a year to address pump clogs. *Id.*

12         69.    Defendants repeatedly have insisted that these problems are caused by other non-

13  flushable products, and not their wipes. But sewer officials have noted that the growing problems

14  with sewer clogs have coincided with the growing sales of flushable wipes.

15  http://www.contracostatimes.com/news/ci_24156213/popular-bathroom-wipes-blamed-sewer-

16  clogs (last accessed March 25, 2015). And sewer officials in Vancouver, Washington dyed

17  several kinds of wipes to see what happens once they enter the sewer system, and found that

18  wipes labeled "flushable" were still intact after traveling a mile through sewage pipes.

19         **(3) Defendants Intend To Continue To Market And Sell Non-Flushable Products as "Flushable"**

20         70.    Defendants' marketing campaign has been extremely successful. The market for

21  flushable wipes is projected to grow 12.1% annually to reach $2.4 billion by 2018.

22  http://www.giiresearch.com/report/apex279326-future-flushable-wipes.html (last accessed March

23  25, 2015). Charmin is a popular brand, and the Charmin Wipes are sold in grocery stores and big

24  box stores throughout California and the country. Because of the big potential for sales,

25  Defendants have no incentive to stop selling "flushable" products or change their disclaimers to

26  discourage sales.

27         71.    Because Defendants know consumers rely on representations about flushability on

28  product packaging, even when presented with warnings from local wastewater treatment

-19-

1 │ authorities, Defendants have opposed both mandatory and voluntary standards that would require
2 │ Defendants to provide more information to consumers about the risks associated with flushing the
3 │ Charmin Wipes. For example, while the INDA Guidelines and industry definition of "flushable"
4 │ is conditioned upon usage instructions being correctly followed, INDA does not encourage, nor
5 │ do Defendants actually print, disclaimers and usage instructions in a conspicuous location on the
6 │ front of the package where consumers are most likely to read the information.

7 │      72.    The INDA Guidelines are voluntary. While wastewater treatment professionals
8 │ and legislatures want, at a minimum, for the guidelines to be mandatory, so far, INDA has not
9 │ acceded to their requests.

10 │      73.    Defendants, through INDA, have also opposed legislative efforts to regulate the
11 │ labeling of products as flushable, even where those laws put in place weakened standards for
12 │ "flushability. For example, in 2010, a bill was proposed in the California Senate that would
13 │ regulate the use of the term "flushable." That bill, A.B. 2256, made it unlawful to label as
14 │ flushable any product that did not adhere to the same INDA Guidelines that Defendants have
15 │ claimed that they follow. But INDA opposed the measure, and the legislative history
16 │ demonstrates that Defendants did not separately file any statement of support. See
17 │ http://www.leginfo.ca.gov/pub/09-10/bill/asm/ab_2251-
18 │ 2300/ab_2256_cfa_20100617_172920_sen_comm.html (last accessed March 24, 2015). Similar
19 │ bills have been proposed in other states, including Maine and New Jersey, though all have been
20 │ opposed by INDA and none have been successful.

21 │      74.    Wastewater treatment operators have criticized the industry's failure to accept that
22 │ dispersibility is an essential part of flushability, and have stated that the Third Edition of the
23 │ INDA Guidelines "may be a step backwards" from previous editions. See
24 │ http://www.weat.org/Presentations/04%20Villee_Non-dispersibles.pdf (last accessed March 31,
25 │ 2015).

26 │ **PLAINTIFF'S EXPERIENCE**

27 │      75.    Plaintiff is a consumer of Charmin brand toilet paper. While shopping in Target in
28 │ California in 2014, Plaintiff noticed the Charmin Wipes. She was interested in the fact that the

1  product was a pre-moistened wipe, and read on the package that the wipes were "flushable." On
2  that basis, she decided to buy the Charmin Wipes for personal use.

3      76.    Plaintiff purchased the wipes on a few occasions in 2014, typically paying around
4  three or four dollars per package. On several occasions, the wipes clogged her toilet when
5  flushed. The wipes repeatedly required multiple flushes to clear her toilet bowl.

6      77.    Plaintiff later learned that use of flushable wipes such as the Charmin Wipes has
7  damaged home plumbing systems and wastewater treatment facilities in municipalities all over
8  the country. Had she known of the risk of clogging, as well as the expensive plumbing repairs and
9  damage that the wipes cause, Plaintiff would not have purchased the Charmin Wipes, or at a
10 minimum, would not have paid a premium for them.

11     78.    Had Defendants not misrepresented (by omission and commission) the true nature
12 of their "Flushable" Products, Plaintiff would not have purchased Defendants' product.

