**GvUTRIDE SAFIER LLP**
ADAM J. GUTRIDE (State Bar No. 181446)
SETH A. SAFIER (State Bar No. 197427)
KRISTEN G. SIMPLICIO (State Bar No. 263291)
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 271-6469
Facsimile: (415) 449-6469

**TYCKO & ZAVAREEI LLP**
LORENZO B. CELLINI
1828 L Street, N.W., Suite 2000
Washington, DC 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950

**SPANGENBERG SHIBLEY & LIBER LLP**
STUART E. SCOTT
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
Telephone: (216) 696-3232
Facsimile: (216) 696-3924

Attorneys for Plaintiff Jamie Pettit

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| JAMIE PETTIT, an individual, on behalf of herself, the general public and those similarly situated<br><br>Plaintiff,<br><br>v.<br><br>THE PROCTER & GAMBLE COMPANY; Defendant | CASE NO. 3:15-CV-02150-RS<br><br>PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF<br><br>Date: May 18, 2017<br>Time: 1:30 p.m.<br>Ctrm. 3, 17th Floor<br><br>Hon. Judge Richard Seeborg |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................................................iv

NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION..................................vii

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................1

I. INTRODUCTION ............................................................................................1

II. STATEMENT OF FACTS ..............................................................................2

    A. P&G Admits That "Flushable" Means "Suitable to Be Flushed" and "Compatible with Municipal Sewage Treatment." ...........................................................2

    B. The Freshmates Product Has Never Been Suitable To Be Flushed. ....................4

        1. Throughout the Class Period, the Freshmates Were Not Designed and Manufactured to Be Suitable to Be Flushed Or Compatible With Municipal Sewage Treatment. ...................................................................................4

        2. Freshmates Do Not Disintegrate, Disperse, or Biodegrade. ....................5

        3. P&G Worked With A Manufacturers' Trade Association To Rig Flushability Standards. ................................................................................................6

        4. Wastewater Experts Unanimously Agree That Freshmates Are Not Flushable. ............8

        5. Guidance from the Federal Trade Commission Is In Accord. ....................9

    C. Consumers Seek Out And Pay Premiums Flushable Products ...........................10

    D. Plaintiff and The Public Were Harmed at the Point of Sale. ...........................11

III. ARGUMENT ..............................................................................................12

    A. Legal Standards For Class Certification .......................................................12

    B. The Classes Satisfy the Requirements of Rule 23(a). .....................................13

        1. Numerosity Exists. ...............................................................................13

        2. There Is No Requirement That Plaintiff Identify All Class Members. .........................13

        3. Common Questions of Fact and Law Exist. .............................................14

        4. Plaintiff is Typical of Both Classes. ......................................................15

        5. The Plaintiff Will Adequately Protect the Interests of the Class. ...............17

    C. The Class Satisfies the Requirements of Rule 23(b)(3). ...................................17

        1. Common Questions Predominate About Whether P&G's Representations Were False. ...................................................................................................18

2. Common Questions on Restitution and Damages Predominate Over Individual Issues....................................................................................................21

3. A Class Action Is Superior............................................................................24

IV. CONCLUSION........................................................................................................25

Plaintiff's Motion for Class Certification

**TABLE OF AUTHORITIES**

**CASES**

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) ........................................................ 12

*Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29 (E.D.N.Y. Oct. 15, 2015) ................................ 1

*Briseno v. ConAgra Foods, Inc.*, 844 F.3d. 1121 (9th Cir. 2017)................................... 13

*Briseno v. ConAgra*, 2017 WL 53421 (9th Cir. Jan. 3, 2017) ...................................... 23

*Brockey v. Moore* 107 Cal.App.4th 86 (2003) ........................................................ 14, 20

*Brown v. Hain Celestial Grp., Inc.*, 2014 WL 6483216 (N.D. Cal. Nov. 18, 2014) .............. 20, 22

*Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013) *cert. denied,* 13-430, 2014 WL 684064 (U.S. Feb. 24, 2014)................................................................. 24

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004)................................ 25

*Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365 (N.D. Cal. 2010) ...................... 15, 22

*Colgan v. Leatherman Tool Group, Inc.*, 135 Cal.App. 4th 663 (2006).......................... 21, 22

*Comcast v. Behrend*, 133 S. Ct. 1426 (2013)........................................................ 21

*Consumer Justice Ctr. v. Olympian Labs, Inc.*, 99 Cal. App. 4th 1056 (2002) ........................... 25

*Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163 (2000) ...................................... 21

*Delarosa v. Boiron, Inc.*, 275 F.R.D. 582 (C.D. Cal. 2011) ............................................ 21

*General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982) ................................... 13, 14

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)................................................ 12

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992)................................... 15, 16

*Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909 (9th Cir. 1964) ........................... 13

*Hinojos v. Kohl's Corp.*, 718 F.3d 1098 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013) ........................................................... 19

*In re Brazilian Blowout Litig.*, 2011 WL 10962891 (C.D. Cal. Apr. 12, 2011) ...................... 21

*In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919 (C.D. Cal. 2015) .................................. 23

*In re High-Tech Employee Antitrust Litig., 985* F. Supp. 2d 1167 (N.D. Cal. Oct. 24, 2013) ........................................................................................... 24

*In re POM Wonderful LLC Marketing & Sales Practices Litig.*, 2012 WL 4490860 (C.D. Cal. Sept. 28, 2012)........................................................ 15

iv

*In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145 (2010), *as modified on denial of reh'g* (Feb. 8, 2010).......................................................................................... 19, 20

*In re Tobacco II Cases*, 46 Cal. 4th 298(2009)................................................................. 14, 19, 20

*In re Vioxx Class Cases*, 180 Cal. App. 4th 116 (2009) ........................................ 20

*In re Visa Checks/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001) ..................... 18, 25

*In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*, 722 F.3d 838, 858-59 (6th Cir. 2013) ,*cert. denied,* 13-431, 2014 WL 684065 (U.S. Feb. 24, 2014) ............................................................................................................................... 24

*Jones v. ConAgra Foods, Inc.,* 2014 WL 2702726 (N.D. Cal. June 13, 2014) ........................ 23

*Jordan v. County of Los Angeles,* 669 F.2d 1311 (9th Cir. 1982), *vacated on other grounds,* 459 U.S. 810 (1982)................................................................................. 13, 16

*Just Film v. Buono,* -- F.3d --, 2017 WL 510452 (9th Cir. 2017)........................................ 15, 16

*Kasky v. Nike, Inc.,* 27 Cal. 4th 939 (2002) ................................................................. 15

*Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal. 4th 1134, 1149 (2003) ........................... 21

*Kumar v. Salov N. Am. Corp.*, No. 14-CV-2411-YGR, 2016 WL 3844334 (N.D. Cal. July 15, 2016)........................................................................................... 14, 19, 20, 23

*Levya v. Medline Industries, Inc.,* 716 F.3d 510 (9th Cir. 2013) ..................................... 22

*Marsu, B.V. v. Walt Disney Co.,* 185 F.3d 932 (9th Cir. 1999) ..................................... 23

*Mazza v. Honda American Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) ........................... 14

*McCrary v. Elations Co., LLC,* 2014 WL 1779243 (C.D. Cal. Jan. 13, 2014)........................... 22

*Meta v. Target Corp.*, No. 4:14 CV 832, 2016 WL 5076089 (N.D. Ohio Sept. 20, 2016) ............................................................................................................................... 15

