UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

JAMIE PETTIT, an individual, on behalf of
herself, the general public and those similarly
situated,

Plaintiff,

Case No. 15-cv-02150-RGS

v.

PROCTER & GAMBLE COMPANY; AND
DOES 1 THROUGH 50,

Defendants.

Declaration

of

**COLIN B. WEIR**

February 14, 2017

REFERENCES MATERIALS DESIGNATED "CONFIDENTIAL" AND "HIGHLY

CONFIDENTIAL ATTORNEYS' EYES ONLY" UNDER PROTECTIVE ORDER

I, Colin B. Weir, declare as follows:

I am Vice President at Economics and Technology, Inc. ("ETI"), One Washington Mall, 15th Floor, Boston, Massachusetts 02108.  ETI is a research and consulting firm specializing in economics, statistics, regulation and public policy.

## I. QUALIFICATIONS, BACKGROUND, AND EXPERIENCE

1.    I hold a Masters of Business Administration, with honors, from the High Technology program at Northeastern University, Boston, Massachusetts.  I hold a Bachelor of Arts degree cum laude in Business Economics from The College of Wooster, Wooster, Ohio.  I have provided expert testimony before federal and state courts, the Federal Communications Commission, and state regulatory commissions, and have contributed research and analysis to numerous ETI publications and expert testimony at the state, federal, and international levels.  I have consulted on a variety of consumer and wholesale products cases, calculating damages relating to food products, household appliances, herbal remedies, health/beauty care products, electronics, and computers.  My Statement of Qualifications, which outlines my professional experience, publications, and record of expert testimony, is attached hereto as Exhibit 1.  This includes a list of all cases in which, during the previous four years, I have testified as an expert at trial or by deposition.  Prior to joining ETI, I worked at Stop and Shop Supermarkets for a period of seven years, working as a cash department head, grocery/receiving clerk, and price-file maintenance head.

## II. ENGAGEMENT

2.    I provide this declaration in connection with the case filed by Plaintiff Jamie Pettit ("Plaintiff") in the above-captioned action against Defendant Procter & Gamble ("Defendant" or "P&G").  I make this declaration based upon my own personal knowledge and, if called as a



Declaration of Colin B. Weir
February 14, 2017
Page 2 of 26

witness in this action, I would be able to competently testify as to the facts and opinions set forth herein.

3.    I have been advised by Counsel for Plaintiff that a class of consumers purchased certain P&G Products[1] labeled as being "Flushable" ("the Claim").  I have been further advised that Plaintiff alleges that the Product was, in fact, not "Flushable," meaning not suitable for plumbing/septic/sewer systems.  I have been asked by Counsel for Plaintiff to provide a framework for the calculation of damages and the harm suffered by the Class resulting from the allegedly false "Flushable" claim made by Defendant.

4.    ETI is being compensated at the rate of $650 per hour for my work on this case.  The opinions expressed in this declaration are my own, and my compensation is not dependent upon the substance of these opinions or the outcome of the litigation.

5.    The documents, data and other materials that I relied upon in forming my opinions are identified throughout my report and in Exhibit 2, attached hereto.  In addition, I have relied upon my educational background and more than 13 years of experience.

### III.  THE ALLEGED MISREPRESENTATION

6.    Plaintiff alleges that the Product does not disintegrate, clogs pipes, and is not suitable for plumbing and septic tanks.

7.    Plaintiff alleges that the "Flushable" claim is false or misleading.[2]

8.    Plaintiff also alleges that the false "Flushable" claim resulted in consumers paying a price premium for the Product, i.e., that the Product was sold to all consumers at prices higher than if the Product did not make the claim.

---

[1] Charmin Freshmates brand "Flushable" Wipes, of various sizes, hereinafter ("the Products").

[2] *See, generally,* Class Action Complaint, filed April 6, 2015 ("Complaint").



Declaration of Colin B. Weir
February 14, 2017
Page 3 of 26

9.   Plaintiff further alleges that consumers would not purchase the Product if the "Flushable" claim was known to be false.

10.   In economics, the concept of product differentiation can be summarized as the introduction of product attributes that allows the consumer to differentiate between otherwise similar products with the goal of increasing sales and profits.[3]

11.   From the documents I have reviewed, it appears that Defendant itself also believes "flushable" to be an important product attribute.  Testifying at deposition, P&G representative Marlene Otero stated that one important attribute of the Product is "that it's flushable."[4]  Ms. Otero testified that, "for consumers, they want to hear that it's flushable."[5]  Ms. Otero noted that, in P&G's view, the Product does not compete with non-flushable products:

> Q.   Does it compete with anything that is not a flushable wet wipe?

> A.   We don't consider those nonflushables key competitors for Freshmates.[6]

## IV.  FRAMEWORK FOR DAMAGES

12.   As a threshold matter, it is my opinion that it is possible to determine class-wide damages in this case using the Defendant's own available business records, third party records and industry resources.

---

[3] Case, Fair & Oster, Principles of Microeconomics, 9th Edition, 2009, at 305-316, 449.

[4] Deposition of Marlene Otero, January 26, 2015 ("Otero Deposition"), at 47.

[5] *Id.,* at 48.

[6] *Id.,* at 100.



Declaration of Colin B. Weir
February 14, 2017
Page 4 of 26

13.   Below, I propose one possible measure of damages, along with another methodology that may be used to calculate such damages:

- Price Premium Damages[7] (wherein consumers would receive the difference between the value (purchase price) of the Products and value of the Products had the "Flushable" Claim not been made);

- Alternate Price Premium Damages (wherein consumers would receive the difference in the value between the Products, and the alternate product, toilet paper).

## V.  CALCULATION OF THE PRICE PREMIUM:
## REGRESSION ANALYSIS

14.   In this litigation, price premium restitution for the Class is the difference between the market price of the Products and the market price that would exist but for Defendant's misrepresentation.

15.   A method that can reliably isolate that difference in price is the econometric technique referred to as regression analysis.  A regression analysis is an econometric tool commonly used by economists.  A regression analysis identifies and quantifies the relationship between two or more variables.  A regression analysis is used to identify the variation in the so-called "dependent variable" (such as the price of a wipe) through its relationship with one or more "independent" or "explanatory" variables (such as, e.g., the Claim or the brand).[8]  A regression analysis can identify both whether a particular effect is present (such as to confirm

---

[7] As used throughout this declaration, the term "Price Premium Damages" is used to indicate the additional amount that consumers paid for the Products as a direct result of the Claim only, and not the overall premium that the Products may command in the marketplace vis-a-vis competitor products.  Indeed, a product may still carry a price premium for a product attribute despite having a lower total retail price than other products in the marketplace.

[8] An error term, also called the "disturbance" term, captures the effects of chance events, unmeasured variables, and other residuals as calculated by the regression model.



Declaration of Colin B. Weir
February 14, 2017
Page 5 of 26

that the Claim does increase the price of the Products) and the overall amount of such an effect (by how much the Claim increases the price of the Products).

16.  Hedonic regression is an application of standard regression techniques that measure the value of various product attributes.  Hedonic regression is based on the concept that each product attribute has a different and measurable impact on aggregate consumer utility.

17.  First detailed by Rosen in 1974,[9] hedonic regression is now widely used by economists.  Indeed, there are numerous studies that apply the hedonic regression technique to myriad consumer products and the practice has been adopted by statistical agencies with a focus on measuring consumer prices (e.g., the U.S. Bureau of Economic Analysis, the U.S. Bureau of Labor Statistics).[10]

18.  Hedonic regression also has a long history of use for determining damages in class action litigation.

> We have proposed the use of hedonic regression analysis as a tool to assist the courts in dealing with the difficult procedural decisions involved in these certification proceedings. Our proposed use of hedonic analysis fundamentally links class certification to the estimation of damages. In our application, we have used hedonic analysis to help certify class *specifically* by estimating the uniform and common damage caused to plaintiffs by the tortious behavior of defendant.[11]

19.  Recently, various courts (including federal courts in New York and California) have found that hedonic regression analysis is a suitable method for determining class-wide damages

---

[9] *Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition.* Rosen, Sherwin, The Journal of Political Economy, Vol. 82, No. 1. (Jan. - Feb., 1974) ("Rosen").

[10] The use of hedonic regression in individual studies is too widespread to exhaustively document in detail. *See, e.g., The Expanding Role of Hedonic Methods in the Official Statistics of the United States,* Moulton, Brent R., Bureau of Economic Analysis, U.S. Department of Commerce, June 2001.

[11] *The Use of Hedonic Analysis for Certification and Damage Calculations in Class Action Complaints*, Doane, Michael (Analysis Group) and Hartman, Raymond, Journal of Law, Economics, & Organization, Vol. 3, No. 2 (Autumn, 1987), pp. 351-372.  [Emphasis original]



Declaration of Colin B. Weir
February 14, 2017
Page 6 of 26

(and specifically price premium damages) in consumer class action lawsuits, including cases involving similar so-called "Flushable" wipes.[12]  I have conducted hedonic regressions numerous times in other cases.

20.   The hedonic regression analysis is conducted using actual aggregated pricing and product attribute information.  Hedonic regression does not require individual analysis to provide a class-wide result.  This is a mechanical truth as to how the technique works.

21.   The hedonic regression function can be expressed as:

$$P_i(Z) = P_i(Z_1, Z_2, \ldots Z_N)$$

In this function, P is the Price of product "i", each Z factor is a product attribute variable.  Each product attribute Z factor can have either a positive, negative, or null effect on the total Price, P. This model can be used to determine the value of the specific attributes of various products.

---

[12] *See, e.g.*, "Flushable" wipes specifically: *Anthony Belfiore v. The Procter & Gamble Company*, 140 F. Supp. 3rd 241, Case 1:14-cv-01142-JBW-RML, (E.D.N.Y. October 5, 2015); *D. Joseph Kurtz v. Kimberly-Clark Corporation*, 2015 WL 8481833, Case 1:14-cv-01142, (E.D.N.Y.); *Christopher Meta v. Target Corporation*, 74 F. Supp. 3d 858, Case No. 4:14-CV-0832, (N.D. Ohio 2015); Judge Weinstein has promised class certification in both *Belfiore v. The Procter & Gamble Co.* and *Kurtz v. Kimberly-Clark Corp.*, "U.S. District Judge Jack B. Weinstein said he would issue an order in 30 days approving a suit entirely composed of New York plaintiffs as well as the New York plaintiffs in a multistate suit"; https://www.law360.com/newyork/articles/888612/ny-judge-to-certify-2-of-6-flushable-wipe-class-actions%20&cd=1&hl=en&ct=clnk&gl=us (last accessed February 7, 2017).