13     79.    Plaintiff continues to desire to purchase wipes suitable for flushing from
14 Defendants. She regularly visits stores where Defendants' "flushable" wipes are sold. Without
15 purchasing and attempting to flush a Charmin Wipe, Plaintiff is unable to determine if the wipes
16 are flushable. Plaintiff understands that the design and construction of the Charmin Wipes may
17 change over time or Defendants may respond to pressure from wastewater treatment operators,
18 legislators, government agencies, competitors, or environmental organizations. But as long as
19 Defendants may use the word "flushable" to describe non-flushable wipes, then when presented
20 with Defendants' packaging, Plaintiff continues to have no way of determining whether the
21 representation "flushable" is in fact true. Thus, Plaintiff is likely to be repeatedly presented with
22 false or misleading information when shopping and unable to make informed decisions about
23 whether to purchase the wipes. She is further likely to be repeatedly misled by Defendants'
24 conduct, unless and until Defendants are compelled to ensure that their wipes packaged as
25 flushable truly are dispersible and suitable for flushing.

26                              **CLASS ALLEGATIONS**

27     80.    Plaintiff brings this action against Defendants on behalf of herself and all others
28 similarly situated, as a class action pursuant to section 382 of the California Code of Civil

-21-

1   Procedure and section 1781 of the California Civil Code. Plaintiff seeks to represent a group of

2   similarly situated persons (the "Class"), defined as follows:

3           All persons who, between April 6, 2011 and the present, purchased in
            California the Charmin Freshmates Flushable Wipes ("Charmin Wipes").

4         81.     This action has been brought and may properly be maintained as a class action

5   against Defendants pursuant to the provisions of California Code of Civil Procedure section 382

6   because there is a well-defined community of interest in the litigation and the proposed class is

7   easily ascertainable.

8         82.     Numerosity: Plaintiff does not know the exact size of the class, but it is estimated

9   that it is composed of more than 100 persons. The persons in the class are so numerous that the

10  joinder of all such persons is impracticable and the disposition of their claims in a class action

11  rather than in individual actions will benefit the parties and the courts.

12        83.     Common Questions Predominate: This action involves common questions of law

13  and fact to the potential class because each class member's claim derives from the deceptive,

14  unlawful and/or unfair statements and omissions that led Defendants' customers to believe that

15  the Charmin Wipes were flushable.  The common questions of law and fact predominate over

16  individual questions, as proof of a common or single set of facts will establish the right of each

17  member of the Class to recover. Among the questions of law and fact common to the class are:

18        a)     Whether Defendants' Charmin Wipes are suitable for flushing down a toilet;

19        b)     Whether Defendants unfairly, unlawfully and/or deceptively failed to

20  inform class members that their Charmin Wipes are not suitable for flushing;

21        c)     Whether Defendants' advertising and marketing regarding their Charmin

22  Wipes sold to class members was likely to deceive class members or was unfair;

23        d)     Whether Defendants engaged in the alleged conduct knowingly, recklessly,

24  or negligently;

25        e)     The amount of revenues and profits Defendants received and/or the amount

26  of moneys or other obligations lost by class members as a result of such wrongdoing;

27        f)     Whether class members are entitled to injunctive and other equitable relief

28  and, if so, what is the nature of such relief; and

1         g)     Whether class members are entitled to payment of actual, incidental,

2 consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the

3 nature of such relief.

4       84.     Typicality:  Plaintiff's claims are typical of the class because, in 2014, she

5 purchased at least one package of the Charmin Wipes, in reliance on Defendants'

6 misrepresentations and omissions that they were flushable. Thus, Plaintiff and class members

7 sustained the same injuries and damages arising out of Defendants' conduct in violation of the

8 law.  The injuries and damages of each class member were caused directly by Defendants'

9 wrongful conduct in violation of law as alleged.

10      85.     Adequacy:  Plaintiff will fairly and adequately protect the interests of all class

11 members because it is in her best interests to prosecute the claims alleged herein to obtain full

12 compensation due to her for the unfair and illegal conduct of which she complains. Plaintiff also

13 has no interests that are in conflict with or antagonistic to the interests of class members. Plaintiff

14 has retained highly competent and experienced class action attorneys to represent her interests

15 and the interests of the class. By prevailing on her own claim, Plaintiff will establish Defendants'

16 liability to all class members. Plaintiff and her counsel have the necessary financial resources to

17 adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their

18 fiduciary responsibilities to the class members and are determined to diligently discharge those

19 duties by vigorously seeking the maximum possible recovery for class members.