*Mullins v. Premier Nutrition Corp.*, No. 13-CV-01271-RS, 2016 WL 1535057 (N.D. Cal. Apr. 15, 2016)........................................................................................... 16, 20

*Occidental Land, Inc. v. Superior Court*, 18 Cal. 3d 355 (1976) ................................... 19

*Pulaski & Middleman, LLC v. Google, Inc.*, -- F.3d --, 2015 WL 5515617 (9th Cir. Sept. 21, 2015) ................................................................................................. 21, 22, 23

*Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523 (N.D.Cal.2012) ............................... 13, 15

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003)....................................................... 17

*Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011) ......................................... 18, 19, 20

*Vasquez v. Superior Court,* 4 Cal. 3d 800 (1971) ....................................................... 14

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ............................................. 13, 14, 18

*Williams v. Gerber Products Co.,* 552 F.3d 934 (9th Cir. 2008)....................................... 14, 15

v

*Wolph v. Acer Am. Corp.*, 2012 WL 993531 (N.D. Cal. Mar. 23, 2012) ...................................... 21

*Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087 (9th Cir. 2010) .................................... 22

*Zeisel v. Diamond Foods, Inc.*, 2011 WL 2221113 (N.D. Cal. June 7, 2011) ........................ 21, 22

**STATUTES**

Cal. Bus. & Prof.Code § 17203 ................................................................................................... 21

Cal. Bus. & Prof.Code § 17535 ................................................................................................... 21

Cal. Civ. Code § 1761 .................................................................................................................. 21

Cal. Civ. Code § 1780 .................................................................................................................. 21

Cal. Civ. Code § 3294(a) ............................................................................................................. 21

**TREATISES**

Newberg on Class Actions § 3:31 (5th ed.) ................................................................................ 16

Plaintiff's Motion for Class Certification

# NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

Please take notice that on May 18, 2017, at 1:30 p.m., or as soon thereafter as this motion may be heard, Plaintiff Jamie Pettit will, and hereby does, move, pursuant to Rule 23 of the Federal Rules of Civil Procedure, to certify the following class:

> All persons who, between April 6, 2011 and the [date of class certification], purchased in California the Charmin Freshmates Flushable Wipes (excluding purchases for purpose of resale).

The Class will pursue claims under the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq. ("UCL"); the California Legal Remedies Act, Cal. Civ. Code §§ 1750 et seq., ("CLRA"); the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 et seq. ("FAL"); and for common law fraud, deceit and/or misrepresentation.

Plaintiff further requests that the Court appoint (1) Plaintiff Jamie Pettit as class representative on all claims, and (2) Gutride Safier LLP; Tycko & Zavareei LLP; and Spangenberg Shibley & Liber LLP as class counsel. Plaintiff finally requests the Court to order the parties to meet and confer and present this Court, within fifteen (15) days of an order granting class certification, a proposed notice to the certified class.

This motion follows conferences and communications between counsel and is based upon this Notice of Motion and Motion, Memorandum of Points and Authorities, and the accompanying Declarations in support of Class Certification by the following persons:

Jamie Pettit;

Kristen Simplicio;

Adam Gutride;

Lorenzo Cellini;

Stuart Scott;

Barry Orr; and

Colin Weir.

(In the Memorandum of Points and Authorities that follows, those declarations shall be referred to by the last name of the declarant, followed with the abbreviation "Decl." (For example: "Simplicio Decl.") This Motion is also based on the pleadings and papers on file in this action

vii

and all matters of which this Court may take notice.

## I.     INTRODUCTION

This case involves Procter & Gamble's false and misleading labeling of Charmin Freshmate wet wipes as "flushable" even though they are not suitable for flushing. Because the wipes are made of thick, strong fibers, they do not disperse in the toilet (unlike toilet paper), and thus greatly increase the risk of clogs in household plumbing and municipal water treatment systems. The wipes are particularly prone to snag and tangle with each other and with other debris, blocking impellers and backing up sewage. Their use violates the California Plumbing Code, which prohibits flushing "any other thing whatsoever that is capable of causing damage to the drainage system or public sewer." Municipalities throughout California have spent millions of dollars to ameliorate the problems caused by "flushable" wipes, and government officials have repeatedly urged consumers not to flush them. Even after the Federal Trade Commission ruled that the "flushable" label should not be used on such products, P&G has continued to market the wipes, having made only minor, inadequate improvements to product formulation, no changes to the labeling, and little effort to comply with the FTC standards.

P&G's false advertising and unfair and unlawful business practices have been highly successful. Both the overall market for flushable wipes and ████████████████████ ████████ Millions of packages of Freshmates have been sold in California, including to Plaintiff Jamie Pettit, who purchased the product during the class period, relying on P&G's flushability claim. She paid a substantial premium compared to both toilet paper and other wipes not labeled "flushable," only to learn that the wipes were not suitable for disposal via the toilet. She sued on behalf of herself and similarly situated persons to obtain restitution of the premium price and injunctive relief.

This case is well-suited for class certification. In a similar case pending in New York, Judge Weinstein stated on February 3, 2017 that he intended to certify a New York class of Freshmates purchasers to pursue similar claims under New York law. That decision comes after an earlier published order that the plaintiff there had satisfied nearly all Rule 23 elements. *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29 (E.D.N.Y. Oct. 15, 2015). Here, as in New

York, millions of consumers were exposed to identical misrepresentations on P&G's labels and purchased the same mislabeled product. They all paid a premium due to the mislabeling. That price premium can be determined on a class-wide basis using common proof. These consumers' relatively small individual damages make it economically irrational for them to pursue individual suits. Thus, unless a class is certified here, and P&G is enjoined from falsely advertising the Freshmates, it has an incentive to continue its false advertising and will continue to defraud consumers out of millions of dollars each year.

## II.     STATEMENT OF FACTS

P&G was an early pioneer in the field of "flushable" products, investing heavily in the research and development of products it could market to consumers as suitable for disposal via the toilet. ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ [1] (Simplicio Decl., Ex. 2, Paschka Tr. 12:8-11; Ex. 23.) Throughout the class period, P&G has uniformly marketed the Freshmates with "Flushable" displayed prominently on the front panels of every package. (Id. Ex. 1; Ex. 3, Otero Tr. at 46:2-9.) P&G marketed these wipes in such a way ██████████████ ████████████████████████████████████████████████████████████████████ ████████████ (Id., Ex. 3, Otero Tr. at 42:12-23; Ex. 4, Sanchez Tr. at 58:24-60:1.)[2]

As set forth below, the Freshmates are not "flushable," and P&G has misled millions of consumers.

### A.     P&G Admits That "Flushable" Means "Suitable to Be Flushed" and "Compatible with Municipal Sewage Treatment."

According to standard usage, the word "flushable" has only one meaning: "suitable for disposable by flushing down a toilet." (Simplicio Decl., Ex. 11.) ████████████████████████

---

[1] Another lawsuit alleges that P&G and its licensee, Nehemiah Manufacturing Company, falsely advertised the Pampers® Kandoo® brand Flushable Wipes. The parties there have reached a settlement and are awaiting final approval. *See Machlan v. The Procter & Gamble Company*, Case No. CGC-14-538168 (San Francisco Sup. Ct.).