In his 2015 Order in *Anthony Belfiore v. The Procter & Gamble Company* temporarily staying the case, Judge Weinstein affirmed that "Hedonic regression can be used to determine whether the class paid a premium for the product because it was marketed as 'flushable.'" pp. 71

Hedonic regression in other contexts: *Rohini Kumar v. Salov North America Corp.*, 2016 WL 3844334, Case No.: 14-CV-2411-YGR, (N.D. Cal July 15, 2016); *In re: Scotts EZ Seed Litigation,* 304 F.R.D. 397, Case No. 12-cv-4727-VB, (S.D.N.Y. January 26, 2015); *In re: ConAgra Foods Inc.*, 90 F. Supp. 3d 919, Case No. 11-cv-05379-MMM, (C.D. Cal February 23, 2015) *aff'd, Briseno v. ConAgra*, No. 15-55727, 2017 WL 53421, at *2 (9th Cir. Jan. 3, 2017); *Dei Rossi vs. Whirlpool*, 2015 U.S. Dist. LEXIS 55574, Case No. 12-cv-00125-TLN, (E.D. Cal April 28, 2015).

.



Declaration of Colin B. Weir
February 14, 2017
Page 7 of 26

22.   In this litigation, the hedonic regression can be specified to separate out the prices that consumers pay and/or the amount of revenue or profit that Defendant will glean, for each of the Product attributes (e.g., the Claim).

23.   The regression can be calculated in a variety of forms, including "linear" and "semi-log."

24.   In a linear format, the regression will calculate the dollar component amount of each product attribute (the value of each attribute as expressed in dollars and cents).

25.   In the semi-log format, the use of natural logarithms[13] allows the regression to calculate a percentage price increase or discount for each product attribute (the value of each attribute is expressed as a percentage of the price).

26.   One example model specification would be:

$$logP(Wipe) = \sum_{n=1}^{N}(\beta_n * z_n) + \varepsilon$$

where P(Wipe) is the natural log of the price of the Product or Products.  Beta, $\beta$, is the coefficient for the vector $z$, $z_{nt}$ is a vector representing the bundle of product attributes being measured, and $\varepsilon$ is the error term.

**A review of sample literature**

27.   Hedonic regression is routinely used to calculate the value of individual product attributes.  The hedonic regression model has been used to evaluate pricing in many different types of markets, but there is particularly extensive literature on this method in consumer product mass markets—the stated marketplace for the Products at issue in this litigation.

28.   Any variety of attributes can be studied, ranging from time/seasonality, geo-location/regional differences, brand, and product-specific attributes.  These attributes span things

---

[13] The logarithm of a number is the exponent to which another fixed value, the base, must be raised to produce that number.  This expression is often notated as $log_{base}(x)$.  The natural logarithm has the number $e$ (approx. 2.718) as its base.  Natural logarithms are often notated without reference to the base as $ln(x)$.



Declaration of Colin B. Weir
February 14, 2017
Page 8 of 26

such as package size or the Claim at issue in this litigation.  While too voluminous to document exhaustively here, there is a wealth of studies that confirm the ability of hedonic regression to determine the market value of product attributes.

29.  For example, U.S. Bureau of Labor Statistics ("BLS") published an article that uses the hedonic regression technique specifically on refrigerators for use in enhancing the calculation of the U.S. CPI.[14]  In the study, the BLS examines the price premiums associated with various product attributes (such as brand, whether the refrigerator had an ice maker, etc.) in an effort to improve the CPI by adjusting the index for such attribute premiums.

30.  Another example is a study of the yogurt market that shows that various production standard claims all produce positive, statistically significant price premiums associated with labeling claims such as "organic," "all natural" or "natural."[15]

31.  Another study used hedonic regression to examine the attributes of retail eggs to determine whether "organic feeding" labeling had a positive price premium effect on the retail price of eggs.[16]

32.  Another hedonic regression study examines the impact of "organic" labeling on Breakfast Foods.  "Organic" was found to have a significant positive effect on the retail price of Breakfast Bars, Granola and Hot Cereals.[17]

---

[14] *Developing a Hedonic Regression Model For Refrigerators in the U.S. CPI*, Shepler, Nicole, October 16, 2001, available at http://data.bls.gov/cgi-bin/print.pl/cpi/cpirfr.htm (last accessed February 24, 2015).

[15] *Organic and All Natural: Do Consumers Know the Difference?* Anstine, Jeffrey, Journal of Applied Economics and Policy 26.1 (2007):15-27.

[16] *Hedonic Analysis of Retail Egg Prices*, Karipidis, Philippos I., *et al*, Journal of Food Distribution Research 36.3 (2005).

[17] *The Value to Consumers of Health Labeling Statements on Breakfast Foods and Cereals,* Muth, Mary K., *et al* Contributed Paper prepared for presentation at the International Associate of Agricultural Economists Conference, Beijing, China, August 2009, on behalf of RTI International and Food and Drug Administration, Center for Food Safety and Applied Nutrition. 10 March 2014. http://ageconsearch.umn.edu/bitstream/50333/2/Manuscript_Value_of_Labeling_Statements_IAAE%20174.pdf



Declaration of Colin B. Weir
February 14, 2017
Page 9 of 26

33.  Another study used hedonic regression to evaluate how consumers value nutrients in breakfast cereals including vitamins, fiber, and sodium.  Results showed that vitamin content had a positive impact on the price of cereals.[18]

**Use of hedonic regression in this litigation**

34.  Hedonic regression is an ideal technique for calculating the price difference between the value of the Products with and without the Claim.

35.  The time periods, geographies, and relevant product attributes are easily identifiable and determinable in this litigation.   Indeed, the Defendant's own testimony[19] help provide a list of attributes that can be controlled for by the hedonic regression:

- "Flushable" Claim;[20]

- Brand;[21]

- Pack Size (Number of Wipes, etc.);[22]

- Packaging Type (Tub, Soft Package, etc.);[23]

- Wipe Size/Area;

- Promotional Pricing;[24]

- Fragrance/Scent.[25]

---

[18] *Hedonic Prices for a Nondurable Good: The Case of Breakfast Cereals.* Stanley, L. R. and John T. Tschirhart, Review of Economics and Statistics 73.3 (1991):537-541.

[19] *See, generally,* Otero Deposition; Deposition of Scott Richards January 27, 2015 ("Richards Deposition").

[20] Otero Deposition, at 47-48, 100, 107.

[21] *Id.*, at 47, 107

[22] *Id.,* at 49; Richards Deposition, at 43.

[23] Richards Deposition, at 57.

[24] *Id*.

[25] Otero Deposition., at 108.


ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
February 14, 2017
Page 10 of 26

36.   Defendant has also identified its primary brand name competitors to be Kleenex,
Cottonelle, and Scott.[26]

37.   The process of hedonic regression is iterative.  It would be extremely rare for an
economist to pull together a proposed list of attributes, assemble a data set, run one single
regression, and declare the results as final.  Instead, multiple regressions are run to help
determine the best regression specification before finalizing the results.  The identification of
explanatory variables is an ongoing process that starts with economic theory, then involves
collecting and reviewing data, and analyzing the data to make an empirical determination about
the use of the variable.  Sometimes a variable may seem relevant theoretically, but may later be
discovered to not be proper for inclusion in the model, and vice versa.

**Statistical evaluations of a regression model**

38.   Hedonic regression (as with any regression) produces statistical measures, such as
the R-squared statistic, the F-statistic, and T-statistic, all of which can be used to evaluate the
reliability of the results of the study.  These measures are objective, mathematical calculations
produced mechanically by statistical software packages.  Questions about the reliability or
explanatory power of these models can be answered by examining these and other measures of
reliability.

39.   The R-squared and adjusted R-squared are widely-recognized and accepted
indicators of the explanatory power of a regression model.  The R-squared essentially identifies
the percent of the variation in the dependent variable that can be explained by the independent
variables.

40.   Another commonly used and widely-recognized measure of the explanatory power
of a model is the F-statistic.  The F-statistic helps to determine the overall "goodness of fit" of

---

[26] Otero Deposition, at 77.

ETi   ECONOMICS AND
      TECHNOLOGY, INC.

Declaration of Colin B. Weir
February 14, 2017
Page 11 of 26

the model.  It is a statistic one might examine to see whether if the model produces appropriate results and whether the model makes statistical sense.

41.    The T-statistic is yet another objective measure of the reliability of the results of a statistical model.  Each explanatory variable will produce a result from the model—a "coefficient"—along with a T-statistic to evaluate whether the result is statistically significant.[27] It gives the economist guidance that the coefficient is meaningful in a statistical sense.

**The available data**

42.    The data necessary to conduct a hedonic regression analysis and damage calculation in this litigation are available, or will become available.  Such data come from one of several sources: Defendant's own business records (e.g., pricing data, product attributes, sales volumes); third party competitors (e.g., labels); or industry resources and independent market research (e.g., pricing and product attribute information from IRI/Nielsen).

43.    I have been provided with myriad sales and other data, as described below.

44.    Counsel for Plaintiff has subpoenaed, and obtained sales data from IRI.[28]  This data set contains weekly sales data of wipe products, including from January 2011 through December 2016, for the state of California.  The data contains information, by product/UPC, the Dollar and Unit Sales, as well as brand, size, and other product attribute information.  This data is broken down into normal sales, and so-called "merchandized" or promotional sales--or what might commonly be described as data for products "on sale" vs "not on sale."  This allows for the regression to account for couponing and discount promotional sales such as 50% off or Buy One Get One ("BOGO").

---

[27] T-statistics can be calculated in a "standard" form (which relies upon certain assumptions about the underlying data, and can overstate the t-statistics if those assumptions do not hold) and "robust" form (which does not rely on these assumptions, and instead uses calculation methods that are not sensitive to whether those assumptions are invalid in some particular ways).