20      86.     Superiority:  There is no plain, speedy, or adequate remedy other than by

21 maintenance of this class action.  The prosecution of individual remedies by members of the class

22 will tend to establish inconsistent standards of conduct for the Defendants and result in the

23 impairment of class members' rights and the disposition of their interests through actions to

24 which they were not parties.  Class action treatment will permit a large number of similarly

25 situated persons to prosecute their common claims in a single forum simultaneously, efficiently,

26 and without the unnecessary duplication of effort and expense that numerous individual actions

27 world engender.  Furthermore, as the damages suffered by each individual member of the class

28 may be relatively small, the expenses and burden of individual litigation would make it difficult

Civil Code §1770(a)(5), Defendants' acts and practices constitute improper representations that the goods they sell have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have. In violation of California Civil Code §1770(a)(7), Defendants' acts and practices constitute improper representations that the goods they sell are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code §1770(a)(8), Defendants have disparaged the goods, services, or business of another by false or misleading representation of fact. In violation of California Civil Code §1770(a)(9), Defendants have advertised goods or services with intent not to sell them as advertised. Specifically, in violation of sections 1770 (a)(2), (a)(5), (a)(7) and (a)(9), Defendants' acts and practices led customers to falsely believe that that their Charmin Wipes were suitable for flushing down a toilet. In violation of section 1770(a)(8), Defendants falsely or deceptively market and advertise that, unlike products not specifically denominated as flushable, the Charmin Wipes are suitable for flushing down a toilet, when in fact none of the products are suitable for flushing.

95.     Plaintiff requests that this Court enjoin Defendants from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Defendants are not restrained from engaging in these types of practices in the future, Plaintiff and the other members of the Class will continue to suffer harm.

96.     CLRA § 1782 NOTICE. **Irrespective of any representations to the contrary in this Class Action Complaint, Plaintiff specifically disclaims, at this time, any request for damages under any provision of the CLRA.** Plaintiff, however, hereby provides Defendants with notice and demand that within thirty (30) days from that date, Defendants correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. Defendants' failure to do so will result in Plaintiff amending this Class Action Complaint to seek, pursuant to California Civil Code § 1780(a)(3), on behalf of herself and those similarly situated class members, compensatory damages, punitive damages and restitution of any ill-gotten gains due to Defendants' acts and practices.

97.     Plaintiff also requests that this Court award her costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

**PLAINTIFF'S SECOND CAUSE OF ACTION**
**(False Advertising, Business and Professions Code § 17500, *et seq.* ("FAL"))**
**On Behalf Of Herself and the Class**

98.   Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

99.   Beginning at an exact date unknown to Plaintiff, but within three (3) years preceding the filing of the Class Action Complaint, Defendants made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of their Charmin Wipes.

100.   Defendants made representations and statements (by omission and commission) that led reasonable customers to believe that they were purchasing products that could be flushed down the toilet without problem. Defendants deceptively failed to inform Plaintiff, and those similarly situated, that their Charmin Wipes were not suitable for disposal by flushing down a toilet, and that the Charmin Wipes are not regarded as flushable by municipal sewage systems; routinely damage or clog pipes, septic systems, and sewage pumps; and do not disperse like toilet paper.

101.   Plaintiff and those similarly situated relied to their detriment on Defendants' false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth in paragraphs 19-21, and 75 above. Had Plaintiff and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, refraining from purchasing Defendants' Charmin Wipes or paying less for them.

102.   Defendants' acts and omissions are likely to deceive the general public.

103.   Defendants engaged in these false, misleading and deceptive advertising and marketing practices to increase their profits. Accordingly, Defendants have engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

104.   The aforementioned practices, which Defendants have used, and continue to use, to their significant financial gain, also constitute unlawful competition and provide an unlawful

1    advantage over Defendants' competitors as well as injury to the general public.

2        105.    As a direct and proximate result of such actions, Plaintiff and the other members of

3    the Class have suffered, and continue to suffer, injury in fact and have lost money and/or property

4    as a result of such false, deceptive and misleading advertising in an amount which will be proven

5    at trial, but which is in excess of the jurisdictional minimum of this Court.

6        106.    Plaintiff seeks, on behalf of those similarly situated, full restitution of monies, as

7    necessary and according to proof, to restore any and all monies acquired by Defendants from

8    Plaintiff, the general public, or those similarly situated by means of the false, misleading and

9    deceptive advertising and marketing practices complained of herein, plus interest thereon.

10       107.    Plaintiff seeks, on behalf of those similarly situated, a declaration that the above-

11   described practices constitute false, misleading and deceptive advertising.

12       108.    Plaintiff seeks, on behalf of those similarly situated, an injunction to prohibit

13   Defendants from continuing to engage in the false, misleading and deceptive advertising and

14   marketing practices complained of herein.  Such misconduct by Defendant, unless and until

15   enjoined and restrained by order of this Court, will continue to cause injury in fact to the general

16   public and the loss of money and property in that the Defendants will continue to violate the laws

17   of California, unless specifically ordered to comply with the same.  This expectation of future

18   violations will require current and future consumers to repeatedly and continuously seek legal

19   redress in order to recover monies paid to Defendants to which Defendants are not entitled.