[2] During the class period, P&G employed a variety o███████████████████████hat ████████████████████████████████████████████████████████████████████ █████████████████████████████████████████



Plaintiff's Motion for Class Certification

**B.** **The Freshmates Product Has Never Been Suitable To Be Flushed.**

Despite the claim on the label, the Freshmates are not suitable for flushing down a toilet, nor have they ever been. The Freshmates do not dissolve, disintegrate, disperse, or biodegrade upon flushing, but instead are designed of a thick fibrous blend that includes plastic fibers, and which fails to break down properly, causing clogs and damage to home plumbing, septic tanks, sewers, and municipal wastewater treatment equipment.

**1.** **Throughout the Class Period, the Freshmates Were Not Designed and Manufactured to Be Suitable to Be Flushed Or Compatible With Municipal Sewage Treatment.**

At all times throughout the class period, P&G manufactured the Freshmates using nearly identical substrate textiles. ███████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████ a blend of 71.1% wood pulp, 26.1% Lyocell (a synthetic fiber made by treating wood chips with a petrochemically derived solvent to create fibers that are substantially longer and stronger than wood chip fibers, and 2.8% synthetic bicomponent fibers. █████████████████ a blend of 72.2% pulp, 25.8% Lyocell, and 2% synthetic bicomponent. (Orr. Decl. ¶¶ 43, Ex. 22.)  In both cases, the substrate is produced in a "hydroentangled," a process by which high-speed jets of water strike a web of the fibers so that they form knots around each other, giving the textile very high "wet-strength," which prevents it from disintegrating in water. (Id. ¶¶ 20, 44, 46.) In both, the bicomponent fibers are made of a polyester core and an amorphous sheath. (Id.  ¶ 43.) As discussed in the next section, the use of bicomponents, Lyocell and a hydroentangled product are the key reasons why the wipes are not suitable for disposal. (Id. ¶ 46.) ████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████ discussed in Section II.B.3, *infra*. (Id. Ex. 9

(Response to Interrogatory No. 11).)[4]

## 2. Freshmates Do Not Disintegrate, Disperse, or Biodegrade.

P&G's internal documents show it is aware that its Freshmates do not effectively disintegrate, disperse, and biodegrade, and accordingly, throughout the class period, its own employees had concerns about calling the product "flushable." ████████████████

Because the Freshmates are not, and have never been, constructed solely from wood pulp, unlike toilet paper, the presence of the additional synthetic fibers prevents the wipes from disintegrating and dispersing in a manner consistent with a product that is appropriate to be flushed. Lyocell fibers—which exist in all versions of the Freshmates—have never been approved by wastewater professionals for disposal in the water system, as they provide too much "wet-strength" to the wipes, preventing them from degrading and dispersing, and increasing the risk that they will snag, clog, rag, and cause other disruptions. The slow-dispersing properties of Lyocell are exacerbated by the spunlace method of manufacture, which results in strong knots of fibers. (Orr. ¶¶ 20, 44.) While a Lyocell-based splunlace product might theoretically be able to be degraded and digested in a large compost facility given a sufficient period of time, it will not do

---

[4] ███████████████████████████████████████
███████████████████████████████████████ P&G has produced no evidence that this product has yet been sold in stores in California. In any event, the change is not likely to make any material difference to the suitability of the product for flushing (Orr Decl. ¶¶ 46, 50, 54.)

so in the shorter time available at the wastewater treatment plant. (Id.)[5]

The use of the bicomponent fibers also precludes flushability. Plastic fibers do not biodegrade, so they are ingested by wildlife and eventually by humans, causing health risks. (Id. ¶ 21.) P&G was always aware that the use of a substrate made with plastic fibers prevents the product from being "flushable." ██████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████ P&G nevertheless elected to continue to manufacture and sell the Freshmates with the plastic fibers for years.[6]

Plaintiff's expert's testing of the Freshmates confirms that they are not flushable. For example, after subjecting both versions of the Freshmates to an agitation test for 30 minutes, neither version had broken into *any* pieces, and neither version had even the *first* rip or tear, whereas three brands of toilet tissue dispersed into one inch pieces in less than three minutes. (Orr Decl. ¶ 50.) Similarly, both versions snagged in a drainline test and failed to clear, even after five flushes. (Orr Decl. ¶ 54.)

### 3. P&G Worked With A Manufacturers' Trade Association To Rig Flushability Standards.

To combat public pressure to cease selling non-dispersible products as "flushable," P&G and other manufacturers work through their lobbying organization, INDA, and its "Flushability Task Force." (Id. Ex. 12.) P&G and INDA created the "Flushability Guidelines," a voluntary set of standards for members to use when deciding whether to label their wipes as "flushable."[7] (Id. Ex.

---

[5] The Freshmates are even less likely to degrade in the receiving waters (rivers, bays, oceans) into which the wastewater is released, which have nowhere near the density of microorganisms as the wastewater treatment facility. (Orr Decl. ¶ 33.)

[6] To the extent that P&G claims to have modified the wipe in 2016 to exclude plastic fibers, this decision appears to be in response to litigation.

[7] There have been several iterations of the Flushability Guidelines. The most recent of those guidelines was published in 2013 ("2013 Guidelines"). (Id. Ex. 13.) Those guidelines are comprised of seven pass/fail tests, which are summarized on page 42 (PG_P0088813) of Exhibit 28 of the Simplicio Declaration.

13.) 

The result is a flawed set of guidelines that do not measure suitability for flushing. For example, one test purports to measure whether, after three hours of agitation in a "slosh box," at least 25% of the wipe passes through a 12.5 millimeter (roughly a half inch) sieve, 80% of the time. (Id. Ex. 13 at p. 14.) Thus, the test is still passed even if after more than *three hours* of agitation, nearly *three-quarters* of the material is *unable* to pass through the sieve. Id. Ex. 29 at PG_P0006398;

---

[8] A key criticism by the wastewater industry of the INDA Guidelines is their failure to acknowledge that dispersability is a key component of flushability. (Id., Ex. 35.) While dispersability was identified as a desireable aspect of flushability in earlier versions of the guidelines, INDA removed it in 2013, likely because flushable wipes manufacturers such as P&G were unable to achieve it. (Id.)

[REDACTED][9] Not surprisingly, wastewater treatment officials and environmental professionals have heavily criticized this test as (1) bearing no relation to real-world conditions, in which there is much less agitation and time, and (2) having too permissive a standard that ensures the wipes remain in large pieces where they will tangle with each other and cause clogs.[10] (Orr Decl. ¶ 31-32.)

Likewise, while another test purports to measure whether the wipes will clog municipal sewer pumps, [REDACTED] *see also* Orr Decl. ¶ 34.)

### 4. Wastewater Experts Unanimously Agree That Freshmates Are Not Flushable.

Wastewater treatment professionals agree that flushability requires dispersability and prohibits plastics. For example, the Water Environment Federation, a nonprofit association of water quality professionals, has explained that "[a]nything labeled as flushable should start to break apart during the flush and completely disperse within 5 minutes." (Id. Ex.15.) More than 320 wastewater agencies throughout the world, including the California Association of Sanitation Agencies, have agreed with the statement of Cynthia A. Finley, the Director of Regulatory Affairs for the National Association of Clean Water Agencies, that a "flushable" wipe must:

---

[9] [REDACTED]

[REDACTED] d. Ex. 37.) A spokesperson for an environmental group noted, the test is "a lot more turbulent than the flow that you find in a wastewater pipe." (Id. Ex. 14.) Another explained that the Slosh Box Disintegration Test is "way more violent than you would see in a sewer" and that it "is not acceptable to the wastewater industry because it is too long (thre [REDACTED] d. Ex. 6, Rece Tr. at 67:17-68:17.)