[28] IRI_Pettit_PG_0002^Highly Confidential AEO.xlsx



Declaration of Colin B. Weir
February 14, 2017
Page 12 of 26

45.  ==Defendant regularly uses and relies upon third party market research data== of this kind,[29] ==and has a full time representative from such a firm co-located at P&G.==[30]

46.  I have also obtained label information for the top selling brands in the wipe market in California.

47.  I understand that Counsel for Plaintiff has also subpoenaed label data from additional third parties.[31]  To date, I have received historic label data from P&G for the Products, and have considered such data as part of the regression analysis.  As additional data becomes available, it will be possible to update the data set and regression.

48.  No individualized analyses, or Class-Member-specific inquiry will be required.  All relevant data needed to complete the hedonic regression analysis is Class-wide, common evidence.

**Data Preparation**

49.  Prior to running a preliminary regression, I undertook several steps to prepare the data.  The primary task was to integrate the IRI sales data with attribute information taken from product labels.  Specifically, I obtained California IRI sales of wipe products, identified the top selling brands in the wipe market in California, representing 72.38% of the total market share by units from 119 products and obtained labels for these products from stores and online sources. After obtaining product labels, I generated a coded spreadsheet of the various claims made by manufacturers on their product labels, as well as other product attributes.

---

[29] Deposition of Scott Richards January 27, 2015 ("Richards Deposition") at 22, 27, 59.

[30] *Id.,* at 31-32.

[31] Including Kimberly-Clark, Rockline and NicePak.



Declaration of Colin B. Weir
February 14, 2017
Page 13 of 26

50.  In addition to sales information, the IRI data contains information about each of the following attributes: Brand Name, Manufacturer, Product Type, Flavor/Scent, Total Sheet Count, and Total Pack Count.

51.  The regression contains the following attributes as independent variables, which I coded as either a single variable or a set of categorical[32] (dummy)[33] variables: "Flushable" Claim, Brand, Number of Sheets, Number of Packs, Wipe Area, Package Type, Baby & Toddler/Adult, Travel Pack, Alcohol Free, Hypoallergenic, Aloe & Vitamin E, Fragrance/Scent, Natural Claims, and Sensitive/Gentle Claims.

*Brand*

52.  The dataset includes 11 major brands:  Charmin, its two primary competitors,[34] Scott and Kleenex, and Boogie Wipes, Huggies, Johnson's, NoBrand, Pampers, Pure N' Gentle, Seventh Generation, and The Honest Co.  The dataset for these brands include 119 products that comprise 72.38% of the market.  To control for brand specific effects in the regression, I created a group of "Brand" dummy variables, which were included in the regression model.

*Sold on Promotion*

53.  As previously discussed, IRI data captures information about the portion of sales of each Product that are "merchandized" sales or promotional sales.  In order to account for

---

[32] A single variable would be something like size, whereas a categorical variable would be something like brand, where each observation would have a separate variable indicating whether the Product was or was not each of the brands in the model.

[33] "Dummy" variable is a term of art in econometrics (and is not used in a pejorative sense), referring to a variable that takes the value 0 under one condition, or 1 in the alternate.  For example, the presence of a flushable claim will be coded as a dummy variable, where each observation will be coded as 1 if the products makes a flushable claim, and 0 if it does not.

[34] Otero Deposition, at 77.



Declaration of Colin B. Weir
February 14, 2017
Page 14 of 26

promotional sales of the Products I generated a dummy variable to indicate sales that occurred on promotion.

*"Flushable" Claim*

54.  In order to isolate the price premium associated with flushability I created a dummy variable, which indicates whether a product is "Flushable" or not.

*Number of Sheets and Number of Packs*

55.  For each product the IRI sales data captures the total quantity of sheets (wipes), as well as the total quantity of packs (separate packages), contained in each package or bundle of packages.  Both of these variables were included in the regression model in order to control for the total number of wipes and packs contained within each product.

*Package Type*

56.  Wipes are typically available for purchase in one of four types of containers: soft packages (plastic-wrapped packages), tubs (hard plastic containers), soft pack tubs (soft plastic packages with hard plastic lids), and boxes.  I created a dummy variable for each type of container.

*Wipe Area*

57.  One attribute of that is commonly featured on wipe packaging is the size of the wipes, which is often reported as the width of the wipe in inches by the height of the wipe in inches (width" x height") or vice versa (height" x width").  In order to control for wipe size, I generated a "Wipe Area" variable (measured in square inches) equal to width times height.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
February 14, 2017
Page 15 of 26

*Baby/Toddler v Adult*

58.   Based upon a review of the labels and products, I generated a dummy variable to capture which products are typically sold for babies/toddlers versus products that are typically sold for adults.

*Travel Pack*

59.   Wipe manufacturers commonly label certain products as "travel packs."  I generated a dummy variable to indicate whether products were labeled as "travel packs."

*Hypoallergenic*

60.   Some wipes indicate that they are "hypoallergenic" or "allergy tested"  on their labels.  I created a single dummy variable to account for the effect of hypoallergenic on price.

*Scented/Unscented*

61.   In order to control for the effect scent on the price of wipes, I included a dummy variable to indicate whether each product was scented or unscented.

*Alcohol Free*

62.   A portion of wipe products specify that they are "Alcohol Free" on their labels.  I created a dummy variable to control for the effect of "Alcohol Free" on price.

*Aloe/Aloe & Vitamin E*

63.   Various wipes indicate that they contain aloe or aloe and vitamin E.  I generated a dummy variable to capture the effect of aloe or aloe and vitamin E on price.



Declaration of Colin B. Weir
February 14, 2017
Page 16 of 26

*Natural Claims*

64.  Various wipes claim to be "Natural."  I included a dummy variable in the regression model to account for products that include "Natural" claims on their packaging.

*Sensitive/Gentle Claims*

65.  Wipe products often include language on their labels that indicates they are "Sensitive" or "Gentle."  In order to account for "Sensitive" and "Gentle" claims I created a dummy variable that indicates whether a product claims to be "Sensitive" or "Gentle."

**Hedonic Regression Results**

66.  I have conducted a hedonic regression that confirms the existence of a price premium attributable to the "Flushable" Claim.  These results pertain to sales throughout California and all of the challenged P&G Products, across all sizes, and across multiple years.  Additional regressions could be run for different Class periods and/or geographic areas, and may be subject to refinement as new, different and/or additional data becomes available.  My results confirm that the hedonic regression technique is capable of making such a determination in this case.

67.  I conducted my analysis using Stata.[35]  Stata is commercially available (for sale) to all researchers who conduct statistical analysis, and is widely used in the profession: "Stata is distributed in more than 200 countries and is used by hundreds of thousands of professional researchers in many fields of research."[36] Stata has been used numerous times to conduct

---

[35] http://www.stata.com/products/

[36] http://www.stata.com/why-use-stata/

ECONOMICS AND
TECHNOLOGY, INC.

regression analysis in litigation damages contexts.[37]

68.  The dependent variable is the natural logarithm of price.

69.  I have analyzed several product attributes and control variables as potential explanatory variables of price in this hedonic regression of the prices in the IRI data.

70.  As noted above, the dataset contains California price, unit sales, and attribute (including flushability) data for the wipe product category, including data on the sales of the P&G Products, for the period January 2011 through December 2016.

71.  I converted the IRI data into quarterly data since the econometrics literature suggests that regression with highly granular data may, but not always, suffer from problems associated with serial correlation.[38]  On this basis I chose to estimate the regression model using quarterly data.  However, whether the regression model is estimated using monthly or quarterly data does not materially affect the results of the regression model in this case.

72.  As discussed above, I have analyzed several product attributes and control variables as potential explanatory variables of price in this hedonic regression.

73.  After organizing the data, I tested several different specifications of the regression model using the natural log of price as the dependent variable.[39]  Each regression had similar, robust results.  The stability of the results across different model specifications, as well as high level diagnostic statistics of the final and preferred model, give me confidence that this preliminary analysis is robust and reliable for purposes of demonstrating that this method can be used to calculate Price Premium Damages on a Class-wide basis.

74.  The preliminary model produced robust results.  I have reproduced the R-Squared,

---

[37] See, e.g., *In re: Cellphone Termination Fee Cases*, Ramzy Ayyad, et al, Plaintiff, v. Sprint Spectrum, L.P., Defendant, JCCP No. 4332, Case No. RG03-121510; *In re: ConAgra Foods Inc.*, 90 F. Supp. 3d 919, Case No. 11-cv-05379-MMM, (C.D. Cal February 23, 2015).

[38] Baker, Jonathan B. and Timothy F. Bresnahan, *Economic Evidence in Antitrust: Defining Markets and Measuring Market Power*, Chapter 1 of Handbook of Antitrust Economics 2007, Cambridge: MIT Press, at 9.

[39] Several dependent variables were tested such as price per wipe, but did not yield substantially different results.



Declaration of Colin B. Weir
February 14, 2017
Page 18 of 26

F-statistic, and independent variable information (including the T-statistic) for the Claim, as well as the associated Price Premiums and Premium Factors[40] in Table 1.  The complete results of the model are reproduced in Exhibit 3.

| Table 1. Summary Preliminary Hedonic Regression Results | | | | |
|---|---|---|---|---|
| | Claim Coefficient | Claim T-Statistic | Claim Price Premium | Claim Price Premium Factor |
| Flushable Claim | 0.087933 | 3.06 | 9.1915% | 8.4178% |
| F-statistic = 2,257.87, Adjusted R-squared = 0.9448 | | | | |

75.   A wipe labeled "Flushable" carries a 9.19% price premium over a standard wipe with no claim about its flushability.

76.   As can be seen in the table, the model produced relatively high adjusted R-Squared values, indicating that the model is explaining 94.5% of the variation of the dependent variable. The F-Statistics also confirm that the model has strong explanatory power.

77.   The consistently positive coefficient for the Claim indicates that consumers place a high value on the "Flushable" Claim, and that market wide, there is a substantial price premium attributable to this Claim.  The T-Statistics for the Claim coefficient indicates that the results are all statistically significantly different from zero at the 99% confidence level.