20   Plaintiff, those similarly situated and/or other consumers nationwide have no other adequate

21   remedy at law to ensure future compliance with the California Business and Professions Code

22   alleged to have been violated herein.

23                    **PLAINTIFF'S THIRD CAUSE OF ACTION**
                      **(Fraud, Deceit and/or Misrepresentation)**
24                       **On Behalf of Herself and the Class**

25       109.    Plaintiff realleges and incorporates by reference the paragraphs of this Class

26   Action Complaint as if set forth herein.

27       110.    In 2014, Defendants fraudulently and deceptively led Plaintiff to believe that the

28   Charmin Wipes were suitable for flushing down a toilet. Defendants also failed to inform Plaintiff

1  that the Charmin Wipes were not suitable for disposal by flushing down a toilet, and the wipes are

2  not regarded as flushable by municipal sewage systems; routinely damages or clogs pipes, septic

3  systems, and sewage pumps; and do not disperse like toilet paper.

4      111.    These misrepresentations and omissions were material at the time they were made.

5  They concerned material facts that were essential to the analysis undertaken by Plaintiff as to

6  whether to purchase Defendants' Charmin Wipes.

7      112.    Defendants made identical misrepresentations and omissions to members of the

8  Class regarding Defendants' Charmin Wipes.

9      113.    Plaintiff and those similarly situated relied to their detriment on Defendants'

10  fraudulent misrepresentations and omissions.  Had Plaintiff and those similarly situated been

11  adequately informed and not intentionally deceived by Defendants, they would have acted

12  differently by, without limitation, not purchasing (or paying less for) Defendants' Charmin

13  Wipes.

14      114.    Defendants had a duty to inform class members at the time of their purchase of

15  that the Charmin Wipes were not suitable for flushing down a toilet, and the wipes are not

16  regarded as flushable by municipal sewage systems; routinely damage or clog pipes, septic

17  systems, and sewage pumps; and do not disperse like toilet paper. Defendants omitted to provide

18  this information to class members.  Class members relied to their detriment on Defendants'

19  omissions.  These omissions were material to the decisions of the class members to purchase the

20  Charmin Wipes.  In making these omissions, Defendants breached their duty to class members.

21  Defendants also gained financially from, and as a result of, their breach.

22      115.    By and through such fraud, deceit, misrepresentations and/or omissions,

23  Defendants intended to induce Plaintiff and those similarly situated to alter their position to their

24  detriment.  Specifically, Defendants fraudulently and deceptively induced Plaintiff and those

25  similarly situated to, without limitation, to purchase their Charmin Wipes.

26      116.    As a direct and proximate result of Defendants' misrepresentations and omissions,

27  Plaintiff and those similarly situated have suffered damages, including, without limitation, the

28  amount they paid for the Charmin Wipes.

117.  Defendants' conduct as described herein was willful and malicious and was designed to maximize Defendants' profits even though Defendants knew that it would cause loss and harm to Plaintiff and those similarly situated.

## PLAINTIFF'S FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation)
### On Behalf of Herself and the Class

118.  Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

119.  In 2014, Defendants provided false and misleading information regarding the Charmin Wipes, representing that the wipes were "flushable," leading Plaintiff to believe that the Charmin Wipes were flushable, i.e., suitable for flushing down a toilet.

120.  These representations were material at the time they were made.  They concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to purchase the Charmin Wipes.

121.  Defendants made identical misrepresentations and omissions to members of the Class regarding Defendants' Charmin Wipes.

122.  Defendants should have known their representations to be false and had no reasonable grounds for believing them to be true when they were made.

123.  By and through such negligent misrepresentations, Defendants intended to induce Plaintiff and those similarly situated to alter their position to their detriment.  Specifically, Defendants negligently induced Plaintiff and those similarly situated to, without limitation, to purchase their Charmin Wipes.

124.  Plaintiff and those similarly situated relied to their detriment on Defendants' negligent misrepresentations.  Had Plaintiff and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, not purchasing (or paying less for) Defendants' Charmin Wipes.

125.  Plaintiff and those similarly situated have suffered damages, including, without limitation, the amount they paid for the Charmin Wipes. Defendants' negligent representations and omissions were a substantial factor in causing the damage.