1. Break into small pieces quickly;
2. Not be buoyant; and
3. Not contain plastic or regenerated cellulose and only contain materials which will readily degrade in a range of natural environments.

(Id. Ex. 16.; Orr Decl. ¶¶ 7, 26) ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████ (Id. Ex. 28 at PG_P0088785.)

The Freshmates do not meet these standards because they do not effectively break apart, are slow to disperse, and contain plastics that prevent them from biodegrading. Indeed, P&G's wipes have been the subject of specific criticism from the wastewater industry. Robert Villee, the Executive Director of the Plainfield Area Regional Sewerage Authority and liaison between the wastewater industry and INDA, testified in the New York litigation that he conducted various tests of the Freshmates, and has concluded that they are not flushable. (Id. Ex. 7; Science Day Tr. at 22:25-23:6.) In particular, Mr. Villee observed that after being subjected to 20 hours of agitation, the wipes had not sufficiently broken down and were still "identifiable as a wipe." (Id. at 43:20-25.) Likewise, after conducting the fiber analysis and tests described in Section II.B.1, Plaintiff's expert concluded that the Freshmates are not suitable to be flushed down a toilet and disposed via the wastewater system. (Orr Decl. ¶ 56.)

### 5. Guidance from the Federal Trade Commission Is In Accord.

In June 2013, the FTC made an informal inquiry to P&G, requesting that it substantiate the flushability claims on the Charmin Wipes; that investigation is ongoing. *See* Dkt. ## 32-38. The FTC also investigated a number of other manufacturers, leading to a consent decree with Nice-Pak, Inc., which the Commissioners approved on November 2, 2015 ("Nice-Pak Order") (Exhibit 18.)

The Nice-Pak Order sets tough standards for the manufacturer to meet before it may label its product as "flushable." Under the Nice-Pak Order, the manufacturer is prohibited from using a series of words and phrases, including "flushable" and "safe for sewer and septic," unless it has conducted scientifically valid studies that demonstrate that the product will quickly disperse when flushed, so as to avoid clogging in real-world conditions. The order bans words such as "flushable" unless:

the representation is non-misleading, and, at the time the representation is made, [the manufacturer] possesses and relies upon …. competent and reliable scientific evidence, that …

A. demonstrate that the Covered Product disperses in a sufficiently short amount of time after flushing to avoid clogging, or other operational problems in, household and municipal sewage lines, septic systems, and other standard wastewater equipment; and

B. substantially replicate the physical conditions of the environment in which the Covered Product is claimed, directly or indirectly, expressly or by implication, to be properly disposed of; or, if no specific environment is claimed, then in all environments in which the product will likely be disposed of.

(Id .) Before issuing that order, the FTC took nearly six months to review the proposal, inviting public comments on the proposed order via the Federal Register. (Id. Ex. 18.) Many of the commenters urged the FTC to take action against other manufacturers, to which the FTC responded by stating, "[w]e believe that the final order will put manufacturers on notice of the quality of substantiation a manufacturer should possess and rely upon before representing that a wipe is "flushable,"…." (Id. Ex. 19.)

### C.  Consumers Seek Out And Pay Premiums Flushable Products

P&G falsely markets the products as flushable because those misrepresentations inflate the price and drive sales. Over the past ten years, flushable wipes has become increasingly popular. ███████████████████████████████████

Plaintiff's economics expert, Colin Weir, has proposed two methods for calculating the revenues received by P&G as a result of its false advertising. First, he ran a preliminary

---

[11] ███████████████████████████████████

Plaintiff's Motion for Class Certification

regression analysis of prices paid by California consumers for flushable and non-flushable wipes since 2011, based on data from thousands of retail stores. █████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████. (Weir Decl. ¶¶ 75, 80.) His conclusions about a price premium buttress

███████████████████████████████████████████████████████████████████████████

██████████████████.

Second, Mr. Weir notes that because █████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████ (Id.

¶¶ 82-86.) Mr. Weir then provides the methodology to determine the price premium that

consumers are paying as compared to the substitute product, controlling for differences in usage

quantities and other factors, which is ██████████████████ (Id.)

**D.    Plaintiff and The Public Were Harmed at the Point of Sale.**

In recent years, because of widespread false advertising in the industry, the "flushable"

wipes market has become a target for litigation and government investigation. In addition to the

FTC action, there have been civil suits filed by municipalities and consumers against P&G in New

York, Ohio, and Minnesota for falsely advertising the Freshmates as "flushable." P&G's licensee,

Nehemiah, was sued in California and in Florida for falsely advertising a different brand of

flushable wipes. The New York lawsuit, *Belfiore v. Procter & Gamble Co.* ("*Belfiore*"), is notable

as it involves similar allegations against P&G for falsely advertising the Freshmates as "flushable"

in violation of New York law.

Like the consumers in New York and elsewhere, Plaintiff was a victim of P&G's false

advertising. In 2014, Plaintiff purchased several packages of Freshmates at a nearby Target store.

(Id., Ex. 18 (Interrogatory No. 13).) Prior to her purchase, she reviewed the packaging and saw the

phrase "flushable," and made the decision to purchase the wipes for that reason. (Declaration of

Jamie Pettit, ¶ 2.)[12] When using the wipes, Plaintiff observed that she needed to use a plunger. (Simplicio Decl., Ex. 18 (Interrogatory No. 2).) While Plaintiff has resided in her apartment for over ten years, the only occasions on which she has needed to use the plunger was after flushing "flushable" wipes. (Id.) Concerned for her plumbing, Plaintiff stopped purchasing and flushing Freshmates. (Pettit Decl., ¶ 3.) Later, Plaintiff read a New York Times article on the problems caused by "flushable" wipes. (Simplicio Decl., Ex. 18 (Interrogatory No. 12); Ex. 14.) Had P&G accurately represented the true nature of the Freshmates, Plaintiff would not have purchased them. (Pettit Decl., ¶ 4.)

On May 23, 2014, Plaintiff filed suit to stop P&G's deceptive practices. She pled four causes of action, all under California law: for violations of the Consumer Legal Remedies Act ("CLRA"), False Advertising Law ("FAL"), Unfair Competition Law ("UCL") and fraud, deceit and/or misrepresentation. Plaintiff understands her responsibilities as class representative and has no conflicts that would prevent her from performing them. (Pettit Decl., ¶ 5.)

## III. ARGUMENT

### A. Legal Standards For Class Certification

Rule 23 provides district courts with broad discretion to determine whether a class should be certified. *See Armstrong v. Davis*, 275 F.3d 849, 872, n.28 (9th Cir. 2001). Class actions are favored where, like here, there is alleged wrongdoing against a large number of persons, each of whom has suffered only a small amount of damages. *See, e.g., Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1023 (9th Cir. 1998) (class certification appropriate because litigation costs would dwarf potential recovery by class members if forced to pursue actions individually).

A class action must satisfy all four requirements in Fed. R. Civ. P. 23(a): "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect

---

[12] On a second occasion, Plaintiff saw the word "new" on the package, and believing it to refer to a new formulation of the "flushable" product, Plaintiff made the decision to purchase a second time, only to find that it was equally unsuitable for flushing. (Simplicio Decl., Ex. 18 (Interrogatory No. 11).)

the interests of the class." In some cases, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160-61 (1982)).