---

[40] To interpret a coefficient in this log-linear regression, it must first be exponentiated to undo the log transformation. This is done by taking the mathematical constant e (roughly 2.71828), and raising it to the exponent of the coefficient, and then subtracting 1 from the result. This result can then be interpreted as the percentage price premium or discount for that attribute, when all other attributes are held constant.  When interpreting the effects of more than one coefficient at a time, one must understand that the model coefficients in total are relative to a base price without any attributes at all.  The price premium calculated here is the extra amount consumers would have paid above a base amount had the Claims not been made.  The actual available sales data in this case are sales dollars that occurred *with* the Claims.  To determine restitution, you need the corresponding price premium factor, which is calculated as, e.g. $[premium] \div [1 + premium] = 0.087933 \div 1.087933 = 0.091915$ or 9.1915%.



Declaration of Colin B. Weir
February 14, 2017
Page 19 of 26

# VI.  TOTAL SALES OF THE PRODUCTS

78.  Total Dollar Sales of the P&G Products were calculated from the IRI through-the register sales data as the basis for the total sales of the P&G Products during the Class period: April 6, 2011 through the present.  The sales of the P&G Products are summarized in Table 2.

| Table 2. California Retail Sales of the P&G Products | |
| --- | --- |
| **Charmin Freshmates Product** | **California Retail Sales** |
| CHARMIN FRESHMATES MOIST TOWELETTE 5.6 INCH X 7.5 INCH ADULT RP 40 CT | $ 87 |
| CHARMIN FRESHMATES MOIST TOWELETTE 7.4 INCH X 5.3 INCH ADULT SP 48 CT | $ 40,668 |
| CHARMIN FRESHMATES MOIST TOWELETTE 7.4 INCH X 5.3 INCH CLEANSING RP 40 CT | $ 5,161,132 |
| CHARMIN FRESHMATES MOIST TOWELETTE REFILL ADULT RP 160 CT | $ 6,126,992 |
| CHARMIN FRESHMATES MOIST TOWELETTE REFILL ADULT RP 160 CT | $ 8,309 |
| CHARMIN FRESHMATES MOIST TOWELETTE REFILL ADULT RP 40 CT | $ 16 |
| CHARMIN FRESHMATES MOIST TOWELETTE REFILL ADULT RP 40 CT | $ 2,328 |
| CHARMIN FRESHMATES MOIST TOWELETTE REFILL ADULT RP 40 CT | $ 2,859 |
| CHARMIN FRESHMATES MOIST TOWELETTE REFILL CLEANSING RP 80 CT | $ 9,704,018 |
| CHARMIN FRESHMATES MOIST TOWELETTE REFILL FRESH ADULT RP 80 CT | $ 8,394 |
| CHARMIN FRESHMATES MOIST TOWELETTE REFILL REGULAR GENERAL PURPOSE RP 120 CT | $ 1,404,527 |
| CHARMIN FRESHMATES MOIST TOWELETTE REFILL TWIN PAK ADULT RP 80 CT | $ 43 |
| COTTON BUDS CHARMIN TO GO FRESHMATES MOIST TOWELETTE TRAVEL PACK FRESH CLEAN SCENT ADULT RP 10 CT[41] | $ 1,098,763 |
| TOTAL | $ 23,558,138 |

---

[41]This product bears the Charmin brand, but appears to be distributed by the company Cotton Buds and not P&G. "At Cotton Buds we develop, manufacture and market innovative, practical, value-added personal care toiletries for use when away from home…"  "In April, 2005, Procter & Gamble granted a license to Cotton Buds to market and distribute a travel-size version of Charmin Freshmates® flushable moist wipes under the Charmin To Go® label.  It is currently sold in a convenient package of 10 wipes, wrapped in a light weight, resealable plastic pouch that can easily fit in a pocket or purse."  http://www.cottonbuds.com/about (last accessed February 8, 2017).  I have included the Cotton Buds Charmin Freshmates product here on a preliminary basis because the products carry the Charmin brand.  Should it be determined that these wipes are not part of the litigation, they can easily be removed from the tally of total sales.  These products would remain a part of the hedonic regression analysis one way or another, as the regression includes both class products and competitors.


ECONOMICS AND TECHNOLOGY, INC.

Declaration of Colin B. Weir
February 14, 2017
Page 20 of 26

## VII.  CALCULATION OF PRICE PREMIUM

## DAMAGES

79.  Calculating regression price premium damages in this litigation is simple and straightforward.  With the price difference due to the Claim determined on a percentage basis, the calculation of Class-wide damages for any Product will be:

$$\%Price\ Premium\ Factor: Claim \times \$Units\ Sold\ = Damages$$

80.  These calculations can be performed on a Class-wide basis, for any defined time period, including the Class Period(s) in this litigation, and/or geographic location.

| Table 3. Preliminary Damages Estimates | | | |
|---|---|---|---|
| Charmin Freshmates Product | California Retail Sales | Price Premium Factor | Damages |
| CHARMIN FRESHMATES MOIST TOWELETTE 5.6 INCH X 7.5 INCH ADULT RP 40 CT | $ 87 | 8.4178% | $ 7 |
| CHARMIN FRESHMATES MOIST TOWELETTE 7.4 INCH X 5.3 INCH ADULT SP 48 CT | $ 40,668 | 8.4178% | $ 3,423 |
| CHARMIN FRESHMATES MOIST TOWELETTE 7.4 INCH X 5.3 INCH CLEANSING RP 40 CT | $ 5,161,132 | 8.4178% | $ 434,452 |
| CHARMIN FRESHMATES MOIST TOWELETTE REFILL ADULT RP 160 CT | $ 6,126,992 | 8.4178% | $ 515,756 |
| CHARMIN FRESHMATES MOIST TOWELETTE REFILL ADULT RP 160 CT | $ 8,309 | 8.4178% | $ 699 |
| CHARMIN FRESHMATES MOIST TOWELETTE REFILL ADULT RP 40 CT | $ 16 | 8.4178% | $ 1 |
| CHARMIN FRESHMATES MOIST TOWELETTE REFILL ADULT RP 40 CT | $ 2,328 | 8.4178% | $ 196 |
| CHARMIN FRESHMATES MOIST TOWELETTE REFILL ADULT RP 40 CT | $ 2,859 | 8.4178% | $ 241 |
| CHARMIN FRESHMATES MOIST TOWELETTE REFILL CLEANSING RP 80 CT | $ 9,704,018 | 8.4178% | $ 816,862 |
| CHARMIN FRESHMATES MOIST TOWELETTE REFILL FRESH ADULT RP 80 CT | $ 8,394 | 8.4178% | $ 707 |
| CHARMIN FRESHMATES MOIST TOWELETTE REFILL REGULAR GENERAL PURPOSE RP 120 CT | $ 1,404,527 | 8.4178% | $ 118,230 |
| CHARMIN FRESHMATES MOIST TOWELETTE REFILL TWIN PAK ADULT RP 80 CT | $ 43 | 8.4178% | $ 4 |
| COTTON BUDS CHARMIN TO GO FRESHMATES MOIST TOWELETTE TRAVEL PACK FRESH CLEAN SCENT ADULT RP 10 CT[41] | $ 1,098,763 | 8.4178% | $ 92,491 |
| TOTAL | $ 23,558,138 | 8.4178% | $ 1,983,069 |

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
February 14, 2017
Page 21 of 26

81.  Table 3 above summarizes these calculations.

## VIII.  CALCULATION OF PRICE PREMIUM: TOILET PAPER EQUIVALENCE

82.  There is another possible methodology for determining a price premium in this litigation.  <mark>Defendant has indicated that its Products rely on being flushable, that the flushable attribute is important to consumers, and that non-flushable products do not compete with the Products.</mark>[42]  As such, one appropriate measure of damages would be to consider the difference in value between the Products, and the alternate product, toilet paper.[43]  According to Plaintiffs' wastewater expert Barry Orr, toilet paper is the only currently available product that is truly flushable, i.e. suitable for disposal by flushing down the toilet.[44]  This difference in value could be calculated by comparing the average price of the Products to the average price of toilet paper or using regression analysis (controlling for factors such as brand, package size, etc) on an "equivalized" basis, using an equivalence factor to control for the different quantities of the Product and toilet paper used in each trip.  Once both the difference in price between the Products and toilet paper has been determined on an equivalized basis, the calculation of Class-wide damages for any Product will be:

$$\big((\textit{Price per Wipe} \times \textit{Eq.}) - (\textit{Price per Sheet} \times \textit{Eq.})\big) \times \left(\frac{\textit{Total Wipes}}{\text{Wipe Eq.}}\right) = \textit{Damages}$$

---

[42] *See, generally*, Otero Deposition.

[43] <mark>Lisa Sanchez, Research and Development Director for the Charmin and Puffs brands in P&G's Family Care business unit, testified that, as to the recommended retail location for the Products, "A: The toilet paper aisle would be the location that we recommend.... We put it in that location for its intended use. It's intended to be used in the bathroom with the toilet. So it's with the other items that are to be used in the bathroom with the toilet.  Q: That's the only place?  A: Yes."  Deposition of Lisa Sanchez, January 26, 2017 ("Sanchez Deposition") at 58-59.  Ms. Sanchez also testified: "Q. So I guess if the consumer is not  in the market for a flushable wipe, your cleanliness claim is not going to matter to them, correct?  A. If my consumer is not in the market for flushable wipes, they're not paying attention to the category. They're not coming through that aisle, looking for that product. So it's kind of, like, irrelevant. It's invisible to them if they are not in the market for that kind of product."  Sanchez Deposition, at 95.</mark>

[44] *See, generally*, Declaration of Barry Orr, February 14, 2017.