-29-

**PLAINTIFF'S FIFTH CAUSE OF ACTION**
**(Unfair, Unlawful and Deceptive Trade Practices,**
**Business and Professions Code § 17200, *et seq*.)**
**On Behalf of Herself and the Class**

126.    Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

127.    Within four (4) years preceding the filing of this Class Action Complaint, and at all times mentioned herein, Defendants have engaged, and continue to engage, in unfair, unlawful and deceptive trade practices in California by engaging in the unfair, deceptive and unlawful business practices outlined in this Class Action Complaint. In particular, Defendants have engaged, and continue to engage, in unfair, unlawful and deceptive trade practices by, without limitation, the following:

a.    deceptively representing to Plaintiff, and those similarly situated, the Charmin Wipes were suitable for flushing down a toilet;

b.    failing to inform Plaintiff, and those similarly situated, that the Charmin Wipes were not suitable for disposal by flushing down a toilet, and the wipes are not regarded as flushable by municipal sewage systems; routinely damage or clog pipes, septic systems, and sewage pumps; and do not disperse like toilet paper.

c.    labeling the Charmin Wipes as "flushable," even though, under section 305 of the California Plumbing Code, the wipes are not actually flushable, and accordingly, have caused, induced, abetted, and contributed to illegal activity, namely, the flushing of non-flushable materials;

d.    engaging in fraud, deceit, and misrepresentation as described herein;

e.    violating the CLRA as described herein; and

f.    violating the FAL as described herein.

128.    Plaintiff and those similarly situated relied to their detriment on Defendants' unfair, deceptive and unlawful business practices. Had Plaintiff and those similarly situated been adequately informed and not deceived by Defendants, they would have acted differently by not purchasing (or paying less for) Defendants' Charmin Wipes.

1    129.    Defendants' acts and omissions are likely to deceive the general public.

2    130.    Defendants engaged in these unfair practices to increase their profits.

3    Accordingly, Defendants have engaged in unlawful trade practices, as defined and prohibited by

4    section 17200, *et seq.* of the California Business and Professions Code.

5    131.    The aforementioned practices, which Defendants have used to their significant

6    financial gain, also constitute unlawful competition and provide an unlawful advantage over

7    Defendants' competitors as well as injury to the general public.

8    132.    As a direct and proximate result of such actions, Plaintiff and the other members of

9    the Class have suffered and continue to suffer injury in fact and have lost money and/or property

10   as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount

11   which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

12   Among other things, Plaintiff, and those similarly situated, lost the amount they paid for the

13   Charmin Wipes.

14   133.    As a direct and proximate result of such actions, Defendants have enjoyed, and

15   continue to enjoy, significant financial gain in an amount which will be proven at trial, but which

16   is in excess of the jurisdictional minimum of this Court.

17   134.    Plaintiff seeks, on behalf of those similarly situated, full restitution of monies, as

18   necessary and according to proof, to restore any and all monies acquired by Defendants from

19   Plaintiff, the general public, or those similarly situated by means of the deceptive and/or unlawful

20   trade practices complained of herein, plus interest thereon.

21   135.    Plaintiff seeks, on behalf of those similarly situated, a declaration that the above-

22   described trade practices are fraudulent and/or unlawful.

23   136.    Plaintiff seeks, on behalf of those similarly situated, an injunction to prohibit

24   Defendants from continuing to engage in the deceptive and/or unlawful trade practices

25   complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained

26   by order of this Court, will continue to cause injury in fact to the general public and the loss of

27   money and property in that Defendants will continue to violate the laws of California, unless

28   specifically ordered to comply with the same. This expectation of future violations will require

-31-

1  current and future consumers to repeatedly and continuously seek legal redress in order to recover

2  monies paid to Defendants to which Defendants were not entitled. Plaintiff, those similarly

3  situated and/or other consumers nationwide have no other adequate remedy at law to ensure

4  future compliance with the California Business and Professions Code alleged to have been

5  violated herein.

6                                          **PRAYER FOR RELIEF**

7          WHEREFORE, Plaintiff prays for judgment as follows:

8          A.      On Cause of Action Number 1 against Defendants and in favor of Plaintiff

9                  and the other members of the Class:

10                 1.  for restitution and injunctive relief pursuant to California Civil

11                     Code section 1780;

12                 2   [Reserved]; and

13                 3   [Reserved].

14         B.      On Causes of Action Numbers 2 and 5 against Defendants and in favor of

15                 Plaintiff and the other members of the Class:

16                 1.  for restitution pursuant to, without limitation, the California

17                     Business & Professions Code §§ 17200, *et seq.* and 17500, *et seq.*;

18                     and

19                 2.  for injunctive relief pursuant to, without limitation, the California

20                     Business & Professions Code §§ 17200, *et seq.* and 17500, *et seq.*;

21         C.      On Cause of Action Number 3 against Defendants and in favor of Plaintiff

22                 and the other members of the Class:

23                 1.  an award of compensatory damages, the amount of which is to be

24                     determined at trial; and

25                 2.  an award of punitive damages, the amount of which is to be

26                     determined at trial.