In addition, the class must also satisfy at least one subdivision of Fed. R. Civ. P. 23(b). Here, the Class satisfies Rule 23(b)(3) because "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

## B. The Classes Satisfy the Requirements of Rule 23(a).

### 1. Numerosity Exists.

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is "impracticable." Fed. R. Civ. P. 23(a)(1). "Impracticable" does not mean impossible, only that it would be difficult or inconvenient to join all members of the class. *See Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964). "Where a class is large in numbers, joinder will usually be impracticable." *Jordan v. County of Los Angeles*, 669 F.2d 1311, 1319 (9th Cir. 1982), *vacated on other grounds*, 459 U.S. 810 (1982). The exact size of the class need not be known, as long as general knowledge and common sense indicate that the class is sufficiently numerous. *Id.* Here, records show that it has ████████████ Freshmates in California during the class period. (Weir Decl., ¶ 78.)

### 2. There Is No Requirement That Plaintiff Identify All Class Members.

"There is no requirement that 'the identity of the class members…be known at the time of certification." *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 536 (N.D. Cal. 2012). As the Ninth Circuit recently explained, "the language of Rule 23 does not impose a freestanding administrative feasibility prerequisite to class certification." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d. 1121, 1126 (9th Cir. 2017).

Plaintiff's class definition is clear and consistent with class definitions in number of certified classes. *See, e.g., id.* at 1124 (affirming certification of class of "All persons . . . who

Plaintiff's Motion for Class Certification

have purchased Wesson Oils within the applicable statute of limitations periods established by the laws of their state of residence . . . through the final disposition of this and any and all related actions"); *Astiana,* 291 F.R.D. at 500 (class was sufficiently ascertainable where "the proposed class definition simply identifies purchasers of Defendant's products that included the allegedly material misrepresentations"); *Kumar v. Salov N. Am. Corp.*, No. 14-CV-2411-YGR, 2016 WL 3844334, at *7 (N.D. Cal. July 15, 2016) (finding ascertainability where "the labels here all contained the same challenged language for the time period. The claim involves identical statements on all products for the relevant time period, with no "memory test" for flavor, size, or time period necessary to determine whether the product purchased had the challenged statement on the label. The statement appeared on the front of the bottle...").

### 3. Common Questions of Fact and Law Exist.

Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury." *Wal-Mart*, 131 S. Ct. at 2551 (quoting *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 157 (1982)). Class members' claims must depend upon a common contention that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Not all questions of fact and law need be common to satisfy the rule. *Id.; see also Mazza v. Honda American Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) ("[C]ommonality only requires a single significant question of law or fact.").

The key question in this case is common to all class members: were Defendant's uniform labels false? As many courts have explained, "the primary evidence in a false advertising case is the advertising itself." *Williams v. Gerber Products Co.,* 553 F.3d 934, 938 (9th Cir. 2008), 938 (quoting *Brockey v. Moore* 107 Cal. App. 4th 86, 100 (2003)). In cases alleging a deceptive advertising scheme under the UCL, CLRA, FAL, and common law fraud, it is well-settled that where "numerous consumers are exposed to the same dubious practice by the same seller [] proof of the prevalence of the practice as to one consumer would provide proof for all." *Vasquez v. Superior Court,* 4 Cal. 3d 800, 808 (1971). *See also In re Tobacco II Cases,* 46 Cal. 4th 298, 312 (2009) (holding that questions of materiality and the likelihood a representation will mislead a

reasonable consumer predominate over individual issues); *Kasky v. Nike, Inc.,* 27 Cal. 4th 939, 951 (2002), *as modified* May 22, 2002 (explaining that the UCL and FAL "prohibit not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public") (internal citations omitted), *cited with approval in Williams,* 552 F.3d at 938 (same for CLRA).

Accordingly, commonality is met here as it was in *Astiani v. Kashi Company.* There, the court found that, "[b]y definition, all class members were exposed to such representations and purchased Kashi products, creating a 'common core of salient facts.'" 291 F.R.D. at 501 (citing *Ries,* 287 F.R.D. at 528). *Astiani* concluded that "[c]ourts routinely find commonality in false advertising cases." *Id.* (citing *Ries,* 287 F.R.D. at 537); *see also Kumar,* 2016 WL 3844334, at *8; *Chavez v. Blue Sky Natural Beverage Co.,* 268 F.R.D. 365, 377 (N.D. Cal. 2010); *In re POM Wonderful LLC Marketing & Sales Practices Litig.,* 2012 WL 4490860, at *1 (C.D. Cal. Sept. 28, 2012). It further explained that "variation among class members in their motivation for purchasing the product, the factual circumstances behind their purchase, or the price that they paid does not defeat" commonality. 291 F.R.D. at 502 (quoting *Ries,* 287 F.R.D. at 537).[13]

**4.      Plaintiff is Typical of Both Classes.**

The purpose of the "typicality" requirement of Fed. R. Civ. P. 23(a)(3) is to ensure the named representative's interests "align" with those of the class. *See Just Film v. Buono,* -- F.3d --, 2017 WL 510452, at *4 (9th Cir. 2017) ("Typicality focuses on the class representative's claim— but not the specific facts from which the claim arose—and ensures that the interest of the class representative 'aligns with the interests of the class.'") (citing *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir. 1992)). Typicality is a "permissive standard," and "representative claims

---

[13] As the Belfiore court noted: "In the instant case, commonality is satisfied. The proposed class presents common questions: (1) What does defendant's "flushable" representation mean to a reasonable consumer? (2) Do Freshmates satisfy that meaning? (3) Is defendant's "flushable" representation materially misleading? (4) Did class members pay an unsupported premium as a result of the "flushable" representation? (5) Was that premium—to the extent that it can be reasonably ascertained—relatively uniform?" *Belfiore v. Procter & Gamble Co.,* 311 F.R.D. 29, 62 (E.D.N.Y.), *reconsideration denied,* 140 F. Supp. 3d 241 (E.D.N.Y. 2015). *See also Meta v. Target Corp.,* No. 4:14 CV 832, 2016 WL 5076089, at *4 (N.D. Ohio Sept. 20, 2016) ("The basic question of fact remaining in this case is whether the Defendants' product is 'flushable,' 'sewer and septic safe' and/or 'breaks apart after flushing' as stated on its packaging/label. This question is common to all users of the product, and, all potential class members.").

are 'typical' if they are reasonably coextensive with those of absent class members." *Just Film,* 2017 WL 510452, at * 4 (quoting *Hanon,* 976 F.2d at 508). While "[s]ome degree of individuality is to be expected in all cases, but that specificity does not necessarily defeat typicality." *Hanlon,* 150 F.3d at 1020. Typicality is satisfied if the named plaintiff's claims stem from the same practice or course of conduct that forms the base of the class claims and are based upon the same legal remedial theory. *Jordan v. Los Angeles Cnty.,* 669 F.2d 1311, 1321 (9th Cir.), *vacated on other grounds,* 459 U.S. 810 (1982). *See also Just Film,* 2017 WL 510452, at *5 ("Her claim is typical of the class because it shares ''some common question of law and fact with class members' claims.'") (quoting Newberg on Class Actions § 3:31 (5th ed.)).

Plaintiff's claims are typical of those of the other Class members because she, like all Class members, purchased the Freshmates that P&G marketed as being "flushable." (Pettit Decl., ¶ 2.) At the time of purchase, she reasonably believed that "flushable" meant that the product was appropriate for flushing down the toilet. (Id. at ¶ 5.) Her claims for relief are co-extensive with those of the Class.