Declaration of Colin B. Weir
February 14, 2017
Page 22 of 26

83.   As an illustration, assume the average price of the Products is $0.0509 per wipe, and that the price of toilet paper is $0.0034 per sheet;[45] assume that the number of wipes used per trip (i.e., the wipe equivalent factor) is 2, and that the number of sheets of toilet paper used (i.e., the toilet paper equivalent factor) is 8.6.[46]   As such, the equivalized price per wipe is $0.1017 ($0.0509 x 2) and per toilet paper is $0.0296 ($0.0034 x 8.6).   Subtracting, $0.1017 - $0.0296 = $0.0721.   To determine Class-wide damages, this figure would then be multiplied by the number of Charmin wipe equivalent units[47] sold during the class period (460,000,000/2 x 0.0721 = $16,572,894).[48]

$$\left( (\$0.0509 \times 2) - (\$0.0034 \times 8.6) \right) \times \left( \frac{460,000,000}{2} \right) = \$16,572,894$$

84.   As an alternative to measuring the difference in price between "Flushable" wipes and toilet paper by calculating the difference in equivalized average price, it is also possible to estimate this difference using an econometric model that controls for a range of factors such as brand, package size, and other product attributes.   In such a regression model the dependent variable would be specified as the equivalized price per sheet of "Flushable" wipes and toilet paper products ($Price\ per\ Wipe \times 2$ for wipes and $Price\ per\ Sheet \times 8.6$ for toilet paper),

---

[45] The average price per wipe of the Products over the Class period, calculated using IRI data, is approximately $0.0509.   The average price per sheet of toilet paper was calculated for illustrative purposes using the advertized price of Charmin Toilet Paper Ultra Soft 24 CT ($12.47) on Walmart.com (https://www.walmart.com/ip/Charmin-Ultra-Strong-Toilet-Paper-Double-Rolls-154-sheets-24-rolls/45098933; last accessed February 8, 2017).   I am awaiting additional toilet paper label data before making a final determination of appropriate value of this input.

[46] For illustrative purposes, according to the Toilet Paper Encyclopedia, on average consumers use 8.6 sheets per bathroom trip. (http://encyclopedia.toiletpaperworld.com/surveys-stories/toilet-paper-statistics; last accessed February 8, 2017).

[47] The "equivalent units," in this instance, is the total number of wipes or sheets of toilet paper sold divided respectively by the average number of wipes or sheets of toilet paper used per trip (the Wipe Eq. Factor or Toilet Paper Eq. Factor).   E.g., there were approximately 460-million Charmin Freshmate wipes sold to the class, and for purposes of illustration, I have used an average number of wipes per trip--Wipe Eq. Factor-- of 2.   Using per trip equivalents acknowledges that one wipe is not directly equivalent to one sheet of toilet paper in terms of the quantity of each product used per trip.

[48] According to IRI data, California consumers purchased at retail during the class period approximately 6.4-million packages of the Products, which equates to approximately 460-million individual wipes based on the number of wipes in each package.



Declaration of Colin B. Weir
February 14, 2017
Page 23 of 26

while the independent variables would (as in the case of hedonic regression) include product attributes.  However, the model would also include a dummy variable indicating which products included in the regression model are "Flushable" wipes (indicated with "1") and which are toilet paper products (indicated with "0").  The model could be specified using a variety of functional forms (see "linear" vs. "semi-log" in para. 23-25), however, one example specification would be the following:

$$Eq.\, Price = \delta * D + \sum_{n=1}^{N} (\beta_n * z_n) + \varepsilon$$

where $Eq.\, Price$ is the equivalized price per wipe/sheet of "Flushable" wipes and toilet paper products.  Delta, $\delta$, is the coefficient of the dummy variable $D$, described above, which represents the estimate of the difference in price between "Flushable" wipes and toilet paper.  Beta, $\beta$, is the coefficient for the vector $z$, $z_{nt}$ is a vector representing the bundle of product attributes being measured, and $\varepsilon$ is the model error term.

85.  In the case of regression, using the equivalence methodology, Class-wide damages are calculated as follows:

$$\delta \times \left( \frac{Total\, Wipes}{Wipe\, Eq.} \right) = Damages$$

Or as in the previous example:

$$\delta \times \left( \frac{460,000,000}{2} \right) = Damages$$

86.  Either implementation of the equivalence methodology can be performed on a Class-wide basis, for any defined time period, including the Class Period(s) in this litigation, and/or geographic location.



Declaration of Colin B. Weir
February 14, 2017
Page 24 of 26

## IX.  INDIVIDUAL INQUIRY IS NOT REQUIRED

**Variations in purchase price do not alter the calculation of total, Class-wide damages**

87.  Variations in purchase price do not prevent the calculation of Class-wide damages. Such variations in price are captured in the IRI actual sales data used for analysis, and analyzed by the hedonic regression model.  Such variations are also inapposite to the calculation of Class-wide damages, because the ultimate method of distribution or allocation of restitution to individuals during claims administration or a settlement does not alter the calculation of total, Class-wide damages.

88.  Class-wide damages under a price premium model can be calculated from the bottom up as the sum of individual damages (as defendants often assert), or can be calculated from the top down, without individual inquiry, by finding the percentage price difference resulting from the Claim and then multiplying it by the number of units or dollars sold.  As outlined above, I propose to use the latter technique, obviating the need for individual inquiry.

89.  Ultimately, no matter the method by which restitution is distributed, it does not affect the calculation of, or the total amount of Class-wide damages in this litigation.

**Individual interpretation of the Claim is irrelevant to the determination of Class-wide damages**

90.  Individual interpretation of the Claim is irrelevant to the determination of Class-wide price premium damages here.  Individual interpretations of the Claim do not change the price paid by an individual.  As such, we are dealing with a simple but-for question: What did the Class pay for the Products with the Claim, and what would they have paid had the Claim not been made?

91.  Calculating a but-for price premium does not depend on an individual interpretation of the Claim because there is no middle ground.  If the market price for the Products was higher



Declaration of Colin B. Weir
February 14, 2017
Page 25 of 26

as a result of the Claim, then ALL consumers will have paid a higher price than if the Claim had not been made, regardless of their personal interpretations.

**Individual behavior or use of the Products is irrelevant to the determination of Class-wide damages**

92.   Calculating a but-for price premium does not depend on individual behaviors or uses of the Products.  As I have discussed at length, if the market price for the Products was higher as a result of the Claim, then ALL consumers will have paid a higher price than if the Claim had not been made.

**Individual reasons for purchase do not change the price, or price premium paid by an individual**

93.   Individual reasons for purchase are irrelevant in this case, because a consumer's individual reasons for purchase do not change the price paid by that individual.  Consumers do not negotiate the price of the Products at retail.  Shelf prices do not adjust themselves for individual consumers.

94.   As I have discussed above, if there is a market price premium included in the price of the Products as a result of the Claim and consumers buy the Product, they will pay that premium regardless of their reasons for purchase, because their individual reasons for purchase do not change the price they will pay.

95.   Even if a consumer bought a unit of the Products with the intention to immediately throw that Product in the garbage, the consumer has been harmed because he paid more for the Products than he would have but for the Claim.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
February 14, 2017
Page 26 of 26

## X.  RESERVATION OF RIGHTS

My testimony is based upon the information and data presently available to me.

Additional, different and/or updated data including market research data may be obtained in

advance of trial.  I therefore reserve the right to amend or modify my testimony.

### VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information, and belief, and that this declaration was executed at Koloa, Hawaii, this

14th day of February, 2017.

Colin B. Weir

ECONOMICS AND
TECHNOLOGY, INC.

**Exhibit 1**

**Statement of Qualifications
of**

**COLIN B. WEIR**

## Statement of Qualifications

## COLIN B. WEIR

Colin B. Weir is Vice President at Economics and Technology, Inc.  Mr. Weir conducts economic, statistical, and regulatory research and analysis, and testifies as an expert witness. Mr. Weir's work involves econometric and statistical analysis, multiple regression, surveys, statistical sampling, micro- and macroeconomic modeling, accounting and other economic analysis.  Such analysis often involves analysis of databases, call detail records, and other voluminous business records. Mr. Weir  is familiar with common statistical and econometric software packages such as STATA and SHAZAM.  Mr. Weir assists with analysis of economic, statistical and other evidence; and preparation for depositions, trial and oral examinations. Mr. Weir has provided expert testimony before federal and state courts, the FCC, and state regulatory commissions, and has contributed research and analysis to numerous ETI publications and testimony at the state, federal, and international levels.  Prior to joining ETI, Mr. Weir worked at Stop and Shop Supermarkets as a cash department head, grocery/receiving clerk, and price-file maintenance head.

Mr. Weir's experience includes work on a variety of issues, including: economic harm and damage calculation;  liquidated damages provisions; lost profits; false claims; diminution in value; merger/antitrust analysis; diminution in value; Early Termination Fees (ETFs); Late Fees; determination of Federal Excise Tax burden; and development of macroeconomic analyses quantifying the economic impact of corporate actions upon the US economy and job markets.

Mr. Weir has conducted research and analysis in numerous litigation and regulatory matters on behalf of corporate, government and individual clients, including AT&T, MTS Allstream (Canada), The US Department of Justice, Office of the Attorney General of Illinois, Pennsylvania Department of Revenue,  Thomas v. Global Vision, (class action litigation, Superior Court, County of Alameda), Ayyad v. Sprint (class action litigation,  Superior Court, County of Alameda), Forcellati v. Hylands (class action, U.S. District Court, Central District of California), and Ebin v. Kangadis Foods (class action, U.S. District Court, Southern District of New York).

Mr. Weir holds an MBA with honors from Northeastern University.  He also holds a  Bachelor of Arts degree *cum laude* in Business Economics from The College of Wooster.

Mr. Weir is a member of the Boston Economic Club, a business member of the Boston Bar Association, and serves as the comptroller for the Sybaris Investment Partnership.

ECONOMICS AND
TECHNOLOGY, INC.

**Publications and Testimony of Colin B. Weir**

Mr. Weir has co-authored the following:

*Interoperability and Spectrum Efficiency: Achieving a Competitive Outcome in the US Wireless Market* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, July 2012.

*The Price Cap LECs' "Broadband Connectivity Plan": Protecting Their Past, Hijacking the Nation's Future* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of United States Cellular Corporation, September 2011.

*Regulation, Investment and Jobs: How Regulation of Wholesale Markets Can Stimulate Private Sector Broadband Investment and Create Jobs* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of Cbeyond, Inc., Covad Communications Company, Integra Telecom, Inc., PAETEC Holding Corp, and tw telecom inc., February 2010.