27         D.      On Cause of Action Number 4 against Defendants and in favor of Plaintiff

28                 and other members of the Class:

1.      1. An award of compensatory damages, the amount of which is to be

2.          determined at trial;

3.    E.    On all causes of action against Defendants and in favor of Plaintiff, class

4.      members and the general public:

5.      1. for reasonable attorneys' fees according to proof pursuant to,

6.          without limitation, the California Legal Remedies Act and

7.          California Code of Civil Procedure § 1021.5;

8.      2. for costs of suit incurred; and

9.      3. for such further relief as this Court may deem just and proper.

10.                  **JURY TRIAL DEMANDED**

11. Plaintiff hereby demands a trial by jury.

12. Dated: April 6, 2015          **GUTRIDE SAFIER LLP**

13.

14.

15.

16.

17.             Adam J. Gutride, Esq.
            Seth A. Safier, Esq.

18.             Kristen G. Simplicio, Esq.
            Marie McCrary, Esq.

19.             100 Pine Street, Suite 1250
            San Francisco, California 94111

20.             **TYCKO & ZAVARREEI LLP**

21.             Lorenzo B. Cellini
            2000 L Street, N.W., Suite 808

22.             Washington, DC 20036

23.             **SPANGENBERG SHIBLEY & LIBER LLP**
            Stuart E. Scott

24.             Daniel Frech
            1001 Lakeside Avenue East, Suite 1700

25.             Cleveland, OH 44114

26.             **Attorneys for Plaintiff**

27.

28.

# EXHIBIT A

**EXHIBIT A**

I, Seth A. Safier, declare:

1.    I am an attorney licensed to practice law in the State of California and admitted to practice before this Court, and am a partner of the law firm Gutride Safier LLP. I have personal knowledge of the facts stated herein and, if called as a witness, I could and would competently testify thereto. I am counsel for Jamie Pettit, the Plaintiff in this action.

2.    I submit this Declaration pursuant to California Code of Civil Procedure section 2215.5 and California Civil Code section 1780(d).

3.    Defendant The Procter & Gamble Company (P&G) is doing business in San Francisco. Attached as Exhibit A is a true and correct copy of a listing of open positions with P&G in San Francisco, obtained from http://jobs-pg.com, for which P&G was recruiting on or around February 12, 2015. Attached as Exhibit B are true and correct copies of job descriptions for open positions at the San Francisco location of P&G, also obtained from http://jobs-pg.com.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Executed this 3rd day of April, 2015, in San Francisco, California.

/s/ Seth A. Safier       /
Seth A. Safier

-1-

SETH A. SAFIER DECLARATION RE CAL. CIV. CODE SECTION 1780(D) JURISDICTION

San Francisco jobs at P&G

2/12/15, 1:17 PM



We hire the
# PERSON
not the position.

Search Jobs [ Enter Search Terms... ]    ▶

(+) Advanced Search

P&G Jobs > San Francisco Jobs

## UsefulLinks

People & Purpose

Brands

Over 50 Years of Sustainable Progress

Choose a Region

Recruiting Blueprint

## Get to Know P&G

Our careers offer exciting new challenges,
tremendous growth and support, and a
chance to touch and improve lives daily.

## Jobs at P&G

P&G people get involved — with their
workplace, their community, their neighbors
and each other. If you want a company
whose actions reflect their ethics and
whose people live their values, P&G is an
excellent choice. Jobs at P&G await !

## Common Searches

Jobs   Columbus   **California**
**Logistics**   Careers   **Recruiting**
**Cincinnati**   Chicago
**Manufacturing**   Legal   **Research**
**Accounting**   Business Development
**Customer Service**

| Job Title | Location | Date |
|---|---|---|
| filter by job title | filter by job location | GO reset |
| Salon Professional Field Education Trainer | San Francisco, CA | 12/23/2014 |
| Sales\Customer Business Development Sales\Education Specialist | San Francisco, CA | 11/05/2014 |
| Sales\Customer Business Development Account Manager Developmental | San Francisco, CA | 10/03/2014 |
| Customer Business Development (Sales) Internship | San Francisco, CA | 07/07/2014 |



**P&G**   Our Hiring Process

① ② ③ ④ ⑤

Explore the six steps below for specific details on completing the application.

1. Contact Information   ☒
2. Education   ☒
3. Resume/Attachments   ☒
4. Questionnaire   ☒
5. Confirmation   ☒
6. Summary   ☒

Note: At any time you can save your application as a draft and come back to continue at a later time period.