P&G will likely attempt to attack typicality by pointing to a number of facts that are irrelevant to Plaintiff's consumer claims, which seek restitution of a price premium. For example, P&G may claim that Plaintiff rents her home so she did not personally incur costs of plumbing repairs, or that the clogs she experienced were due to her misuse or unique problems with her plumbing. In rejecting the same arguments in *Belfiore*, Judge Weinstein explained:

> The defendant also contends that the named plaintiff is atypical because (1) the toilets in his home connect to a sewer system, not a septic tank; (2) his plumbing is poorly maintained, and (3) that he experienced clogs prior to his use of Freshmates. Def.'s Reply 3–4. These issues are not part of the class action. They will be separately determined. Defendant again misconstrues the central contention in the case: plaintiff paid a premium for a product that misrepresented itself as flushable. The injury is the payment of an inflated price, not the clog. What happened after his purchase, as a result of his sewage disposal system or the condition of his pipes, is irrelevant to the class's premium price theory.

*Belfiore*, 311 F.R.D. at 64. *See also Mullins v. Premier Nutrition Corp.*, No. 13-CV-01271-RS, 2016 WL 1535057, at *4 (N.D. Cal. Apr. 15, 2016) (where plaintiff's theory is that the product does not provide the advertised benefits to anyone, '[t]here is therefore nothing about her experience with the product that would prevent her from representing a class of all [the product's]

consumers"). ==P&G admits that it markets Freshmates to consumers generally, regardless of age, gender, family structure, or education and regardless of the type of toilet, plumbing structure, and regardless of whether consumers rent or own, or live in a house or an apartment. (==Simplicio Decl. Ex. 4, Sanchez Tr. at 79:5-82:24.)

### 5. The Plaintiff Will Adequately Protect the Interests of the Class.

Fed. R. Civ. P. 23(a)(4) requires that the class representative "fairly and adequately protect the interests of the class." The Ninth Circuit uses a two-prong test for this requirement: "(1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

Plaintiff will fairly and adequately protect the interests of the members of the Class, because it is in her best interest to prosecute the claims alleged in the Complaint to obtain full compensation due to all members for the illegal conduct of which he complains. She has no conflict, let alone an irreconcilable conflict, with other class members. Rather, she stands in the same shoes as all other members of the Class, seeks the same relief as other class members, and has a common interest in obtaining all of the relief sought.

Plaintiff's counsel have successfully represented numerous plaintiff classes, involving a variety of claims, in state and federal courts throughout the country. (Gutride Decl., Ex. 1; Cellini Decl., Ex. 1; Scott Decl., Ex. 1.) Gutride Safier LLP has been involved (and appointed class counsel) in at least fifteen class actions, including several cases relating to food and product mislabeling. (Gutride Decl., Ex. 1.) Tycko & Zavareei LLP and Spangenberg Shibley & Liber LLP have also successfully litigated numerous class actions in state and federal courts across the nation. Plaintiff's counsel have the necessary financial resources to vigorously litigate this action. (Gutride Decl., Ex. 1; Cellini Decl., Ex. 1; Scott Decl., Ex. 1.)

### C. The Class Satisfies the Requirements of Rule 23(b)(3).

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.

R. Civ. P. 23(b)(3). The predominance inquiry asks "whether proposed classes are sufficiently cohesive to warrant adjudication by representation. The focus is on the relationship between the common and individual issues." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019 (9th Cir. 2011) (internal quotations and citation omitted)). This criterion is normally satisfied when there is an essential common factual link between all class members and the defendant, for which the law provides a remedy. *In re Visa Checks/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001).

**1.    Common Questions Predominate About Whether P&G's Representations Were False.**

The UCL's "unfairness" prong and Plaintiff's CLRA, FAL and fraud-based claims prohibit statements that are false or likely to mislead reasonable consumers. P&G made identical representations on all packages of Freshmates throughout the applicable class periods. The Freshmates were advertised as "Flushable" on the front of the packages.[14] (Simplicio Decl., Ex. 1.) All Freshmates were made from substrates composed of approximately 20% synthetic, non-dispersible fibers that wastewater professionals assert are not suitable for disposal via toilets. (Orr Decl. ¶¶ 43, 45-46.) All class members were subject to California Plumbing Code section 305.1, California Code of Regulations, Title 24, Part 5, Chapter 3, which makes it illegal to flush "any other thing whatsoever that is capable of causing damage to the drainage system or public sewer." (Simplicio Decl., Ex. 20.) Thus, the primary predominate question here is whether the advertisement "flushable" is false, in light of the wipes' construction and the risks they pose to the drainage system and public sewer. The answer to this question will drive resolution of the case. *See Wal-Mart*, 131 S. Ct. at 2551. *See also Allen v. Hyland's Inc.*, 300 F.R.D. 643, 667 (C.D. Cal. 2014) (finding common questions to predominate where defendants used similar representations as to the products' effectiveness on all packaging).

Questions of materiality also predominate. Under California law, the question of whether the misrepresentation or omission is "material" under California law is an objective one,

---

[14] More specifically, because this packaging will serve as "primary evidence" on all of Plaintiff's claims, the answer to question of whether the representation "flushable" is false will drive resolution of the case. *See Wal-Mart*, 131 S. Ct. at 2551. *See also Allen v. Hyland's Inc.*, 300 F.R.D. 643, 667 (C.D. Cal. 2014) (finding common questions to predominate where defendants used similar representations as to the products' effectiveness on all packaging).

depending on the "reasonable person" standard, and has long been so. *See Stearns,* 655 F.3d at 1022; *see also Kumar v. Salov N. Am. Corp.*, No. 14-CV-2411-YGR, 2016 WL 3844334, at *7 (N.D. Cal. July 15, 2016) ("Questions of materiality and reliance are determined based upon the reasonable consumer standard, not the subjective understandings of individual plaintiffs."); *Occidental Land, Inc. v. Superior Court*, 18 Cal. 3d 355, 363 (1976) (for common-law fraud class, reliance can be proven on common basis by showing that misrepresentations were material); *Vasquez v. Superior Court*, 4 Cal. 3d 800, 814 (1971) (on fraud claim, "[i]f the court finds that a reasonable man would have relied upon the alleged misrepresentations, an inference of justifiable reliance by each class member would arise"); *In re Tobacco II Cases*, 46 Cal. 4th at 327 ("[a] misrepresentation is judged to be 'material' if 'a reasonable man would attach importance to its existence or non-existence in determining his choice of action in the transaction' and as such materiality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it."). Because materiality is an objective standard common to all, and classwide reliance is inferred if the misrepresentations were material, the common question of materiality predominates. In addition, the CLRA and common law fraud claims present the further common question of whether P&G intended to deceive consumers.