*Revisiting Us Broadband Policy: How Re-regulation of Wholesale Services Will Encourage Investment and Stimulate Competition and Innovation in Enterprise Broadband Markets*, (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, February 2010.

*Longstanding Regulatory Tools Confirm BOC Market Power: A Defense of ARMIS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, January 2010.

*Choosing Broadband Competition over Unconstrained Incumbent Market Power: A Response to Bell and TELUS* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, April 2009.

*The Role of Regulation in a Competitive Telecom Environment: How Smart Regulation of Essential Wholesale Facilities Stimulates Investment and Promotes Competition* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, March 2009.

*Special Access Overpricing and the US Economy: How Unchecked RBOC Market Power is Costing US Jobs and Impairing US Competitiveness* (with Lee L. Selwyn, Susan M. Gately, and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of the AdHoc Telecommunications Users Committee, August 2007.

*The AWS Spectrum Auction: A One-Time Opportunity to Introduce Real Competition for Wireless Services in Canada* (with Lee L. Selwyn and Helen E. Golding) Economics and Technology, Inc., prepared on behalf of MTS Allstream, June 2007.

*Comparison of Wireless Service Price Levels in the US and Canada* (with Lee L. Selwyn) Economics and Technology, Inc., prepared on behalf of MTS Allstream, May 2007.



*Hold the Phone! Debunking the Myth of Intermodal Alternatives for Business Telecom Users In New York* (with Susan M. Gately and Lee L. Selwyn) Economics and Technology, Inc., prepared for the UNE-L CLEC Coalition, August 2005.


Mr. Weir has submitted the following testimony:

**United States District Court, Southern District Of New York,** *Alan Gulkis, individually and on behalf of all others similarly situated, Zicam LLC and Matrixx Initiatives, Inc.*, Case No. 7:15-cv-09843-CS, on behalf of Bursor & Fisher, P.A., Declaration submitted on February 8, 2017.

**United States District Court, Central District Of California,** *Elisabeth Martin, on behalf of herself, all others similarly situated, and the general public, v. Monsanto Company*, Case No. 16-02168-JFW (SPx), on behalf of the Law Office of Jack Fitzgerald, PC, Declaration submitted February 6, 2017; Deposition on February 9, 2017.

**United States District Court, Southern District Of New York,** *Walt Famular, on behalf of himself and all others similarly situated, v. Whirlpool Corporation*, Case No. 16-cv-00944, on behalf of Bursor & Fisher, P.A., Declaration submitted February 3, 2017.

**United States District Court, Central District of California,** *In re: 5-Hour Energy Marketing and Sales Practices Litigation*, Case No. 2:13-ml-02438 PSG, on behalf of Bursor & Fisher, P.A., Declaration submitted September 26, 2016; Reply Declaration submitted October 14, 2016; Deposition on October 27, 2016.

**United States District Court, Southern District of Florida,** *Benjamin Hankinson, James Guerra, Jeanette Gandolfo, Lisa Palmer, Donald Anderson, Catherine Long, and Lisa Prihoda, individually and on behalf of others similarly situated, v. R.T.G. Furniture Corp., d/b/a Rooms to Go, RTG America, LLC, The Jeffrey Seaman 2009 Annuity Trust, RTG Furniture Corp. of Georgia, d/b/a Rooms to Go, Rooms to Go North Carolina Corp., d/b/a Rooms to Go, RTG Furniture of Texas, L.P., d/b/a Rooms to Go, RTG Texas Holdings, Inc., and R.T.G. Furniture Corp. of Texas*, Case No. 9:15-cv-81139-COHN/SELTZER, on behalf of Cohen Milstein, Declaration submitted September 1, 2016; Declaration submitted October 3, 2016; Deposition on November 4, 2016; Declaration submitted on January 5, 2017.

**Circuit Court Of Cook County, Illinois County Department, Chancery Division,** *Amy Joseph, individually and on behalf of all others similarly situated, Benjamin Perez, individually and on behalf of all others similarly situated, Intervening Plaintiff, v. Monster Inc., a Delaware Corporation, and Best Buy Co., Inc., a Minnesota Corporation*, Case No. 2015 CH 13991, on behalf of Interveners, Declaration submitted August 8, 2016.



**United States District Court, Central District of California, Eastern Division,** *Jeff Looper, Michael Bright, Scott Johnson, individuals on behalf of themselves and all others similarly situated, v. FCA US LLC, f/k/a Chrysler Group LLC, a Delaware limited liability company, and DOES 1-100 inclusive*, Case No. 14-cv-00700-VAP-DTB, on behalf of Gibbs Law Group, LLP; Declaration submitted August 7, 2016; Deposition on September 29, 2016.

**United States District Court, Eastern District of California,** *Chad Herron, individually, on behalf of himself and all others similarly situation, v. Best Buy Stores, LP, a Virginia limited partnership*, Case No. 12-cv-02103-TLN-CKD, on behalf of Stonebarger Law, A Professional Corporation; Declaration submitted June 24, 2016; Deposition on July, 29; Supplemental Declaration submitted September 8, 2016.

**United States District Court for the Southern District of Florida,** *Angela Sanchez-Knutson v. Ford Motor Company*, Case No. 14:61344-CIV DIMITROULEAS, on behalf of Kelley Uustal Trial Attorneys; Deposition on June 1, 2016.

**United States District Court, Central District of California,** *Jacqueline Dean, on behalf of herself and all others similarly situated, v. Colgate-Palmolive Co.*, Case No. 5:15-cv-00107, on behalf of Bursor & Fisher, P.A.; Declaration submitted April 29, 2016; Deposition on July 13, 2016.

**United States District Court, District of New Jersey,** *In re: AZEK Decking Marketing & Sales Practices Litigation*, Case No. 12-cv-06627-MCA-MAH, on behalf of Seeger Weiss, LLP; Declaration submitted February 26, 2016; Declaration submitted May 16, 2016; Deposition on July 6, 2016; Reply Declaration submitted August 29, 2016.

**United States District Court. Northern District Of California,** *In re: Nest Labs Litigation*, Case No. 5:14-cv-01363-BLF, on behalf of Bursor & Fisher, P.A.; Declaration submitted on January 22, 2016; Deposition on March 2, 2016; Reply Declaration submitted on June 3, 2016.

**United States District Court, Northern District Of California,** *Rohini Kumar, an individual, on behalf of herself, the general public and those similarly situated, v. Salov North America Corp.; And Italfoods, Inc.*, Case No. 4:14-cv-02411-YGR, on behalf of Gutride Safier LLP; Declaration submitted on January 19, 2016; Deposition on February 24, 2016; Reply Declaration submitted on May 10, 2016.

**United States District  Court, Northern District of Ohio, Eastern Division,** *Christopher Meta, On Behalf Of Himself And All Others Similarly Situated v. Target Corporation, et al.*, Case No. 4:14-0832-DCN, on behalf of Tycko & Zavareei, LLP, Declaration filed January 6, 2016; Deposition on March 15, 2016; Reply Declaration submitted on March 18, 2016.



**United States District Court, District of New Jersey,** *Charlene Dzielak, Shelley Baker, Francis Angelone, Brian Maxwell, Jeffery Reid, Kari Parsons, Charles Beyer, Jonathan Cohen, Jennifer Schramm, and Aspasia Christy on behalf of themselves and all others similarly situated, v. Whirlpool Corporation, Lowe's Home Center, Sears Holdings Corporation, The Home Depot, Inc., Fry's Electronics, Inc., And Appliance Recycling Centers Of America, Inc.,* Case No. 12-cv-0089-KM-JBC, on behalf of Bursor & Fisher, P.A., Declaration filed December 28, 2015; Deposition on April 22, 2016; Rebuttal Declaration submitted June 10, 2016.

**United States District Court, District of New Jersey,** *In re: Tropicana Orange Juice Marketing and Sales Practices Litigation,* Case No. 12-cv-7382-WJM-JBC, on behalf of Carella, Byrne, Cecchi, Olstein, Brody & Agnello, PC.; Declaration filed on November 6, 2015; Deposition on January 28, 2016.

**United States District Court, Northern District of California**, *Scott Koller, an individual, on behalf of himself, the general public and those similarly situated v. Deoleo USA, Inc. and Med Foods, Inc.*, Case No. 3:14-cv-02400-RS, on behalf of Gutride Safier LLP; Declaration filed on October 29, 2015; Deposition on December 21, 2015.

**United States District Court, Eastern District Of New York,** *Patrick Hughes and Nafisé Nina Hodjat, individually and on behalf of others similarly situated, v. The Ester C Company; NBTY, Inc.; and Naturesmart, LLC*, Case No. 12-cv-00041-JFB-ETB, on behalf of Reese LLP and WhatleyKallas LLP; Declaration submitted October 22, 2015; Deposition on December 1, 2015; Reply Declaration submitted on January 28, 2016; Surrebuttal Declaration submitted on April 20, 2016; oral testimony and cross examination on September 20, 2016.

**United States District Court, District Of Connecticut,** *Glen Grayson, and Doreen Mazzanti, individually and on behalf of themselves and all others similarly situated, v. General Electric Company*, Case No. 3:13-cv-01799-WWE, on behalf of Izard Nobel LLP; Declaration submitted October 15, 2015; Deposition on November 17, 2015; Rebuttal Declaration submitted March 23, 2016.

**United States District Court, District of New Jersey,** *Lynne Avram, on behalf of herself and all others similarly situated, v. Samsung Electronics America Inc., and Lowe's Home Centers, Inc.*, Case No. 11-cv-6973-KM-MCA, on behalf of Faruqi & Faruqi LLP; Declaration filed July 15, 2015; Deposition September 29, 2015.

**United States District Court, District of Connecticut,** *Heidi Langan, on behalf of herself and all others similarly situated, v. Johnson & Johnson Consumer Companies, Inc.*, Case No. 3:13-cv-01471-RNC, on behalf of Izard Nobel LLP; Declaration filed June 23, 2015; Deposition on July 21, 2015; Reply Declaration filed October 15, 2015.

**United States District Court, Eastern District of California,** *Yesenia Melgar, on behalf of herself and all others similarly situated, v. Zicam LLC, and Matrixx Initiatives, Inc.*, Case No. 2:14-cv-00160-MCE-AC, on behalf of Bursor & Fisher, PA; Declaration filed June 8, 2015.