## Recent P&G Openings

Sales\Customer Business Development Sales\Education Specialist - San Francisco, CA
Description: P&G serves nearly five billion people around the world and has the strongest portfolio of trusted, quality, leadershi...
Reference Code: CBD00015047-1

Sales/Customer Business Development Account Manager Diversity/Internal - San Francisco, CA
Description: Most people think of everyday actions as ordinary...
Reference Code: CBD00014995-14

Salon Professional Field Education Trainer - San Francisco, CA
Description: The Field Education Trainer will partner with assigned sales team to grow salon business through the
directed Education and Go-to-Market Strategies of Wella — the Salon Professional Division of P&G brands, products
and services within an assigned geographical territory...
Reference Code: CBD00014942-5

© 2015 P&G | We are an Equal Opportunity Employer

# EXHIBIT B



Sales\Customer Business Development Account Manager Developmental at P&G - San Francisco Entry Level Sales Jobs

2/12/15, 1:16 PM

## We hire the
# PERSON
## not the position.

Search Jobs  Enter Search Terms...

(+) Advanced Search

P&G Jobs > Entry Level Sales Jobs > San Francisco Entry Level Sales Jobs

### Useful Links

**People & Purpose**

**Brands**

**Over 50 Years of Sustainable Progress**

**Choose a Region**

**Recruiting Blueprint**

### Get to Know P&G

Our careers offer exciting new challenges, tremendous growth and support, and a chance to touch and improve lives daily.

### Jobs at P&G

P&G people get involved — with their workplace, their community, their neighbors and each other. If you want a company whose actions reflect their ethics and whose people live their values, P&G is an excellent choice. Jobs at P&G await !

### Similar Jobs

Customer Business Development (Sales) Internship - San Francisco, CA

Sales\Customer Business Development
Sales\Education Specialist -
San Francisco, CA

### Job Description

## Sales\Customer Business Development Account Manager Developmental

Apply Now

### Description

Most people think of everyday actions as ordinary. We don't. For 175 years, we have been innovating for the seemingly ordinary... detergent, toothpaste, diapers, shampoo... and so much more. All because we believe that with the benefits of our everyday products, ordinary actions can have extraordinary effects. We call this The Everyday Effect™. We believe everyone deserves an extraordinary day, every day. Join us in creating extraordinary moments every day. P&G serves approximately 4.8 billion people around the world with its brands, operates in approximately 75 countries worldwide, and has the strongest portfolio of trusted, quality, leadership brands, including Pampers®, Tide®, Pantene®, Gillette®, Oral-B®, and Old Spice®.

Are you a leader who possesses an entrepreneurial spirit, a passion for winning, and the ability to build collaborative relationships? We are looking for individuals who set priorities and follow through on commitments, who work effectively with diverse groups of people, and who demonstrate creativity, innovation, and initiative, and are excellent communicators.

P&G Sales Account Managers are essential to the business representing products from P&G's consumer business sectors of grocery, retail, wholesale or mass merchandising accounts. They can also manage our business in the professional products area with accounts such as foodservice distributors, restaurants, hotels, salons, schools, and other institutions.

In your first year as an Account Manager, you will learn about your accounts, products, industry, and the Company's business practices. Account Managers influence our customer's decisions in critical business areas by using conceptual selling techniques and data-based presentations. For consumer accounts, this involves developing assortment, shelving, pricing, and merchandising strategies, based on consumer research that gives us insight into what drives shopper purchase behavior. Account Managers design business plans which will deliver each brand volume and share objectives, and help customers to develop programs which will build the business for them and us. We are seeking candidates who are leaders, who make things happen, analytical thinkers and problem solvers, and excellent communicators. We are looking for individuals who set priorities and follow through on commitments, who work effectively with diverse groups of people, and who demonstrate creativity, innovation, and initiative.

To learn more about this career path, click here.

### Qualifications

A minimum of a bachelor's degree is required for the position. Candidates must have a graduation date no later than January 2015 and have the ability to begin January/February 2015.

Successful candidates must have a valid driver's license and be willing to travel on the job.

Since Customer Business Development/Sales people need to be within driving distance of their accounts, your assignment could require relocation.

All qualified applicants will receive consideration for employment without regard to race, color, religion, sex, national origin, protected veteran status, disability status, age, sexual orientation, gender identity and expression, marital status, citizenship, HIV/AIDS status or any other legally protected factor.

No immigration sponsorship is available for this position. Procter & Gamble does not sponsor candidates for permanent residency except in some areas that in Procter & Gamble's sole discretion require highly specialized backgrounds.

Procter & Gamble participates in e-verify as required by law.

Qualified individuals will not be disadvantaged based on being unemployed.

Requisition Number: CBD00014935

Apply Now

### Entry Level Sales Jobs

By being hired into one of our Entry Level Sales jobs at P&G, you'll be a key member of the P&G

team. Professionals at Entry Level Sales careers come from a variety of backgrounds, bringing an assortment of knowledge and skills to every area of our business.