While P&G may argue that consumers have different understandings of the word "flushable," all consumers are identically situated with respect to the claims here, because Plaintiff will prove that (1) the statement was actually false, by any objective definition, and/or (2) under the California Plumbing Code the use of the product was illegal. *See In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 157 (2010), *as modified on denial of reh'g* (Feb. 8, 2010) ("[i]t requires no stretch to conclude that" a reasonable person would find illegality important); *cf. Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013) ("Moreover, the legislature's decision to prohibit a particular misleading advertising practice is evidence that the legislature has deemed that the practice constitutes a "material" misrepresentation, and courts must defer to that determination.").[15]

---

[15] Similarly, if the advertisement was merely misleading, not false, predominance can still be shown because under the UCL, "relief is available *without* individualized proof of deception,

Nor does it matter if consumers had different motivations that led to their purchases. *See, e.g, id.* at 1022 (citing *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 129 (2009) ("That the defendant can establish a lack of causation as to a handful of class members does not necessarily render the issue of causation an individual, rather than a common, one.")); *Brown v. Hain Celestial Grp., Inc.,* 2014 WL 6483216, at *17 (N.D. Cal. Nov. 18, 2014) (rejecting premise that "there can be only one material trait that causes a person to buy a given product" and explaining that consumers "buy products all the time for more than one reason"); *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 668 (C.D. Cal. 2014) (dismissing evidence that consumers had different primary motivators for purchasing product and finding predominance).[16]

Likewise, hypothetically different individual consumer buying experiences do not defeat certification of the CLRA or fraud-based claims. On those claims, even though there must be proof of reliance by each class member, an inference (or presumption) of reliance arises as to the entire class if the misrepresentation was uniform and material. *See In re Steroid Hormone Prod. Cases,* 181 Cal. App. 4th at 156 (plaintiff entitled to show that defendant's conduct caused the same damage to the class by showing the misrepresentation was material, even if defendant could show some class members would have bought the product anyway); *Wolph v. Acer Am. Corp.*,

---

reliance and injury" by absent class members. *In re Tobacco II Cases,* 46 Cal. 4th at 320 (emphasis added).

[16] While P&G may argue that Plaintiff is obligated to undertake consumer surveys, "California courts have held that proof of deception does not require expert testimony or consumer surveys." *Kumar v. Salov N. Am. Corp.*, No. 14-CV-2411-YGR, 2016 WL 3844334, at *8 (N.D. Cal. July 15, 2016). *See also id.* ("Materiality can be shown by a third party's, or defendant's own, market research showing the importance of such representations to purchasers."); *Mullins v. Premier Nutrition Corp.*, No. 13-CV-01271-RS, 2016 WL 1535057, at *3 (N.D. Cal. Apr. 15, 2016) ("Marketing research suggests the overwhelming majority of Joint Juice users purchased the product to obtain these benefits, and thus there is a reason to believe the represented health benefits were material."); *In re ConAgra Foods, Inc.*, 90 F.Supp.3d 919, 1018-20 (C.D. Cal. 2015) (explaining that materiality could be shown where Defendant's own market research revealed that "all natural" was significant to consumers' interest in purchasing); *Brockey v. Moore*, 107 Cal.App.4th 86, 99-100 (2003) (rejecting argument that survey required, holding that the advertising statements, along with defendant's apparent intent to mislead consumers, were sufficient evidence of materiality).

The UCL does require the *named plaintiff* to show that he was motivated by the mislabeling, but even in that context, "[i]t is not necessary that the plaintiff's reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct. It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision." *In re Tobacco II Cases*, 46 Cal. 4th at 327.

2012 WL 993531, *3 (N.D. Cal. Mar. 23, 2012) ("[T]he Court found that Plaintiffs' claims are premised on misrepresentations that were made to the entire class. Therefore, common issues predominate on Plaintiffs' CLRA claim."); *Delarosa v. Boiron, Inc.*, 275 F.R.D. 582, 594 (C.D. Cal. 2011) ("A determination by the trier of fact that Coldcalm misrepresented its efficacy to Plaintiff will also resolve the common question of whether Coldcalm misrepresented its efficacy to all California consumers of Coldcalm."); *Zeisel v. Diamond Foods, Inc.*, 2011 WL 2221113, *10 (N.D. Cal. June 7, 2011) (where plaintiff can prove representations on label were material, he could establish an inference of reliance on behalf of the class); *In re Brazilian Blowout Litig.,* 2011 WL 10962891, *8 (C.D. Cal. Apr. 12, 2011) (on fraud and negligent misrepresentation claims "reliance may be presumed as to the entire Class if Defendant's misrepresentations or omissions were material").

> ### 2.      Common Questions on Restitution and Damages Predominate Over Individual Issues.

Plaintiff seeks restitution under the UCL, as well as damages under the CLRA and for fraud, presenting further predominant common questions.[17] Pursuant to *Comcast v. Behrend*, 133 S. Ct. 1426 (2013), Plaintiff must show that "analysis of the economic impact" of the challenged conduct can be performed on a classwide basis. *Id.* at 1435. Here, Plaintiff intends to show that everyone in the class paid a premium for the Freshmates that would not have existed in the absence of the labeling misrepresentations. *See Pulaski & Middleman, LLC v. Google, Inc.*, -- F.3d --, 2015 WL 5515617, at *6 (9th Cir. Sept. 21, 2015) (affirming that such a methodology satisfies *Comcast*, explaining that the damages calculation "under the UCL and FAL, the focus is on the difference between what was paid and what a reasonable consumer would have paid at the

---

[17] Under the UCL, a court may grant restitution, *Colgan v. Leatherman Tool Group, Inc.,* 135 Cal.App. 4th 663, 694 (2006); Cal. Bus. & Prof.Code §§ 17203, 17535, an equitable remedy whose purpose is "to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." *Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal. 4th 1134, 1149 (2003); *see also Cortez v. Purolator Air Filtration Products Co.,* 23 Cal. 4th 163, 177 (2000). The form of restitutionary relief has two purposes: returning money unjustly taken from the class, and deterring the defendant from engaging in future violations. *See Colgan,* 135 Cal.App. 4th at 695. If restitution is awarded, it must be a "quantifiable sum," and the award must be supported by substantial evidence. *Id.* at 698. Under the CLRA and fraud-based claims, a consumer may recover actual damages, punitive damages and attorney fees. Cal. Civ. Code § 1780(a)(1),(5), (d); *id.* § 3294(a). The CLRA also provides for statutory damages of $5,000 for each act of false advertising to a person age 65 or older. Cal. Civ. Code §§ 1761(f)-(g), 1780(a)(4).

time of purchase without the fraudulent or omitted information"); *see also Levya v. Medline Industries, Inc.,* 716 F.3d 510, 513–14 (9th Cir. 2013) (citing *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010)); *Colgan*, 135 Cal.App. 4th at 700 (plaintiffs may produce evidence that attaches a dollar value to the "consumer impact or advantage" caused by the unlawful business practices).

At this stage, Plaintiff need only demonstrate the existence of a viable damages model that makes use of common, class-wide evidence. *See Brown,* 2014 WL 6483216, at *19 ("The point for Rule 23 purposes is to determine whether there is an acceptable class-wide approach, not to actually calculate under that approach before liability is established."); *McCrary v. Elations Co., LLC,* 2014 WL 1779243, at *15 (C.D. Cal. Jan. 13, 2014) (certifying consumer class because plaintiff presented a viable damages model and "it is not necessary to show that his method will work with certainty at this time") (quoting *Chavez*, 268 F.R.D. at 379 (certifying consumer class because plaintiffs were able to demonstrate one potential measure of damages based on the premium price paid by consumers)); *see also Zeisel*, 2011 WL 2221113, *10 (accepting plaintiff's assertion for class certification purposes that "he will be able to prove the proper amount of restitution by relying on documents produced by [defendant] relating to net sales, profits, and costs, as well as retail prices of" the products at issue). Even if the amount of restitution owed to each class member differs, that is not a reason to deny certification, as the Ninth Circuit again reaffirmed in *Pulaski & Middleman*, 802 F.3d at 984 ("damage calculations alone cannot defeat class certification"). Moreover, it is well settled that Plaintiff need not account for the relationship between the price each class member paid and the "value" that he or she may have received. *See, e.g., id.* at 989 (damages model "need not account for benefits received after purchase because the focus is on the value of the service at the time of purchase"); *Mullins v. Premier Nutrition Corp.*, No. 13-CV-01271-RS, 2016 WL 1535057, at *3 (N.D. Cal. Apr. 15, 2016) ("That some people *believe* Joint Juice provides benefits as advertised is beside the point. Sonner's 'claims do not rise or fall on whether individual consumers experienced health benefits, due to the placebo effect or otherwise. They rise or fall on whether [Premier's] representations were deceptive.'") (quoting *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 673 (7th Cir. 2015)); *see also Belfiore* 311 F.R.D.

at 64 ("[w]hat happened *after* his purchase . . . is irrelevant") (emphasis added).