*Statement of Qualifications – Colin B. Weir*

**United States District Court, Central District of California, Eastern Division-Riverside** *Michael J. Otto, individually, and on behalf of other members of the general public similarly situated, v. Abbott Laboratories, Inc.*, Case No. 12-01411-SVW(DTBx), on behalf of Baron & Budd; Declaration filed May 25, 2015; Deposition on June 2, 2015; Supplemental Declaration filed July 6, 2015.

**United States District Court, Central District of California,** *Russell Minoru Ono, individually and on behalf of others similarly situated, v. Head Racquet Sports USA, a corp. and Head USA Inc.*, Case No. 13-04222-FMO, on behalf of Baron & Budd; Declaration filed April 24, 2015, Deposition on June 30, 2015; Reply Declaration filed July 2, 2015.

**United States District Court, Southern District of Florida,** *Vanessa Lombardo, on behalf of herself and all others similarly situated, v. Johnson & Johnson Consumer Companies and Neutrogena Corporation*, Case No. 13-60536-SCOLA, on behalf of Morgan & Morgan; Declaration filed March 31, 2015.

**United States District Court, Eastern District of New York,** *D. Joseph Kurtz, individually and on behalf all others similarly situated, v. Kimberly-Clark Corporation and Costco Corporation*, Case No. 14-01142-JBW, on behalf of Robbins Geller Rudman & Dowd LLP; Declaration filed February 27, 2015; Rebuttal Declaration filed March 27, 2015.

**United States District Court, Eastern District of New York,** *Anthony Belfiore, on behalf of himself and all others similarly situated, v. Procter & Gamble*, Case No. 14-04090-JBR, on behalf of Wolf Popper LLP; Declaration filed February 27, 2015; Rebuttal Declaration filed April 30, 2015.

**United States District Court, Northern District of California,** *Patrick Hendricks, individually and on behalf of all others similarly situated, v. StarKist Co.*, Case No. 13-0729-YGR, on behalf of Bursor & Fisher, PA; Declaration filed January 20, 2015; Deposition on February 10, 2015; Reply Declaration filed April 7, 2015.

**United States District Court, Northern District of California, San Francisco Division,** *Scott Miller and Steve Leyton, individually and on behalf themselves, the general public and those similarly situated v. Ghirardelli Chocolate Company*, Case No. 12-04936-LB, on behalf of Gutride Safier LLP, Declaration filed January 8, 2015; Reply Declaration filed February 5, 2015.

**United States Bankruptcy Court, Eastern District of New York,** *In re: Kangadis Food Inc., d/b/a The Gourmet Factory, Debtor*, Case No. 14-72649-REG, on behalf of Bursor & Fisher, PA; Declaration filed August 5th, 2014; Oral testimony on November 24, 2014.

6



**United States District Court, Southern District of New York,** *Joseph Ebin and Yeruchim Jenkins, individually and on behalf of all others similarly situated v. Kangadis Family Management LLC, Aristidia Kangadis a/k/a "Mr. Aris," Andromahi Kangadis a/k/a "Mrs. Mahi," and Themis Kangadis*, Case No. 14-cv-1324-JSR, on behalf of Bursor & Fisher, PA; Declaration filed August 5, 2014; Deposition on October 9, 2014.

**United States District Court, Northern District of California, San Francisco Division,** *Erin Allen, on behalf of herself and all others similarly situated, v. Con Agra Foods, Inc.*, Case No. 13-cv-01279-VC, on behalf of Hagens Berman Sobol Shapiro LLP and The Eureka Law Firm; Declaration filed August 11, 2014; Deposition on September 30, 2014.

**United States District Court, Eastern District of California,** *Kyle Dei Rossi and Mark Linthicum, on behalf of themselves and those similarly situated, v. Whirlpool Corporation*, Case No. 12-cv-00125-TLN-CKD, on behalf of Bursor & Fisher, P.A.; Declaration filed July 31, 2014, Deposition on August 20, 2014.

**United States District Court, Northern District of Illinois, Eastern Division,** *In re: Southwest Airlines Voucher Litigation.*, Case No. 11-cv-8176, Hon. Matthew Kennelly, on behalf of Siprut PC; Declaration filed June 4, 2014; Oral testimony and cross examination on June 16, 2014.

**United States District Court, Central District of California, Western Division,** *In re: ConAgra Foods, Inc.*, Case No. 11-cv-05379-MMM, MDL No. 2291, on behalf of Milberg LLP and Grant & Eisenhofer, P.A.; Declaration filed May 5, 2014; Deposition on May 23, 2014; Declaration filed June 30, 2014; Declaration filed September 8, 2014; Deposition on September 16, 2014, Declaration filed October 27, 2014.

**United States District Court, Southern District of New York,** *In re: Scotts EZ Seed Litigation*, Case No. 12-cv-4727-VB, on behalf of Bursor & Fisher, PA; Declaration filed March 31, 2014; Deposition on May 21, 2014; Declaration filed on January 8, 2016; Deposition on February 10, 2016; Reply Declaration submitted June 30, 2016; Declaration submitted September 1, 2016; Declaration submitted on October 20, 2016.

**United States District Court, Central District of California,** *Julie Fagan, Michael Fagan, Melissa Pennalatore, Amy Sapeika and Shelley Trinchero, individually and on behalf of all others similarly situated v. Neutrogena Corporation*, Case No. 13-cv-01316-SVW, on behalf of Izard Nobel LLP; Declaration filed March 21, 2014; Deposition on April 3, 2014; Supplemental Declaration filed August 4, 2014; Deposition on August 13, 2014; Declaration filed September 9, 2014.

**United States District Court, Central District of California,** *Enzo Forcellati and Lisa Roemmich, individually and on behalf of all others similarly situated v. Hyland's Inc., Standard Homeopathic Laboratories, Inc. and Standard Homeopathic Company*, Case No. 12-cv-01983-GHK, on behalf of Faruqi and Faruqi; Declaration filed December 13, 2013; Deposition on February 27, 2014.



**United States District Court, Southern District of Florida,** *Adam Karhu, on behalf of himself and all others similarly situated, v. Vital Pharmaceuticals, Inc., d/b/a VPX Sports*, Case No. 13-cv-60768-JIC, on behalf of Thornton, Davis, & Fein, P.A., Declaration filed December 13, 2013; Declaration filed January 6, 2014; Declaration filed March 31, 2014.

**Trial Court of Massachusetts, District of Edgartown,** *Schepici v. JetBlue Airways Corp.,* on behalf of plaintiff; Mediation on December 4, 2013.

**Superior Court of California, County of Alameda,** *In re: Cellphone Termination Fee Cases, Ramzy Ayyad, et al, Plaintiff, v. Sprint Spectrum, L.P., Defendant,* JCCP No. 4332, Case No. RG03-121510, on behalf of the Executive Committee; Declaration filed September 18, 2013.

**United States District Court, Northern District of California,** *Maria Torres, Gabriel Rojas, and Ian Kerner, individually and on behalf of all others similarly situated v. JC Penney Corporation, Inc.; and JC Penney Company, Inc.,*, Case No. cv-12-01105-RS, on behalf of Bramson, Plutzik, Mahler and Birkhaeuser; Declaration filed September 13, 2013; Deposition on October 2, 2013.

**United States District Court, Southern District of New York,** *Joseph Ebin and Yeruchim Jenkins, individually and on behalf of all others similarly situated v. Kangadis Foods Inc*, Case No. 13-cv-02311-JSR, on behalf of Bursor & Fisher, PA; Declaration filed August 26, 2013; Deposition on October 21, 2013.

**United States District Court, Northern District of California,** *Desiree Moore, on behalf of themselves, the general public, and all those similarly situated, Plaintiffs v. Verizon Communications*, Case No. 4:09-cv-01823-SBA, on behalf of David Schachman and Associates PC, Jacobs Kolton Chtd., and Keller Grover, LLP; Declaration filed June 24, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on March 1, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 20, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 19, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of  Claimant; Oral testimony and cross examination on February 13, 2013.

**American Arbitration Association,**  *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 7, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on February 4, 2013.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on January 24, 2013.



**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on December 12, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on December 10, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant; Oral testimony and cross examination on November 28, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant, Declarations filed October 4, 2012 and November 5, 2012; Oral testimony and cross examination on November 27, 2012.

**American Arbitration Association,** *[Redacted for public inspection]*, on behalf of Claimant, Declaration filed April 16, 2012; Oral testimony and cross examination on May 11, 2012.

**United States District Court, District of Massachusetts,** *Marcy Cruz v. Justin Kagan, Arthur Hegarty, Ronald Teachman, and the City of New Bedford*, Case No. 1:09-cv-11793-RGS, on behalf of Marcy Cruz, Expert Report filed February 28, 2011; Oral testimony and cross examination on December 1, 2011.

**United States District Court, Southern District of New York,** *Bursor & Fisher P.A., v. Federal Communications Commission*, Case No. 1:11-cv-05457-LAK, on behalf of Bursor & Fisher P.A., Declaration filed August 17, 2011.

**United States District Court, District of New Jersey,** *In Re: Sprint Premium Data Plan Marketing and Sales Practices Litigation,* Master Case No. 10-6334 (SDW) MDL No. 2228, on behalf of Thornton, Davis, & Fein, P.A., Declaration filed August 11, 2011.

**United States District Court, Northern District of California,** *Patrick Hendricks, on behalf of himself and all others similarly situated, Plaintiffs, v. AT&T Mobility LLC, Defendant*, Case No. C11-00409, on behalf of Bursor & Fisher, P.A., Declaration filed August 7, 2011.

**Federal Communications Commission,** *In the Matter of Applications of AT&T Inc. & Deutsche Telekom AG for Consent to Assign or Transfer Control of Licenses and Authorizations*, WT Docket No. 11-65, on behalf of Butch Watson, Declaration filed June 20, 2011.

**California Public Utilities Commission,** *Pacific Bell Telephone Company d/b/a AT&T California (U1001C) Complainant, vs. O1 Communication, Inc. (U 6065 C), Defendant*, Case No. C.08-03-001, on behalf of the O1 Communications, Inc., Reply Testimony filed November 6, 2009; Oral testimony and cross examination on November 16, 2009.