©2013 P&G | We are an Equal Opportunity Employer

Customer Business Development (Sales) Internship at P&G - San Francisco Entry Level Sales Jobs                                                                 2/12/15, 1:17 PM



We hire the
# PERSON
not the position.

Search Jobs  [ Enter Search Terms... ]

(+) Advanced Search

P&G Jobs > Entry Level Sales Jobs > San Francisco Entry Level Sales Jobs

**Useful Links**

People & Purpose

Brands

Over 50 Years of Sustainable Progress

Choose a Region

Recruiting Blueprint

**Get to Know P&G**

Our careers offer exciting new challenges, tremendous growth and support, and a chance to touch and improve lives daily.

**Jobs at P&G**

P&G people get involved — with their workplace, their community, their neighbors and each other. If you want a company whose actions reflect their ethics and whose people love their values. P&G is an excellent choice. Jobs at P&G await!!

**Similiar Jobs**

Sales\Customer Business Development
Sales\Education Specialist -
San Francisco, CA

Sales\Customer Business Development
Account Manager Developmental -
San Francisco, CA

Job Description

## Customer Business Development (Sales) Internship

### Description

At P&G, we produce globally recognized brands, and we grow and embrace the best business leaders in the industry. For more than 175 years, we have been innovating to touch and improve consumers' lives. With a portfolio of trusted brands as diverse as ours, it is paramount our leaders are able to lead with courage the vast array of brands, categories and functions. P&G serves approximately 4.8 billion people around the world with its brands, operates in approximately 70 countries worldwide, and has the strongest portfolio of trusted, quality, leadership brands, including Always®, Ambi Pur®, Ariel®, Bounty®, Charmin®, Crest®, Dawn®, Downy®, Duracell®, Fairy®, Febreze®, Gain®, Gillette®, Head & Shoulders®, Lenor®, Olay®, Oral-B®, Pampers®, Pantene®, SK-II®, Tide®, Vicks®, Wella® and Whisper®. P&G, Building Leaders and Leadership Brands.

Are you a leader who possesses an entrepreneurial spirit, a passion for winning, and the ability to build collaborative, mutually beneficial relationships? We are looking for individuals who set priorities and follow through on commitments, who work effectively with diverse groups of people, and who demonstrate creativity, innovation, and initiative, all while being excellent communicators.

Utilizing proprietary research and industry understanding, sales interns develop and lead joint business plans for our retail, professional products, dental, chemicals, salon, or department store customers. Sales interns also achieve superior brand sales while leveraging and advancing your strategic selling skills in the process. Our internships are designed to provide students with an experience-based understanding of Customer Business Development (Sales) where you will be given real responsibility with targets, goals and objectives, right away. Interns become an important member of our customer teams, and have selling and account management responsibility.

Responsibilities during the internship include achieving superior in-store presence of our brands at assigned grocery or retail accounts, or managing our business with salon, department store, or commercial products (foodservice distributors or restaurant) accounts. Additionally, interns are assigned special projects to complete, and are expected to make meaningful contributions to the growth of our brands by completing business analyses and participating in account presentations. Interns are expected to learn and use conceptual selling techniques and data-based presentations.

We are looking for top-quality students who attend colleges and universities across the country to work for P&G during the summer of 2015.

To learn more about this career path, click here.

### Qualifications

Successful candidates must:
* Be in their Junior year of a Bachelors' degree program, and must be in good academic standing

* Have a valid driver's license

* Be willing to travel on the job and relocate throughout their career

* ~At P&G, Intern/Co-Op sessions are considered temporary employment, with a predicted ending point. No full-time employment commitments are made; however, depending on satisfactory completion of certain criteria, candidates may be considered for full-time positions upon graduation.

  *Candidates pursing Masters-level degrees are welcome to apply, however starting salary for intern and full-time candidates is established based upon achievement of the undergrad degree only.

All qualified applicants will receive consideration for employment without regard to race, color, religion, sex, national origin, protected veteran status, disability status, age, sexual orientation, gender identity and expression, marital status, citizenship, HIV/AIDS status or any other legally protected factor.

No immigration sponsorship is available for this position. Procter & Gamble does not sponsor candidates for permanent residency except in some areas that in Procter & Gamble's sole discretion require highly specialized backgrounds.

Procter & Gamble participates in e-verify as required by law.

Qualified individuals will not be disadvantaged based on being unemployed.

Requisition Number: CBD00014738

Apply Now

### Entry Level Sales Jobs

By being hired into one of our Entry Level Sales jobs at P&G, you'll be a key member of the P&G team. Professionals in Entry Level Sales careers come from a variety of backgrounds, bringing an assortment of knowledge and skills to every area of our business.

©2014 P&G | We are an Equal Opportunity Employer