To measure the price premium that resulted from the false "flushable" claims, Plaintiff's economics expert, Colin Weir, proposes a widely accepted method, hedonic regression, to measure the price premium associated with the word "flushable." (Weir Decl. ¶¶ 14-33.) *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1032 (C.D. Cal. 2015) (accepting Mr. Weir's proposed methodology of measuring damages in food labeling class action and concluding that plaintiffs demonstrated that "individual damages issues do not predominate over common questions"), *aff'd, Briseno v. ConAgra,* 2017 WL 53421, at *2 (9th Cir. Jan. 3, 2017) (explaining that "it was not an abuse of discretion for the district court to conclude that Plaintiffs' proffered model tracked their theory of liability and was therefore sufficient to survive class certification"); *Kumar v. Salov N. Am. Corp.*, No. 14-CV-2411-YGR, 2016 WL 3844334, at *10 (N.D. Cal. July 15, 2016) (accepting Mr. Weir's testimony; nothing that "[f]or purposes of class certification, the proposed regression model appears to meet *Comcast*'s requirement of measuring the damages attributable to the Italian origin statement"). *Cf. Pulaski & Middleman*, 2015 WL 5515617, at *8 ("In calculating damages, here restitution, California law 'requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.'") (quoting *Marsu, B.V. v. Walt Disney Co.,* 185 F.3d 932, 938–39 (9th Cir. 1999)).[18] Mr. Weir's regression analysis will be able to quantify classwide damages based on P&G's material "flushable" misrepresentation. (Weir Decl. ¶¶ 64-76.) Moreover, unlike the damages model that was rejected in *Jones v. ConAgra Foods, Inc.,* 2014 WL 2702726 (N.D. Cal. June 13, 2014), Mr. Weir's report provides the information that court found lacking. *Compare* Weir Decl. ¶¶ 49-73 *with* 2014 WL 2702726 at *20. *Cf. Kumar,* 2016 WL 3844334, at *10 (finding Mr. Weir's approach acceptable; noting that challenges to the "completeness of the variable set used and correctness of

---

[18] P&G will likely argue there is no classwide basis to determine monetary relief, because there is no way to determine who would have purchased had the labels differed, or how much they would have paid, as retail prices are set by retailers and differ by date and location, and there are no centralized documents establishing how much was paid by each class member. But these arguments have all been routinely rejected by the Ninth Circuit and various district courts in the cases cited above.

the data categorizations" are questions for trial).[19]

Mr. Weir's alternate method of calculating the alternate price premium as compared to toilet paper is likewise viable. (Weir Decl. ¶¶ 82-86.) While P&G will likely challenge the theory, the method simply combines two regression analyses – one of toilet paper and one of wipes. (Id.) To the extent P&G asserts that toilet paper is not a proper substitute for flushable wipes, that issue is simply another predominant common question.

### 3.     A Class Action Is Superior

Rule 23(b)(3) enumerates four factors to consider on "superiority": "(A) the interest of members of the class in individually controlling the prosecution ... of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by ... members of the class; (C) the desirability ... of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

There is little to be gained by class members filing individual claims, because the amounts are only a few dollars per purchase.[20] Judicial resources would be conserved by concentrating the action in a single suit. Finally, the adjudication of class claims would not be significantly more burdensome than if the matter were prosecuted individually, while the prosecution of individual remedies could establish inconsistent standards of conduct for P&G. "[A] class action has to be

---

[19] Even were the Court to conclude that there is no class wide method for determining the amount of monetary relief that should be repaid to the Class, it nonetheless still should certify the Class to seek injunctive relief under Rule 23(b)(2), and at a minimum, certify it pursuant to Rule 23(b)(4) for liability only. With regard to injunctive relief, Plaintiff seeks the removal of the phrase "flushable" from the Freshmates. Even if injunctive relief is unavailable, and even if common questions do not predominate because of damages issues, it would be appropriate to certify the class on liability issues only under Rule 23(b)(4). Similar liability-only classes were certified in cases involving allegedly defectively designed washing machines, where class members might be entitled to different remedies depending on whether the defect manifested in their machine. *See In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*, 722 F.3d 838, 858-59 (6th Cir. 2013) *cert. denied,* 13-431, 2014 WL 684065 (U.S. Feb. 24, 2014) (finding certified class "will prevail or fail in unison" and classwide liability adjudication will be "more efficient" notwithstanding differences in damages); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 798 (7th Cir. 2013) *cert. denied,* 13-430, 2014 WL 684064 (U.S. Feb. 24, 2014) (holding *Comcast* does not impact cases where a liability only class is certified; *In re High-Tech Employee Antitrust Litig., 985* F. Supp. 2d 1167, 1185-86 (N.D. Cal. Oct. 24, 2013) (citing *Whirlpool* and *Butler* with approval, and certifying liability-only class).

[20] Class members who have claims for plumbing damage will need to separately pursue those claims.

24

unwieldy indeed before it can be pronounced an inferior alternative . . . to no litigation at all." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004); *Visa Checks/MasterMoney*, 280 F.3d at 140.[21]

P&G may claim that this lawsuit is duplicative of other suits filed against it in Ohio and New York. But neither of the proposed classes in those lawsuits include California consumers. P&G may also claim that a lawsuit is unnecessary, given that the FTC is investigating the claims. But the FTC's investigation has been underway for years, and no resolution has been reached. Judge Weinstein initially stayed the case in New York to allow the FTC time to take action; but that stay was recently lifted, and in remarks at a hearing on February 3, 2017, he noted he would be certifying the class. (Id. Ex. 21.) In any event, the FTC is not able to pursue claims for violations of California law, which led this Court to deny P&G's request for a stay pending conclusion of the FTC Proceedings. *See* Minute Entry for Proceedings of July 21, 2016, Dkt. 36; *cf. Consumer Justice Ctr. v. Olympian Labs, Inc.,* 99 Cal. App. 4th 1056, 1059-62 (2002) ("Congress did not intend the Federal Trade Commission to 'occupy the field' of redressing false advertising claims."); 15 U.S.C. 57b(e) ("Remedies provided in this section are in addition to, and not in lieu of any other remedy or right of action provided by State or Federal law.").

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court grant her Motion for Class Certification.

Dated: February 14, 2017                **GUTRIDE SAFIER LLP**


/s/ Adam Gutride_____
Adam J. Gutride, Esq.
Attorneys for Plaintiff

---

[21] P&G may point to Judge Weinstein's initial ruling in *Belfiore* to argue that a class action is not superior.  But as discussed in Plaintiff's opposition to P&G's motion to stay, the decision is distinguishable in that it relies on two unique provisions in New York's consumer protection law for which there is no California analogue. *See* Dkt. # 34 at 2-6.