**Superior Court of California, County of Alameda**, *James Thomas, on behalf of themselves, the general public, and all those similarly situated, Plaintiffs, v. Global Vision Products, Inc., Anthony Imbriolo, Derrike Cope, David L. Gordon, Powertel Technologies, Inc., Craig Dix, Henry Edelson and Robert Debenedictis, Defendants,* Case No. RG03-091195, on behalf of the Law Offices Of Scott A. Bursor, Oral testimony and cross examination on November 9, 2009.



*Statement of Qualifications – Colin B. Weir*

**United States District Court, District of New Jersey,** *Judy Larson, Barry Hall, Joe Milliron, Tessie Robb, and Willie Davis, individually and on behalf of all others similarly situated, v. AT&T Mobility LLC f/k/a Cingular Wireless LLC and Sprint Nextel Corporation and Sprint Spectrum L.P. d/b/a Sprint Nextel and Nextel Finance Company, Civ. Act. No. 07-5325 (JLL),* on behalf of PinilisHalpern, LLP and Law Offices of Scott A. Bursor, Declaration filed *under seal* October 19, 2009.

**California Public Utilities Commission,** *Pacific Bell Telephone Company d/b/a AT&T California (U1001C) Complainant, vs. Pac-West Telecomm, Inc. (U 5266 C), Defendant,* Case No. C.08-09-017, on behalf of the Pac-West Telecomm, Inc., Rebuttal Testimony filed May 1, 2009.

**Illinois Commerce Commission,** Illinois Bell Telephone Company Annual Rate Filing for Non-Competitive Services Under an Alternative Form of Regulation, Ill. C. C. Docket No. 08-0249, on behalf of the People of the State of Illinois, Declaration filed May 2, 2008.

**Federal Communications Commission,** Qwest Petition for Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of AT&T Inc, For Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of BellSouth Corporation For Forbearance Under 47 U.S.C. §160(c) From Title II and *Computer Inquiry Rules* with Respect to Broadband Services, Petition of the Embarq Local Operating Companies for Forbearance Under 47 U.S.C. §160(c) From Application of *Computer Inquiry* and certain Title II Common Carriage Requirements; WC Docket Nos. 06-125 and 06-147, on behalf of the AdHoc Telecommunications Users Committee, Declaration filed October 9, 2007.

**Superior Court of California, County of Alameda,** *James Thomas, on behalf of themselves, the general public, and all those similarly situated, Plaintiffs, v. Global Vision Products, Inc., Anthony Imbriolo, Derrike Cope, David L. Gordon, Powertel Technologies, Inc., Craig Dix, Henry Edelson and Robert Debenedictis, Defendants,* Case No. RG03-091195, on behalf of the Law Offices Of Scott A. Bursor, Declaration filed January 5, 2007; Deposition on November 13, 2007; Oral testimony and cross-examination on December 19, 2007; Oral testimony on January 9, 2008.

Mr. Weir has served as a consultative expert in numerous proceedings that did not result in testimony, and has contributed research and analysis to numerous additional publications and testimony at the state, federal, and international levels.

10



# Exhibit 2

# Documents Reviewed

- Class Action Complaint, filed April 6, 2015

- Deposition of Marlene Otero, January 26, 2015

- Deposition of Scott Richards January 27, 2015

- Deposition of Lisa Sanchez, January 26, 2017

- Declaration of Barry Orr, February 14, 2017

- IRI_Pettit_PG_0002^Highly Confidential AEO.xlsx

- Case, Fair & Oster, Principles of Microeconomics, 9th Edition, 2009

- *Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition*. Rosen, Sherwin, The Journal of Political Economy, Vol. 82, No. 1. (Jan. - Feb., 1974)

- *The Expanding Role of Hedonic Methods in the Official Statistics of the United States*, Moulton, Brent R., Bureau of Economic Analysis, U.S. Department of Commerce, June 2001

- *The Use of Hedonic Analysis for Certification and Damage Calculations in Class Action Complaints*, Doane, Michael (Analysis Group) and Hartman, Raymond, Journal of Law, Economics, & Organization, Vol. 3, No. 2 (Autumn, 1987)

- *Developing a Hedonic Regression Model For Refrigerators in the U.S. CPI*, Shepler, Nicole, October 16, 2001

- *Organic and All Natural: Do Consumers Know the Difference?* Anstine, Jeffrey, Journal of Applied Economics and Policy 26.1 (2007):15-27

- *Hedonic Analysis of Retail Egg Prices*, Karipidis, Philippos I., *et al*, Journal of Food Distribution Research 36.3 (2005)

- *The Value to Consumers of Health Labeling Statements on Breakfast Foods and Cereals,* Muth, Mary K.,  *et al* Contributed Paper prepared for presentation at the International Associate of Agricultural Economists Conference, Beijing, China, August 2009, on behalf of RTI International and Food and Drug Administration, Center for Food Safety and Applied Nutrition. 10 March 2014

- *Hedonic Prices for a Nondurable Good: The Case of Breakfast Cereals*. Stanley, L. R. and John T. Tschirhart, Review of Economics and Statistics 73.3 (1991):537-541

- Baker, Jonathan B. and Timothy F. Bresnahan, *Economic Evidence in Antitrust: Defining Markets and Measuring Market Power*, Chapter 1 of Handbook of Antitrust Economics, Cambridge: MIT Press, 2007

- http://www.stata.com/why-use-stata/

# Exhibit 3

# Regression Results

**P&G: Preliminary Regression Results**

| Independent Variables | Coefficients | T-Statistics | Exponentiated Coefficients |
|---|---|---|---|
| Flushable | 0.0879*** | (3.06) | 0.0919 |
| Sold on Promotion | -0.118*** | (-17.58) | -0.1117 |
| Log of Number of Sheets | 0.621*** | (90.07) | 0.6210 |
| Log of Number of Packs | 0.0134* | (1.72) | 0.0134 |
| Log of Wipe Area (Square Inches) | 0.218*** | (3.90) | 0.2183 |
| Box | 0.190*** | (17.18) | 0.2097 |
| Soft Pack Tub | -0.231*** | (-17.76) | -0.2060 |
| Tub | -0.0536*** | (-5.25) | -0.0522 |
| Baby/Kids | 0.769*** | (26.70) | 1.1570 |
| Travel Pack | -0.143*** | (-5.72) | -0.1332 |
| Hypoallergenic/Allergy Tested | 0.0640*** | (5.16) | 0.0660 |
| Scented | 0.0581*** | (2.59) | 0.0598 |
| Fragrance Free/Perfume Free/Unscented | 0.0921*** | (4.42) | 0.0964 |
| Alcohol Free | -0.0154** | (-2.08) | -0.0153 |
| Aloe/Aloe & Vitamin E | -0.00304 | (-0.19) | -0.0030 |
| Natural | 0.0179 | (1.02) | 0.0180 |
| Sensitive/Gentle | -0.0198 | (-1.55) | -0.0196 |
| Charmin | 0.129*** | (4.03) | 0.1377 |
| Huggies | -0.923*** | (-53.42) | -0.6025 |
| Johnsons | -0.358*** | (-11.41) | -0.3010 |
| Kleenex | 0.138*** | (4.68) | 0.1478 |
| NoBrand | -2.207*** | (-63.33) | -0.8900 |
| Pampers | -0.931*** | (-40.46) | -0.6058 |
| Pure N Gentle | -1.300*** | (-49.15) | -0.7274 |
| Scott | -0.0870*** | (-2.63) | -0.0833 |
| Seventh Generation | -0.526*** | (-19.36) | -0.4091 |
| The Honest Co. | -0.533*** | (-13.02) | -0.4132 |
| Quarter: 2011q2 | 0.0404* | (1.67) | 0.0412 |
| Quarter: 2011q3 | 0.0368 | (1.51) | 0.0375 |
| Quarter: 2011q4 | 0.0384 | (1.59) | 0.0391 |
| Quarter: 2012q1 | 0.0564** | (2.45) | 0.0580 |
| Quarter: 2012q2 | 0.0480** | (2.14) | 0.0492 |
| Quarter: 2012q3 | 0.0355 | (1.57) | 0.0361 |
| Quarter: 2012q4 | 0.0343 | (1.53) | 0.0349 |
| Quarter: 2013q1 | 0.0397* | (1.75) | 0.0405 |
| Quarter: 2013q2 | 0.0221 | (0.94) | 0.0224 |
| Quarter: 2013q3 | 0.0287 | (1.24) | 0.0291 |
| Quarter: 2013q4 | 0.0304 | (1.36) | 0.0308 |
| Quarter: 2014q1 | 0.0333 | (1.49) | 0.0339 |
| Quarter: 2014q2 | 0.0129 | (0.54) | 0.0130 |
| Quarter: 2014q3 | 0.0237 | (0.98) | 0.0239 |
| Quarter: 2014q4 | 0.0373 | (1.58) | 0.0380 |
| Quarter: 2015q1 | 0.0383* | (1.66) | 0.0391 |
| Quarter: 2015q2 | 0.0132 | (0.56) | 0.0133 |
| Quarter: 2015q3 | -0.00889 | (-0.35) | -0.0088 |
| Quarter: 2015q4 | 0.0169 | (0.74) | 0.0170 |
| Quarter: 2016q1 | 0.0338 | (1.50) | 0.0344 |
| Quarter: 2016q2 | 0.0180 | (0.76) | 0.0182 |
| Quarter: 2016q3 | 0.0401* | (1.79) | 0.0409 |
| Constant | -2.274*** | (-10.49) | -0.8971 |

| | |
|---|---|
| Observations | 3,859 |
| Number of Units | 116,804,332 |
| Adjusted R-squared | 0.945 |
| F-Statistic | 2,257.87 |
| RMSE | 0.148 |

Note (1):  Significance levels:  * p<0.10; ** p<0.05; *** p<0.01
Note (2):  Exponentiated coefficients are transformed for Semi-Log variables only.  Log-Log coefficients are simply restated.
Note (3):  T-Statistics displayed in parenthesis are calculated using robust standard errors.
Note (4):  Regression model is weighted by number of units sold.
Source: IRI Scanner Data.