**GUTRIDE SAFIER LLP**
ADAM J. GUTRIDE (State Bar No. 181446)
SETH A. SAFIER (State Bar No. 197427)
MARIE MCCRARY (State Bar No. 262670)
KRISTEN G. SIMPLICIO (State Bar No. 263291)
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 271-6469
Facsimile: (415) 449-6469

**TYCKO & ZAVAREEI LLP**
HASSAN A. ZAVAREEI (State Bar No. 181547)
KRISTEN L. SAGAFI (State Bar No. 222249)
1828 L Street, N.W., Suite 1000
Washington, DC 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950

**SPANGENBERG SHIBLEY & LIBER LLP**
STUART E. SCOTT (*pro hac vice* admission)
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
Telephone: (216) 696-3232
Facsimile: (216) 696-3924

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JAMIE PETTIT, et al., ,<br><br>     Plaintiffs,<br><br>          v.<br><br>PROCTER & GAMBLE COMPANY,<br><br>     Defendant. | CASE NO. 3:15-cv-2150 RS<br><br>**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPLICATION FOR ATTORNEYS' FEES, COSTS AND CLASS REPRESENTATIVE PAYMENTS**<br><br>Date: March 28, 2019<br>Time: 1:30 p.m.<br>Courtroom 3, 17th Floor<br>Judge: Hon. Richard Seeborg |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................iv

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................1

    A.      INTRODUCTION .................................................................................1

    B.      BACKGROUND FACTS AND DETAILS OF SETTLEMENT ...........................2

          1.   Litigation History .........................................................................2

              a.     Overview of the Pettit and Ramcharitar Actions .............................2

              b.     Other Actions Relating to Flushable Wipes....................................3

              c.     Motion Practice in the Pettit and Ramcharitar Actions....................4

              d.     New Class Representatives and Settlement Negotiations................5

          2.   Settlement Negotiations....................................................................5

          3.   The Proposed Settlement ...................................................................6

              a.     Direct Monetary Relief .....................................................6

               b.     Changed Practices ..........................................................6

               c.     Administrative Expenses, Attorneys' Fees and Costs,

                   Incentive Awards ...........................................................8

          4.   Notice................................................................................9

II.     ARGUMENT ...........................................................................................10

    A.      Final Approval Is Warranted................................................................10

          1.   Substantial Benefits Are Provided To The Class. ...........................................11

          2.   Procedural Concerns......................................................................12

               a.     The Class Representatives and Plaintiffs' Counsel Have

                   Adequately Represented the Class.................................................12

               b.     The Settlement Agreement Resulted from Arm's-Length

                   Negotiations. .................................................................12

           3.   Substantive Concerns ....................................................................13

               a.     There are Serious Risks of Further Litigation................................13

            b.       Effectiveness of Distribution Method ...............................................14

            c.       Terms of Attorneys' Fees.................................................15

            d.       Equitable Treatment of Class Members ..........................................15

       4.    The Experience And Views Of Counsel Favor Final Approval. ....................15

       5.    The Reaction Of The Settlement Class Has Been Overwhelmingly Positive. 16

   B.     Plaintiffs' Counsel Should Be Awarded Attorneys' Fees And Expenses In

       The Amount of $2,150,000. .......................................................................17

       1.    Lodestar ................................................................................18

       2.    Cross-Check...........................................................................22

       3.    Plaintiffs' Counsel Should Be Awarded Costs....................................23

   C.     An Incentive Award To The Representative Plaintiffs Is Reasonable..................24

III.    CONCLUSION ...............................................................................................25

1

## **TABLE OF AUTHORITIES**

2

### **CASES**

*Adlock-Ladd v. Secretary of Treasury*, 227 F.3d 343 (6th Cir. 2000) ........................................24

*Allen v. Bedolla*, 787 F.3d 1218 (9th Cir. 2015) .........................................................................28

*Beasley v. Wells Fargo Bank*, 235 Cal. App. 3d 1407 (1991) ....................................................21

*Belfiore v. P&G,* 140 F. Supp. 3d 241 (E.D.N.Y. 2015) ...............................................................4

*Bluetooth Headset Prods. Liability Litig.*, 654 F.3d 935 (9th Cir. 2011) ...................................20

*Brinker v. Normandin's*, 2017 U.S. Dist. LEXIS 25670 (N.D. Cal. Feb. 23, 2017)...................24

*Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017)................................................12

*Class Plaintiffs v. City of Seattle,* 955 F.2d 1268 (9th Cir. 1992)................................................9

*Cobell v. Norton*, 231 F. Supp. 2d 295 (D.D.C. 2002) ...............................................................24

*Covillo v. Specialtys Café*, No. C-11-00594 DMR, 2014 WL 954516 (N.D. Cal.
    Mar. 6, 2014)..........................................................................................................................26

*Dennings v. Clearwire Corp.*, No. C10-1859JLR, 2013 WL 1858797 (W.D. Wash.
    May 3, 2013)...........................................................................................................................28

*Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15 (N.D. Cal. 1980), *aff'd*, 661 F.2d
    939 (9th Cir. 1981)..................................................................................................................14

*Embry v. Acer America Corp.*, C 09-01808 JW, Dkt.# 218 (N.D. Cal. Feb. 14,
    2012) .......................................................................................................................................30

*Evans v. Linden Research, Inc.*, No. C-11-01078 DMR, 2014 WL 1724891 (N.D.
    Cal. April 29, 2014) ...............................................................................................................18

*Galvez v. Americlean Servs. Corp.*, No. 1:11CV1351 JCC/TCB, 2012 WL
    2522814 (E.D. Va. June 29, 2012)..........................................................................................23

*Gibson & Co. Ins. Brokers, Inc. v. Jackson Nat. Life Ins. Co.*, CV06-5342 DSF
    (SHX), 2008 WL 618893 (C.D. Cal. Feb. 27, 2008) ..............................................................30

*Girsh v. Jepson,* 521 F.2d 153 (3rd Cir. 1975) ..........................................................................16

*Glass v. UBS Fin. Servs., Inc.*, 2007 WL 221862 (N.D. Cal. Jan. 26, 2007)..............................27

*Gutierrez v. Wells Fargo Bank, N.A.*, No. C 07-05923 WHA, 2015 WL 2438274
    (N.D. Cal. May 21, 2015) .......................................................................................................23

*Hall v. Bank of Am.*, No. 1:12-cv-22700-FAM, 2014 WL 7184039 (S.D. Fla. Dec.
    17, 2014) .................................................................................................................................18

*Hanlon v. Chrysler Corp.*, 150 F.3d 1101 (9th Cir. 1998)..............................................10, 13, 14

*In re Apple iPhone 4 Prods. Liab. Litig.*, No. 5:10-md-2188 RMW, 2012 WL
   3283432 (N.D. Cal. Aug. 10, 2012)......................................................................................19

*In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*, MDL Docket No. 901
   All Cases, 1992 U.S. Dist. LEXIS 14337 (C.D. Cal. June 10, 1992) ..................................17

*In re HPL Techs., Inc., Sec. Litig.*, 366 F. Supp. 2d 912 (N.D. Cal. 2005) .............................24

*In re Mego Fin. Corp Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000) ...........................................9, 30

*In re NVIDIA Corp. Derivative Litig.*, 2008 WL 5382544 (N.D. Cal. 2008) ...........................17

*In re Online DVD–Rental Antitrust Litig.*, 779 F.3d 934 (9th Cir.2015)..................................19

*In re Optical Disk Drive Prod. Antitrust Litig.,* No. 3:10-MD-2143 RS, 2016 WL
   7364803 (N.D. Cal. Dec. 19, 2016) ....................................................................................23

*In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2007 WL 4171201
   (N.D. Cal. Nov. 26, 2007)...................................................................................................26

*In re Tobacco II Cases,* 46 Cal. 4th 298 (2009).......................................................................20

*In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291 (9th Cir. 1994)...............25

*Johnson v. Gen. Mills, Inc.*, 2013 WL 3213832 (C.D. Cal. June 17, 2013) .............................27

*Johnson v. Triple Leaf Tea Inc.,* (N.D. Cal. Nov. 16, 2015)....................................................25

*Kelly v. Wengler*, 822 F.3d 108 (9th Cir. 2016).......................................................................20

*Kirkorian v. Borelli*, 695 F. Supp. 446 (N.D. Cal. 1988)..........................................................18

*Kumar v. Salov N. Am. Corp.*, 2017 U.S. Dist. LEXIS 105463 (N.D. Cal. July 7,
   2017), *aff'd Kumar v. Salov N. Am. Corp.*, 737 F. App'x 341  (9th Cir. 2018) ..................12

*Lealao v. Beneficial California, Inc.*, 82 Cal. App. 4th (2000)...........................................20, 21

*LeBlanc-Sternberg v. Fletcher,* 143 F.3d 748 (2nd Cir. 1998)..................................................25

*Linney v. Cellular Alaska Partnership*, 151 F.3d 1234 (9th Cir. 1998)..............................11, 15

*Livingston v. Calvary Portfolio Services, LLC*, 2009 WL 4724268 (N.D. Ohio
   2009) ..................................................................................................................................24

*Lusby v. GameStop Inc.*, No. C12-03783 HRL, 2015 WL 1501095 (N.D. Cal. Mar.
   31, 2015).............................................................................................................................25

*Lymburner v. U.S. Fin. Funding, Inc.*, No. C-08-00325 EDL, 2012 WL 398816
   (N.D. Cal. Feb. 7, 2012).....................................................................................................26

*Mancini v. Dan P. Plute, Inc.*, 358 F. App'x 886 (9th Cir. 2009) ...........................................24

*Marshall v. Holiday Magic, Inc.* 550 F.2d 1173 (9th Cir. 1977) ................................................ 16

*McLaughlin v. Wells Fargo Bank, N.A.*, No. C 15-02904 WHA, 2017 WL 994969
   (N.D. Cal. Mar. 15, 2017) ............................................................................................... 23

*Missouri v. Jenkins*, 491 U.S. 274 (1989) .................................................................................. 25

*Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004) ................ 11

*Nwabueze v. AT&T, Inc.*, 2014 WL 324262 (N.D. Cal. Jan. 29, 2014) ..................................... 27

*Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615 (9th
   Cir. 1982), *cert. denied*, 459 U.S. 1217 (1983) ................................................. 10, 11, 15, 16

*Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010) .............................................................. 20

*Poertner v. Gillette Co.*, 618 Fed. Appx 624 (11th Cir. July 16, 2015) ...................................... 19

*Pollard v. Remington Arms Co.*, LLC, --- F.R.D. ---, 2017 WL 991071 (W.D. Mo.
   Mar. 14, 2017) ................................................................................................................. 19

*Rodriguez v. West Publ'g Corp.*, 2007 WL 2827379 (C.D. Cal. Sept. 10, 2007)
   *rev'd on other grounds*, 563 F.3d 948 (9th Cir. 2009) ...................................................... 15

*Schuchardt v. Law Office of Rory W. Clark*, 314 F.R.D. 673 (N.D. Cal. 2016) ........................ 25

*Six Mexican Workers v. Arizona Citrus Workers*, 904 F.2d 1301 (9th Cir. 1990) ................... 27

*Smith v. CRST Van Expedited, Inc.,* 10-CV-1116- IEG WMC, 2013 WL 163293
   (S.D. Cal. Jan. 14, 2013) ................................................................................................. 30

*Spann v. J.C. Penney Corp.*, 211 F. Supp. 3d 1244 (C.D. Cal. Sept. 30, 2016) ........................ 19

*Stern v. Gambello,* 480 F. App'x 867 (9th Cir.2012)) *aff'd* (Sept. 9, 2013) .............................. 28

*Texas v. U.S.*, No. CV 11-1303 (RMC), 2017 WL 1194159 (D.D.C. Mar. 30,
   2017) .............................................................................................................................. 23

*Theme Promotions, Inc. v. News America Marketing FSI, Inc.,* 731 F. Supp. 2d
   937 (N.D. Cal. 2010) ....................................................................................................... 24

*Touhey v. U.S.*, No. EDCV 08-01418-VAP (RCx), 2011 WL 3179036 (C.D. Cal.
   July 25, 2011) ................................................................................................................. 19

*Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294 (N.D. Cal. 1995) ............................... 27, 29

*Vincent v. Hughes Air West*, 557 F.2d 759 (9th Cir. 1977) ...................................................... 29

*Walsh v. Kindred Healthcare*, No. C 11-00050 JSW, 2013 WL 6623224 (N.D.
   Cal. Dec. 16, 2013) ......................................................................................................... 26

*Wehlage v. Evergreen at Arvin LLC*, No. 4:10-CV-05839-CW, 2012 WL 4755371
   (N.D. Cal. Oct. 4, 2012) .................................................................................................. 26

*Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026 (9th Cir. 1997)............................27, 28

*Williams v. Vukovich*, 720 F.2d 909 (6th Cir. 1983)...................................................13

*Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536 (9th Cir. 2016).......................................28

*Young v. Katz* 447 F.2d 431 (5th Cir. 1971) .................................................16

*Young v. Polo Retail, LLC*, 2007 U.S. Dist. LEXIS 27269 (N.D. Cal. Mar. 28, 2007) ...............................................................................27

**STATUTES**

Cal. C.C.P. § 1021.5...................................................................................17

Cal. Civ. Code § 1750 ................................................................................17

**OTHER AUTHORITIES**

4 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* (4th ed. 2002) § 11:41..............................................................................9, 13

https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2018/saltbl.pdf (last accessed Jan. 22, 2019) .....................................24

*Managing Class Action Litigation:  A Pocket Guide For Judges* § IV(F) ................................23

*Manual For Complex Litigation (Third)* §30.42 .......................................................14

Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. Rev. 1303, 1333 (2006)................................30

**RULES**

Fed. R. Civ. P. 23 .....................................................................................8, 9

Fed. R. Civ. P. 23(b)(3)................................................................................5

Fed. R. Civ. P. 23(e)(2)(A)-(B)........................................................................11

Fed. R. Civ. P. 23(e)(2)(C)-(D).....................................................................12, 13

Fed. R. Civ. P. 23(e)(2)(C)(i)........................................................................13

Fed. R. Civ. P. 23(e)(2)(C)(ii).......................................................................14

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on March 28, 2019, at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 3, 17th Floor, before the Honorable Richard Seeborg, Plaintiffs shall and hereby do move the Court for an order of:

(1) Final approval of the settlement of this class action as set forth in the class action settlement agreement ("Settlement Agreement")[1] attached as Exhibit 1 to the Declaration of Adam Gutride ("Gutride Decl.") filed herewith;

(2) Final certification of the proposed Settlement Class as defined in the Settlement Agreement;

(3) Entry of final judgment;

(4) An award of $2,150,000 in attorneys' fees and expenses; and

(5) Class Representative Payments of $5,000 for Plaintiff Jamie Pettit, $3,000 each for Plaintiffs Karla Ramcharitar, Gloria Wiltrakis, and Cheryl Senko, and $1,000 each for Debra Jewell, Susan Hartzfel, Kenneth Luke, Linda Feiges, Willie Perez, Dian Cotton, Marlena Hinkle, Phyllis Jones, Glenn Katz, Eilene Shaffer, Charles Tippe, Sandra Flores, and Roxy Vance.

A copy of the [Proposed] Order for Final Approval is attached as Exhibit 2 to the Gutride Declaration in Support of Preliminary Approval ("Prelim. Gutride Decl"), Dkt. # 117-4.

This Motion is based on Federal Rule of Civil Procedure 23, this notice, the supporting Memorandum of Points and Authorities; the Declaration of Adam Gutride ("Gutride Decl."); the Declaration of Hassan Zavareei ("Zavareei Decl."); the Declaration of Stuart E. Scott ("Scott Decl."); and the Declaration of Jeanne Finegan ("Finegan Decl.") filed in support of this motion; the declarations and exhibits submitted in support of Plaintiffs' Motion for Preliminary Approval (Dkt. # 117); and the pleadings and papers on file in this action and any other matter of which this Court may take notice.

---

[1] The capitalized terms used herein are defined in and have the same meaning as used in the Settlement Agreement unless otherwise stated.

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### A.   INTRODUCTION

3   On November 26, 2018, this Court preliminarily approved this class action settlement

4  between Plaintiffs[2] and Defendant The Procter & Gamble Company ("P&G"). The Court

5  scheduled a final approval hearing for March 28, 2019 to determine: (a) whether the proposed

6  settlement should be finally approved as fair, reasonable, and adequate, and whether the Final

7  Approval Order should be entered, and (b) whether Plaintiffs' Counsel's application for attorneys'

8  fees, costs, and payments to the Class Representatives should be approved. (Dkt. #129.)

9   Under the Settlement Agreement, Settlement Class Members can file a claim for a cash

10  payment of sixty cents ($0.60) for each package of the Product[3] purchased in the United States

11  (except in New York) during the Class Period (i.e., between April 6, 2011 and November 26,

12  2018, or the date of Preliminary Approval), regardless of the price the Settlement Class Member

13  paid for the package or the number of wipes contained in each package, subject to the following

14  limitations: (a) a maximum of four dollars and twenty cents ($4.20) shall be paid on the combined

15  claims submitted by any Household for claimed purchases that are not corroborated by Proof of

16  Purchase, and (b) a maximum of thirty dollars ($30.00) shall be paid on the combined claims

17  submitted by any Household for claimed purchases that are corroborated by Proof of Purchase.

18  The settlement covers only claims pertaining to false advertising of the Product and the alleged

19  price premium associated with those purported misrepresentations; all Settlement Class Members

20  retain the right to sue for any property damage. This is an excellent settlement in light of the fact

21  that Plaintiffs' expert calculated the average damages to be approximately 34 cents per package. In

22  other words, this settlement provides for a per-package recovery of almost *twice* the actual per-

23  package damages calculated by Plaintiffs' expert. Unlike other settlement structures, the amount

24

25  [2] Plaintiff Jamie Pettit shall be referred to herein as Pettit. Plaintiffs Karla Ramcharitar, Gloria Wiltrakis, and Cheryl Senko shall be referred to herein as the Ramcharitar Plaintiffs. The remaining

26  Plaintiffs are Debra Jewell, Susan Hartzfel, Kenneth Luke, Linda Feiges, Willie Perez, Dian Cotton, Marlena Hinkle, Phyllis Jones, Glenn Katz, Eilene Shaffer, Charles Tippe, Sandra Flores,

27  and Roxy Vance.

28  [3] The "Product" means Charmin Freshmates Flushable Wipes and any other premoistened wipes sold under the Charmin brand name bearing the word "flushable" on the package label.

1   paid to individual claimants does not depend on the number of claims submitted, the cost of notice

2   or administration, the amount paid in cost or fees, or any amounts paid to Plaintiffs—all of which

3   are borne by P&G. (Dkt. #117-4 (("Settlement Agreement")) at 10-41.)

4       During the pendency and as a result of this litigation, P&G has stopped manufacturing

5   versions of the Product containing bicomponent (polyester/poyolefin) fibers. (*Id.*, ¶ 3.1.) P&G has

6   also agreed to be subject to an injunction further modifying the testing and marketing of the

7   Product, including improved testing protocols that require increased dispersability, for a period of

8   two years after the Effective Date. *Id.*

9       Plaintiffs seek an award of $2,150,000 in attorneys' fees and in costs, and Class

10  Representative Payments of $5,000 for Pettit, $3,000 for each Ramcharitar Plaintiff, and $1,000

11  for each other Plaintiff. (*Id.*)  These individuals have not only assisted with this litigation, but are

12  executing much broader releases, including releasing their claims to property damage. And none

13  of these sums comes at the expense of any amount of money set aside for the class. Plaintiffs and

14  their counsel have not yet received any compensation for their work on this case or for the

15  expenses they have incurred. They collectively expended more than 2,900 hours to reach

16  successful settlement of the case, equating to more than $2,400,000 in fees if calculated using the

17  lodestar method, and they incurred more than $261,000 in out-of-pocket expenses. Thus, the

18  requested amount is significantly less than Plaintiffs' Counsel's present lodestar and unreimbursed

19  expenses.

20      As this fair, reasonable and adequate settlement is the product of a non-collusive,

21  adversarial negotiation, and Plaintiffs' Counsel's request for fees and costs is fair and reasonable,

22  Plaintiffs respectfully request that this motion be granted.

23  **B.      BACKGROUND FACTS AND DETAILS OF SETTLEMENT**

24      **1.      Litigation History**

25          **a.      Overview of the Pettit and Ramcharitar Actions**

26      On April 6, 2015, Jamie Pettit filed a class action complaint against P&G in the Superior

27  Court of the State of California, County of San Francisco, Case No. CGC-15-545175. On May 13,

28  2015, P&G removed this action to the United States District Court, Northern District of California,

where it was assigned Case No. 3:15-cv-02150-RS ("Pettit Action"). In her complaint, Pettit alleges that P&G manufactures and markets Charmin Freshmates Flushable Wipes, pre-moistened personal hygiene wipes. Pettit further alleges that, although the packaging on the wipes states that the wipes are "flushable," "septic safe", and "safe for sewer and septic systems," the wipes are not suitable for disposal by flushing down a toilet, are not regarded as flushable by municipal sewage system operators, do not disperse upon flushing, and routinely damage or clog plumbing pipes, septic systems, and sewage lines and pumps.[4]

Shortly after the Pettit Action was filed, on July 10, 2015, Karla Ramcharitar filed a class action complaint against P&G in the United States District Court, Southern District of Ohio, Case No. 1:15-cv-00457-MRB ("Ramcharitar Action"). Ramcharitar filed an amended complaint, which added plaintiffs Gloria Wiltrakis and Cheryl Senko, on January 8, 2016, and which makes similar allegations as Pettit regarding Charmin Freshmates Flushable Wipes.[5] In connection with this settlement, the parties agreed to stay the Ramcharitar Action, and permit the Ramcharitar Plaintiffs to join this suit so that the claims could be settled collectively.

### b. Other Actions Relating to Flushable Wipes

During the pendency of the Pettit and Ramcharitar Actions, many other lawsuits were filed against P&G, each taking issue with the flushability of its flushable wipes.

First, in March 2014, a consumer in San Francisco filed a suit against P&G and its licensee, Nehamiah Manufacturing Company ("Nehemiah"). That case, *Machlan v. Procter & Gamble, et al.*, had been filed in San Francisco Superior Court (Case No. CGC 14-538168) and removed to this District (Case No. 3:14-cv-1982), initially pled claims related to both the Product here and t

---

[4] Pettit alleges that P&G is liable for (a) violations of the California Consumers Legal Remedies Act, Cal. Civil Code §1750 *et seq.*, (b) false advertising in violation of California Business and Professions Code §17500 *et seq.*, (c) fraud, deceit and/or misrepresentation, (d) negligent misrepresentation, and (e) unfair, unlawful and deceptive trade practices in violation of California Business and Professions Code §17200 *et seq*.

[5] Specifically, they allege that P&G is liable for (a) breach of express warranty, (b) negligent design, (c) negligent misrepresentation, (d) failure to warn, (e) violations of the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes §501.201 *et seq.*, (f) unjust enrichment, (g) violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §2301 *et seq.*, (h) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, §805 Ill. Comp. Stat. §505 (2007), (i) tortious breach of warranty, and (j) fraud.

"Kandoo" brand of flushable wipes that was targeted at toddlers and manufactured and marketed by Nehemiah, but the claims involving the Product were dismissed because the Plaintiff did not purchase it. The case alleged the same causes of action as in the Pettit Action. In January 2015, Judge Donato remanded Mr. Machlan's claims for injunctive relief to San Francisco Superior Court and stayed the remaining claims before him. (These two lawsuits are collectively referred to herein as the "Machlan Litigation.") Mr. Machlan was represented by one of the firms representing Pettit and Ramcharitar, and in connection with that litigation, numerous P&G witnesses were deposed on general flushability issues, such as the marketing of flushable products, the development of the INDA guidelines, and flushability standards. That case successfully settled in December 2016, when the state court approved a claims-made settlement pursuant to which Nehemiah agreed to pay cash refunds to California consumers as well as attorneys' fees.

Second, in May 2014, consumers in New York filed a suit against P&G, also alleging that the Charmin Freshmates Flushable Wipes were falsely advertised as "flushable." *Belfiore v. Procter & Gamble*, United States District Court, Eastern District of New York, Case No. 14-cv-4090 ("Belfiore Action"). The case has been overseen by Judge Weinstein, who encouraged the parties in that case to discuss early settlement and suggested a claims-made settlement with changed practices. *Belfiore v. P&G,* 140 F. Supp. 3d 241, 248 (E.D.N.Y. 2015). Per Judge Weinstein's suggestion, Pettit and the Ramcharitar Plaintiffs participated in numerous settlement discussions with litigants in that matter in 2016, including attending an in-person mediation in December 2016 before Magistrate Judge Robert M. Levy, but resolution could not be reached. (Declaration of Adam J. Gutride in Support of Motion for Preliminary Approval, Dkt. # 117-3, ("Prelim. Gutride Decl.") at ¶ 6.)  In February 2017, Judge Weinstein certified a litigation class of New York purchasers of Charmin Freshmates Flushable Wipes. P&G received permission from the Second Circuit to appeal that decision, and the appeal has not yet been decided. The claims of the consumers in the New York case are excluded from this instant settlement: no settlement benefit is offered for their purchases, and all such claims are carved out of the settlement release.

### c.    Motion Practice in the Pettit and Ramcharitar Actions.

On June 23, 2016, P&G filed a motion to stay this litigation pending a response by the

Federal Trade Commission to issues referred to it in connection with the Belfiore Action. The Court denied P&G's request on July 21, 2016.

On February 4, 2017, Plaintiff Pettit moved for class certification. P&G opposed the motion. On August 3, 2017, the Court certified a class of "All persons who, between April 6, 2011 and August 3, 2017 purchased in California the Charmin Freshmates Flushable Wipes (excluding purchases for purpose of resale)." P&G petitioned the Ninth Circuit for a review of that decision, which was denied on November 7, 2017.

In the Ramcharitar Action, P&G filed a motion to dismiss and motion to strike, which that court has not yet decided. P&G also filed a motion to stay, which the court entered on March 1, 2016 and lifted on April 4, 2017. No motion for class certification was filed. On December 6, 2018, the court granted the parties' joint motion to stay the Ramcharitar Action pending final approval of this settlement.

### d.    New Class Representatives and Settlement Negotiations

During the litigation, Plaintiffs' Counsel was retained by thirteen additional consumers from around the country who had purchased P&G's wipes believing them to be flushable. In conjunction with this settlement, an amended complaint was filed on October 31, 2018 which included them as Plaintiffs. (Dkt. # 119-1; 121 (order granting leave to file amended complaint).) That complaint pled nationwide (except New York) claims under the consumer protection statutes in the 49 states and the District of Columbia, as well as claims for unjust enrichment and violations of the Magnuson Moss Warranty Act.

### 2.    Settlement Negotiations

The proposed settlement was reached following significant, hard fought litigation and several rounds of arms-length settlement discussions between capable counsel, most recently before Robert A. Meyer of JAMS ADR, Inc. ("JAMS") in Chicago, Illinois on April 17, 2018. (See Settlement Agreement; Prelim. Gutride Decl., ¶ 6.). The parties agreed to all material terms for a nationwide claims-made settlement regarding monetary and injunctive relief before negotiating about attorneys' fees and expenses.

### 3.      The Proposed Settlement

The Settlement Class is an opt-out class under Fed. R. Civ. P. 23(b)(3) comprised of all Persons, other than Excluded Persons, who purchased the Product in the United States between April 6, 2011 and November 26, 2018 (the date of Preliminary Approval), excluding purchases made in the State of New York and purchases made for purposes of resale. Excluded Persons include P&G and P&G's affiliates, the Court, the mediator, government entities, and those who opt out. (Settlement Agreement, ¶ 1.8.)

#### a.      Direct Monetary Relief

Settlement Class Members can file a claim for a cash payment of sixty cents ($0.60) for each package of the Product purchased in the United States (except in New York) during the Class Period (i.e., between April 6, 2011 and the date of Preliminary Approval, November 26, 2018), regardless of the price the Settlement Class Member paid for the package or the number of wipes contained in each package, subject to the following limitations: (a) a maximum of four dollars and twenty cents ($4.20) shall be paid on the combined claims submitted by any Household for claimed purchases that are not corroborated by Proof of Purchase, and (b) a maximum of thirty dollars ($30.00) shall be paid on the combined claims submitted by any Household for claimed purchases that are corroborated by Proof of Purchase. The release is narrow, and Settlement Class Members retain the right to bring claims against P&G for damage to their personal property.

The claim form is a simple one-page form that can be completed in a few minutes. It can be completed online or submitted by mail. Proof of Purchase can also be submitted electronically or in hard copy.

#### b.      Changed Practices

The Settlement Agreement also contemplates changed practices, some of which have already occurred, as well as injunctive relief. As a result of the litigation, P&G has stopped manufacturing the Product in the formulation(s) that it used at the time the Pettit and Ramcharitar Actions were commenced. (Gutride Decl., Ex. 1 at § 3.10.)  P&G also agreed that versions of the Product manufactured after January 2016 do not and will not contain bicomponent (polyester/polyolefin) fibers. (*Id.*)  Further, P&G has agreed that, for a period of two years after the

Effective Date, it shall be enjoined by the Court as follows:

        a)   As of the Effective Date, Product marketed by P&G will not contain bicomponent (polyester/polyolefin) fibers;

        b)   On or before 90 days after the Effective Date, P&G will modify the packaging of the Product to include a statement that "Your satisfaction is guaranteed. For details of our refund program go to our website www._____.com/_____."  P&G will provide details regarding the satisfaction guarantee on the Charmin website, including reasonable purchase price refunds to consumers who are dissatisfied with the product;

        c)   On or before 90 days after the Effective Date, P&G will modify the packaging of the Product to include the statement: "Use only in well-maintained plumbing systems";

        d)   As of the Effective Date, the Product will comply with current and future versions of the INDA Guidelines, including the slosh box test, provided P&G is a member of INDA and the organization maintains the same purpose and mission, with a similar membership composition, as of the date of the Agreement;

        e)   The Product marketed by P&G on or after June 13, 2018, will comply with the May 2018 more stringent INDA GD4 test protocols which among other things (1) decrease the slosh box test duration from 180 minutes to 60 minutes, (2) increase the slosh box text pass-through percentage requirement from 25% to 60%, and (3) decrease the municipal pump test average power increase over baseline from 15% to 5%.

P&G acknowledges that its consent to adoption of the GD4 protocols, and its further consent to compliance with the more stringent GD4 protocols from June 13, 2018 forward and before industry-wide compliance to GD4, was made in part due to the pendency of this litigation.

### a.     Review of the Settlement Benefit

Plaintiffs' Counsel believes that the provision of the above benefits adequately compensates Class Members for the harm they suffered, in light of the risks of litigation. (Prelim. Gutride Decl.,¶¶ 8-10.)  In particular, there is the possibility that the court will grant P&G's motion to dismiss or decline to certify a class in the Ramcharitar Action; that the California class could be decertified after an unfavorable opinion in the Second Circuit or by the Supreme Court on certiorari; that in both the Pettit Action and Ramcharitar Action summary judgment could be entered against Plaintiffs; and/or that Plaintiffs will be unable to prove liability, damages or

entitlement to injunctive relief at trial on a classwide or individual basis. (*Id.*, ¶¶ 13-15.)

Even if Plaintiffs' claims were successful, ***the "best case" recovery would be less than the settlement remedy***. In connection with class certification, Plaintiffs' expert Colin Weir has performed a regression analysis to calculate the price premium attributable to the challenged "flushable" claim, calculated to be 9.19 percent of the purchase price of each Product (Declaration of Colin Weir in Support of Plaintiffs' Motion for Class Certification ("Weir Decl") (Dkt. #109-1), ¶ 75). The average price per package sold was $4.01, and thus, at trial, consumers would be likely to receive just 34 cents per package, meaning that the settlement payment is approximately 175% of the best-case recovery on a per-package basis. (Prelim. Gutride Decl., ¶ 10.)[6]

### b.   Administrative Expenses, Attorneys' Fees and Costs, Class Representative Payments

All costs of notice and administration of the settlement have been and will continue to be paid by P&G. Plaintiffs seek Class Representative Payments from P&G of $5,000 for Pettit, $3,000 each for the three Ramcharitar Plaintiffs, and $1,000 for the other Plaintiffs. Plaintiffs aided Plaintiffs' Counsel in successfully prosecuting this litigation and reaching a settlement. Pettit located and forwarded responsive documents and information, responded to written discovery, and sat for a full-day deposition. Gutride Decl. at ¶¶ 43-45. She also made her home available for inspection, and in connection with that, alleges that damage was caused to her toilet. (Dkt. #79-43.) The Ramcharitar Plaintiffs allege that they had expensive home repairs and other serious problems. (Dkt. # 117-1, ¶¶ 104-06, 110, 115.) The Class Representative Payments are designed to compensate all Plaintiffs (1) for the time and effort undertaken in and risks of pursuing this action (including the risk of liability for the costs of suit) and (2) because they are agreeing to a release broader than the one that will bind Settlement Class Members, including releasing claims for damage to their personal property.[7]

---

[6] The number of packages sold to the class is estimated to be approximately 74.5 million. (Prelim. Gutride Decl., ¶ 10.) Because a claims process will almost certainly be needed at trial, the best case recovery may be much lower.

[7] Many of the Plaintiffs allegedly incurred high out of cost expenses in connection with their use of the Charmin Freshmates. *See* Dkt. #119-1 at ¶¶ 89-115. For example, Diann Cotton allegedly spent over $550 on a plumber to unclog blockages, *id.* at ¶ 89, whereas Gloria Wiltrakis, one of the Ramcharitar Plaintiffs, allegedly spent over $4,000. *Id.* at ¶ 115. And the Plaintiffs may continue

Plaintiffs' Counsel is applying for an award from P&G of Attorneys' Fees and Costs in the amount of $2,150,000.00, which is less than their lodestar and costs, as further discussed below.

### e.      Notice

The Notice Plan was designed to provide the best notice practicable, was sufficient notice to all persons entitled to notice, and satisfies all applicable requirements of law, including, but not limited to, Rule 23 and constitutional due process.

The court-approved Claim Administrator (Heffler Claims Group) established a settlement website at http://www.PettitWipeSettlement.com, which contains, *inter alia*, the settlement notices, a contact information page that includes address and telephone numbers for the Claim Administrator and Plaintiffs' Counsel**,** the settlement agreement, the signed order of preliminary approval, online and printable versions of the claim form and the opt out forms, and answers to frequently asked questions. In addition, this motion for final approval and application for attorneys' fees, costs, and Class Representative Payments will be placed on the website upon filing. The Claim Administrator is also operating a toll-free number for class member inquiries.

The notice program began on December 20, 2019, when the Claim Administrator issued a press release. (Finegan Decl., ¶ 17, Ex. D.) Thus far, notice has been published in several places, all of which referred Settlement Class Members to the settlement website. (Finegan Decl., ¶¶ 9-17.)  Large ads were published in the January 7, 2019 print version of *People* magazine (on sale December 28, 2018) and the print version of the February issue of *Good Housekeeping* (on sale January 22, 2019) (*Id.*, ¶ 9, Ex. B.) Notice will also appear in the February 2018 print version of *National Geographic* (on sale on January 29, 2019). Online and social media notice began on December 21, with millions of impressions appearing daily on popular websites targeted to reach Settlement Class Members. (*Id.*, ¶¶ 11-13.) Online notice will continue until February 7, 2019. Additional information regarding notice will be provided in the reply brief.

To date, more than 97,193 Claim Forms have been submitted and, while the Claim Administrator will not know how many packages were claimed in the aggregate until it begins

to discover damage in the future. Unlike the class, all of these Plaintiffs have released their claims for this future damage.

MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND FEE APPLICATION

processing the Claim Forms, it is reasonable to expect most Claim Forms are for the maximum

number of packages permitted without proof of purchase. (*Id.*, ¶ 23.)    Only 25 persons have opted

out of the class and, to date, there have been no objections.  (*Id.*, ¶ 20.) The claim filing period is

open until February 28, 2019 and the Claim Administrator must determine the validity of all

submitted Claim Forms by April 29, 2019.  (*Id.*, ¶ 23.)

## II.   ARGUMENT

### A.    Final Approval Is Warranted

Settlement is a strongly favored method for resolving disputes, particularly "where

complex class action litigation is concerned." *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268,

1276 (9th Cir. 1992); 4 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* (4th ed.

2002) § 11:41. Under Rule 23(e), a court should approve a settlement if it is fair, reasonable, and

adequate. *See In re Mego Financial Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000).

As the Ninth Circuit has explained, a decision "to approve or reject a settlement is

committed to the sound discretion of the trial judge because [s]he is exposed to the litigants, and

their strategies, positions, and proof." *In re Mego Financial Corp,* 213 F. 3d at 458. The Court

must consider whether the settlement as a whole is reasonable; it stands or falls in its entirety. *See*

*Hanlon v. Chrysler Corp.*, 150 F.3d 1101, 1026 (9th Cir. 1998).

"The settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on

the merits." *Officers for Justice v. Civil Serv. Comm'n of San Francisco,* 688 F.2d 615, 625 (9th

Cir. 1982), *cert. denied*, 459 U.S. 1217 (1983). Instead, the Court should explore and balance "all

the relevant factors" bearing on approval of a class action settlement, including:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely
> duration of further litigation; the risk of maintaining class action status throughout
> the trial; the amount offered in settlement; the extent of discovery completed and
> the stage of the proceedings; the experience and views of counsel; the presence of
> a governmental participant; and the reaction of the class members to the proposed
> settlement.

*Hanlon,* 150 F.3d at 1026. *Accord Mego*, 213 F.3d at 458. "The relative degree of importance to

be attached to any particular factor will depend upon and be dictated by the nature of the claim(s)

advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each

individual case." *Officers for Justice*, 688 F.2d at 625. Due regard should be given to what is

otherwise a private consensual agreement between the parties. *Id*. The inquiry "must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Id*. "Ultimately, the [trial] court's determination is nothing more than 'an amalgam of delicate balancing, gross approximations and rough justice." *Id*. Here, all the relevant factors support final approval.

Plaintiffs here filed their motion for Preliminary Approval on October 31, 2018, days before the Northern District issued its Procedural Guidance for Class Action settlements, and a month before the amendments to Rule 23's settlement procedures went into effect. This settlement satisfies both the new and old framework.

### 1.    Substantial Benefits Are Provided To The Class.

The Court should first "assess the consideration obtained by the class members in a class action settlement." *Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004). "[I]t is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Officers for Justice* 688 F.2d at 628. "[I]t is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *DIRECTV*, 221 F.R.D. at 527 (citing *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998)).

Here, the benefits to Settlement Class Members are clear, demonstrable, and immediate. Plaintiffs believe that a "best case" recovery at trial, based on Plaintiffs' expert analysis finding the price premium to be 9.19% and the average product cost to be $4.01, would be $0.34 for each package of the Product sold.  (Id.)  Here, because the settlement makes available to class members an amount well in excess of that premium – 60 cents per package instead of 34 cents per package – it makes available an amount in excess of what could be obtained at trial, i.e., the best case recovery. While class members who do not have a proof of purchase will have their recovery capped at $4.20, it hard to see how they would recover more after trial without such proof. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1131-32 (9th Cir. 2017) ("Rule 23 specifically contemplates the need for such individualized claim determinations after a finding of liability.");

1  *Kumar v. Salov N. Am. Corp.*, 2017 U.S. Dist. LEXIS 105463, at *22 (N.D. Cal. July 7, 2017)

2  (approving claims-made settlement in product labeling class action where "the best-case recovery

3  per bottle after trial was less than the amount offered in settlement, and a claims process would be

4  required even after trial, because class members could not otherwise be identified"), *aff'd Kumar*

5  *v. Salov N. Am. Corp.*, 737 F. App'x 341, 342 (9th Cir. 2018).

6        Moreover, P&G has also agreed to changed practices starting in 2016 and continuing for at

7  least two years after the Effective Date. While a precise dollar amount cannot be put on these

8  changed practices, consumers will benefit from better testing, better product design, and more

9  accurate labeling, including details about the satisfaction guarantee, which could save consumers

10 hundreds or thousands of dollars in future plumbing damage and provide an easier method for

11 consumers to obtain redress.

12                           **2.      Procedural Concerns**

13       The Court must consider whether "the class representatives and class counsel have

14 adequately represented the class" and whether "the proposal was negotiated at arm's length." Fed.

15 R. Civ. P. 23(e)(2)(A)-(B). As the Advisory Committee notes suggest, these are "matters that

16 might be described as 'procedural' concerns, looking to the conduct of the litigation and of the

17 negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23(e)(2)(A)-(B) advisory

18 committee's note to 2018 amendment. These concerns implicate factors such as the non-collusive

19 nature of the negotiations, as well as the extent of discovery completed and stage of the

20 proceedings. *See Hanlon*, 150 F.3d at 1026.

21              **a.      The Class Representatives and Plaintiffs' Counsel Have
                           Adequately Represented the Class.**
22

23       In granting class certification, the Court concluded that Pettit and her counsel were

24 adequate. Dkt. # 101 at 8-9. Plaintiffs' Counsel have been appointed to represent classes in product

25 labeling class actions numerous times. No Plaintiffs have any conflicts of interest.

26              **b.      The Settlement Agreement Resulted from Arm's-Length
                           Negotiations.**

27       This Settlement is the product of arm's-length negotiations over the course of many

28 months between counsel for Plaintiffs and counsel for P&G, including mediation with Magistrate

Levy and a full-day mediation before a very experienced, well-respected private mediator, Robert

Meyer. (Settlement Agreement, ¶ 6.) There is an initial presumption that a proposed settlement is

fair and reasonable when it is the result of arm's-length negotiations between experienced counsel.

*See Williams v. Vukovich*, 720 F.2d 909, 922-23 (6th Cir. 1983) ("The court should defer to the

judgment of experienced counsel who has competently evaluated the strength of his proofs"); *see

also 4 Herbert Newberg & Alba Conte, Newberg on Class Actions* §11.41; *Manual For Complex

Litigation (Third)* § 30.42. The non-collusive nature of the negotiations and the stature of counsel

have often been recognized as important factors in the final approval of class action settlements.

*See Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939 (9th

Cir. 1981) ("the fact that experienced counsel involved in the case approved the settlement after

hard-fought negotiations is entitled to considerable weight").

### 3.   Substantive Concerns

Rule 23(e)(2)(C) and (D) set forth factors for conducting "a 'substantive' review of the

terms of the proposed settlement." Fed. R. Civ. P. 23(e)(2)(C)-(D) advisory committee's note to

2018 amendment. In determining whether "the relief provided for the class is adequate," the Court

must consider "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any

proposed method of distributing relief to the class, including the method of processing class-

member claims; (iii) the terms of any proposed award of attorney's fees, including timing of

payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P.

23(e)(2)(C).[8] In addition, the Court must consider whether "the proposal treats class members

equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D).

### a.   There are Serious Risks of Further Litigation

Consistent with Rule 23's instruction to consider "the costs, risks, and delay of trial and

appeal," Fed. R. Civ. P. 23(e)(2)(C)(i), courts in this circuit evaluate "the strength of the plaintiffs'

case; the risk, expense, complexity, and likely duration of further litigation; [and] the risk of

maintaining class action status throughout the trial," *Hanlon*, 150 F.3d at 1026. Generally, the

---

[8] There is no other supplemental agreement in this case.

principal risks to be assessed are the difficulties and complexities of proving liability and damages. *See, e.g., Mego*, 213 F.3d at 458-59 (assessing risk of inability to prove fraudulent scheme in affirming settlement); *Linney*, 151 F.3d at 1240-241 (assessing risks involving fraudulent concealment and ability to obtain damages in affirming settlement).

Here, there are numerous risks in continuing with this Litigation. P&G had appealed the decision to certify a class in the Belfiore Action; if that appeal is ultimately successful, P&G may have attempted to decertify the California class, and certification in the other states was uncertain. *Cf. Rodriguez v. West Publ'g Corp.*, 2007 WL 2827379, at *8 (C.D. Cal. Sept. 10, 2007) (finding that the likelihood that a certification decision would be appealed meant this factor weighed in favor of approval), *rev'd on other grounds*, 563 F.3d 948 (9th Cir. 2009). P&G continues to deny all allegations of wrongdoing, liability and damages. (Settlement Agreement, ¶ 1.9). While Plaintiffs' Counsel are confident in their positions and believe the claims are strong, Plaintiffs' Counsel are also experienced and realistic enough to know that the recovery and certainty achieved through settlement, as opposed to the uncertainty inherent at the summary judgment stage and in the trial and appellate process, weighs heavily in favor of settlement. (*Id.*, ¶ 1.3.)

Finally, P&G would likely appeal any favorable judgment for the class. Thus, even in the best case, class members could wait years to get relief. There is a significant advantage of receiving a benefit now as opposed to later, including to avoid potentially adverse changes in the law.[9] *See Officers for Justice*, 688 F.2d at 625.

### b.    Effectiveness of Distribution Method

The Court must consider "the effectiveness of [the] proposed method of distributing relief to the class." Fed. R. Civ. P. 23(e)(2)(C)(ii). Class Members who seek benefits under the settlement need only submit a simple claim form with basic questions about class membership and their purchases. As P&G does not sell directly to consumers, it does not have records of Class Members' purchases. As such, a claim form is required to identify Settlement Class Members and

---

[9] Plaintiffs' Counsel notes, for instance, that the House of Representatives recently passed a bill that, according to commentators, would substantially and retroactively increase the burden on parties seeking to certify consumer class actions. H.R.985 - Fairness in Class Action Litigation and Furthering Asbestos Claim Transparency Act of 2017. This is just one example of the types of risks and uncertainty inherent in continued litigation eliminated by settlement.

their eligible purchases. The form can be completed online at the settlement website, or class members have the option to print and mail the claim form. Payments will be made by check and mailed. This procedure is claimant-friendly, efficient, cost-effective, proportional and reasonable.

As of this date, approximately 25 Claim Forms have been received by the Claims Administrator. Notice is ongoing and the claims period is open for almost another month (until February 28, 2019).[10]   These claims have not yet been validated but, pursuant to N.D. Guide ¶1(g), Plaintiffs' Counsel estimate, based on their experiences with recent settlements in other product labeling cases and the input of the claims administrator, at least 100,000 or more class members will submit a valid claim. The claims administrator has estimated the size of the class to be approximately 3,884,000 people, which suggests the claims rate will be at least 2.6%, in line with many similar class action settlements. *See* Gutride Decl., ¶ 47, Exhibit 1; Finegan Decl. ¶ 5, fn. 3. Plaintiffs will provide in their reply updated information regarding the number of claims received.

### c.      Terms of Attorneys' Fees

Plaintiffs' Counsel seeks an award of attorneys' fees and costs in an amount of $2,150,000. That request is addressed in Section II.B, *infra*.

### d.      Equitable Treatment of Class Members

All Settlement Class Members are entitled to the same relief under the Settlement. This proposal is fair and equitable because the $0.60 per package refund is far greater than the $0.34 average alleged price premium per package. Even though the wipes may have been sold at different prices based on size or retail location, the alleged premium is always 9.19% and uniform relief makes it unnecessary for claimants to testify how much they paid for each purchase, and makes the settlement administratively efficient. The Settlement also provides for Class Representative Payments**,** which is explained in Section II.C, *infra*.

### 4.      The Experience And Views Of Counsel Favor Final Approval.

Plaintiffs' Counsel, who are experienced class action litigators, support the settlement as

---

[10] The Claim Administrator will not know how many *packages* were claimed in the aggregate until it begins processing the Claim Forms, but it is reasonable to expect most Claim Forms are for the maximum number of packages permitted without proof of purchase.

fair, reasonable, adequate, and in the best interests of the class as a whole. (Dkt. 140-1, ¶¶ 3-21.) P&G is represented by seasoned, class-action litigators at Covington & Burling LLP. It too supports the settlement.

Plaintiffs' Counsel came to recommend this settlement after over three years of hard-fought litigation, during which they expended over 2,900 hours. Plaintiffs' Counsel's work included extensive briefing on a variety of significant legal issues, such as a contested class certification motion. Plaintiffs' Counsel also took numerous fact and expert depositions and reviewed more than 112,000 pages of documents, interrogatories, requests for admission, and third-party discovery. (*Id.*, ¶ 1.10.) In this context, "[s]ignificant weight should be attributed to counsel's belief that settlement is in the best interest of those affected by the settlement." *In re NVIDIA Corp. Derivative Litig.*, 2008 WL 5382544 at *4 (N.D. Cal. 2008); *see also In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*, 1992 U.S. Dist. LEXIS 14337 at *8 (C.D. Cal. June 10, 1992) (finding belief of counsel that settlement represented the most beneficial result for the class to be a compelling factor in approving settlement); *Kirkorian v. Borelli*, 695 F. Supp. 446, 451 (N.D. Cal. 1988) (opinion of experienced counsel is entitled to considerable weight).

### 5.   The Reaction Of The Settlement Class Has Been Overwhelmingly Positive.

Although class notice is still running, and the claims, opt-out, and objection periods are still open, the initial reaction to the settlement has been positive. To date, the settlement website has received over 162,012 unique visits, and the claims administrator has responded to 123 inquiries regarding the settlement made via electronic mail, e-mail, and via the toll-free number. (Finegan Decl., ¶¶ 18-19.)  To date, there have been 25 exclusions and no objections to the settlement. (*Id.* ¶ 20.) "A court may appropriately infer that a class action settlement is fair, adequate, and reasonable when few class members object to it," as is the case here. *Evans v. Linden Research, Inc.*, 2014 WL 1724891, at *4 (N.D. Cal. April 29, 2014).

Nor is there any reason to believe that the amount actually distributed to Settlement Class Members is any less here than would occur after trial, when class members would still need to make claims in order to be identified, and the per-purchase recovery would be lower. Further, "the

number of claims submitted at any particular time is not a relevant factor in evaluating the fairness, reasonableness, or adequacy of the settlement." *Hall v. Bank of Am.*, 2014 WL 7184039, at *8 (S.D. Fla. Dec. 17, 2014). "Courts around the country have approved settlements where the claims rate was less than one percent" because "the claims rate does not dictate whether the notice provided was the best notice practicable under the circumstances" and "does not govern whether the settlement is fair, reasonable, or adequate." *Pollard v. Remington Arms Co.*, LLC, 2017 WL 991071, at *13 (W.D. Mo. Mar. 14, 2017) (collecting cases); *id.* at *10-13 (final approval of claims-made settlement with 0.29% claims rate (22,000 claims / 7.5 million potential members)); *Poertner v. Gillette Co.*, 618 Fed. Appx 624, 625-26, 628 (11th Cir. July 16, 2015) (affirming final approval of claims-made settlement with 0.76% claims rate (55,346 claims / 7.26 million members)); *In re Apple iPhone 4 Prods. Liab. Litig.*, 2012 WL 3283432, at *1 (N.D. Cal. Aug. 10, 2012) (final approval of claims-made settlement with claims rate between 0.16% and 0.28% (44,000 claims / 15.7-27.1 million members)).[11] As in these cases, the identity of Settlement Class Members is unknown and notice was reasonably delivered via publication through national periodicals, social media, and popular websites targeted to reach class members. The notice program is akin to what would have been employed after trial, if not broader, because Plaintiffs were able to negotiate to place the cost of notice on P&G under the terms of the settlement.[12]

### B. Plaintiffs' Counsel Should Be Awarded Attorneys' Fees And Expenses In The Amount of $2,150,000.

The Settlement Agreement provides for P&G to pay attorneys' fees and expenses of up to $2,150,000, separate and apart from the money made available to the class for purposes of claims payment and notice and administration expenses.  This amount should be awarded.

---

[11] *See also Spann v. J.C. Penney Corp.*, 211 F. Supp. 3d 1244, 1257 (C.D. Cal. Sept. 30, 2016) (holding 2.75% claim rate to be reasonable where "direct notice could not be provided to more than half of the class"); *Touhey v. U.S.*, 2011 WL 3179036, at *7-8 (C.D. Cal. July 25, 2011) (finding response rate of 2% "weighs slightly in favor of settlement"); *In re Online DVD–Rental Antitrust Litig.*, 779 F.3d 934, 941 (9th Cir.2015) (upholding settlement in which the parties sent direct notice to 35,000,000 class members and received 1,183,444 claims, which represents a 3.4% claim rate).

[12] No later than March 14, 2019 declarations regarding dissemination of notice, number of claims, dollar value of claims, opt-outs, and objections will be provided to the Court.

### 1.  Lodestar

In cases such as this where the relief is primarily injunctive and there is a fee-shifting statute (Cal. Civ. Code § 1750 and Cal. C.C.P. § 1021.5), the District Court should analyze an attorneys' fee request and issue an award based on the "lodestar" method. *Bluetooth Headset Prods. Liability Litig.,* 654 F.3d 935, 941 (9th Cir. 2011); *see also In re Tobacco II Cases,* 46 Cal. 4th 298, 319 (2009) ("the primary form of relief available under the UCL to protect consumers from unfair business practices is an injunction"). Under the lodestar approach, "[t]he lodestar (or touchstone) is produced by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate." *Lealao v. Beneficial California, Inc.*, 82 Cal. App. 4th 19, 26 (2000); *see also Kelly v. Wengler*, 822 F.3d 1085, 1099 (9th Cir. 2016) ("[A] court calculates the lodestar figure by multiplying the number of hours reasonably expended on a case by a reasonable hourly rate. A reasonable hourly rate is ordinarily the 'prevailing market rate [] in the relevant community.'") (alteration in original) (internal citation omitted) (quoting *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010)). Once the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative "multiplier to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained and the contingent risk presented." *Id.*; *see also Beasley v. Wells Fargo Bank,* 235 Cal. App. 3d 1407, 1418 (1991) (multipliers are used to compensate counsel for the risk of loss, and to encourage counsel to undertake actions that benefit the public interest).

Plaintiffs' Counsel's lodestar through the date of this application is approximately $2,441,293.83. (Gutride Decl., ¶ 53; Zavareei Decl., ¶ 24; Scott Decl., ¶ 22) (tables showing hours worked by timekeeper). Plaintiffs' Counsel's efforts in the Pettit and Ramcharitar Actions to date include, without limitation:

- Pre-filing investigation;

- Drafting and filing two class action complaints and two amended complaints;

- Opposing a motion to dismiss in the Ramcharitar Action;

- Opposing two motions to stay, one in each action, including hearings thereon;

- Drafting and filing numerous case management conference statements and stipulations;

- Meeting-and-conferring with P&G regarding discovery, including the scope, the sufficiency of responses and production, electronic discovery, the protective order, and the timing of production in the Pettit Action;
- Briefing a discovery dispute to this Court in the Pettit Action;
- Reviewing in excess of 112,000 pages of documents produced by P&G in the Pettit Action;
- Subpoenaing and reviewing documents from third party witnesses in the Pettit Action;
- Taking five depositions (three P&G witnesses, two P&G experts) in the Pettit Action;
- Defending the deposition of Pettit;
- Attending an inspection of Pettit's home plumbing;
- Preparing three expert reports and defending two of Pettit's experts in deposition;
- Briefing the motion for class certification, the reply in support thereof, and attending a hearing on that motion in the Pettit Action;
- Briefing an opposition to P&G's Rule 23(f) petition in the Pettit Action;
- Monitoring developments in related litigation as well as the FTC's investigation;
- Attending a settlement conference in New York
- Drafting a mediation statement and participating in an all-day mediation before Mr. Meyer;
- Negotiating and drafting the Settlement Agreement along with corresponding documents, including claim forms, summary notice, and long form notice;
- Filing the motion for preliminary approval and appearing at a hearing thereon;
- Reviewing and responding to correspondence from Settlement Class Members;
- Supervising the work of the Claims Administrator; and
- Preparing this Motion and supporting documentation.

(Gutride Decl., ¶¶ 4-41; Zavareei Decl., ¶¶ 4-19; Scott Decl. ¶¶ 11-14.)

As explained in more detail in the accompanying Declaration of Adam Gutride, Plaintiffs' counsel is also seeking to recover fees associated with the Machlan Action that were not recovered. (Gutride Decl. ¶¶ 38-39.) This work saved enormous time in this litigation. Among other things, the plaintiff there had taken six depositions of P&G employees, which did not have to be retaken. (Id.) Other work, such as the review of nearly 60,000 pages of documents produced by

P&G there and consultation with experts, reduced the time needed to spend on those tasks in this case. (Id.) Work done on motions and in settlement saved time here as well. (Id.)

Before the final approval hearing, Plaintiffs' Counsel's efforts will also include:

- Continued correspondence with Settlement Class Members and supervision of the work of the Claims Administrator; and

- Researching and drafting a reply memorandum and opposing objections, if any.

(Gutride Decl., ¶ 61; Zavareei Decl., ¶ 38)

Plaintiffs' Counsel calculated their lodestar using Plaintiffs' Counsel's regular billing rates, which for the attorneys involved range from $450 to $975 per hour. (Gutride Decl., ¶ 53; Zavareei Decl., ¶ 24; Scott Decl. ¶ 22.) These hourly rates are equal to market rates for attorneys of Plaintiffs' Counsel's background and experience. *See In re Optical Disk Drive Prod. Antitrust Litig.,* 2016 WL 7364803, at *8 (N.D. Cal. Dec. 19, 2016) (approving hourly rates of $205 to $950); *McLaughlin v. Wells Fargo Bank, N.A.*, 2017 WL 994969, at *2 (N.D. Cal. Mar. 15, 2017) (approving an $850 hourly rate for partners); *Gutierrez v. Wells Fargo Bank, N.A.*, 2015 WL 2438274, at *5 (N.D. Cal. May 21, 2015) (approving hourly rates of $475 to $975). Many of the lawyers who did substantive work on the case graduated from top law schools and the key players have at least 10 and in some cases 20 years of litigation experience.[13]

For attorneys and staff from the Washington, D.C. office of Tycko & Zavareei LLP, the hourly rates are calculated using the *Laffey* Matrix.[14] "The *Laffey* Matrix is the most commonly used fee matrix in determining fees for complex federal litigation in the D.C. Circuit." *E.g.*, *Texas v. U.S.*, 2017 WL 1194159, at *4 (D.D.C. Mar. 30, 2017).[15] Spangenberg Shibley & Liber LLP

---

[13] Furthermore, it is almost certain the rates paid by the Defendant to its firms in this case far exceed the rates requested for Class Counsel. . . . *See Managing Class Action Litigation: A Pocket Guide For Judges* § IV(F) (suggesting an examination of the defendant's attorney fee records as a measure of what might be reasonable.) Class Counsel's billing rates were recently approved by other judges around the country. (Gutride Decl., ¶ 56; Zavareei Decl., ¶ 25.)

[14] *See* http://www.laffeymatrix.com/.

[15] *See also Galvez v. Americlean Servs. Corp.*, 2012 WL 2522814, at *5 n.6 (E.D. Va. June 29, 2012) ("The Laffey Matrix is used as a guideline for reasonable attorneys' fees in the Washington/ Baltimore area."); *Cobell v. Norton*, 231 F. Supp. 2d 295, 301-02 (D.D.C. 2002) (referring to Matrix as containing "standard hourly rate for attorneys in the Baltimore–Washington area").

also calculates its rates using the *Laffey* Matrix. See *Livingston v. Calvary Portfolio Services, LLC*, 2009 WL 4724268 (N.D. Ohio 2009) (approving use of Laffey Matrix for Ohio firm) (citing *Adlock-Ladd v. Secretary of Treasury*, 227 F.3d 343, 347 n. 3 (6th Cir. 2000) (same)).[16] The Ninth Circuit has accepted the *Laffey* Matrix as evidence of reasonable hourly rates charged by Washington, D.C. attorneys. *Mancini v. Dan P. Plute, Inc.*, 358 F. App'x 886 (9th Cir. 2009). And a court in this District recently awarded Bay Area attorneys *Laffey* Matrix fees adjusted *upwardly* by nine percent, so, if anything, the *Laffey* Matrix comes in *below* the market rate for attorneys in this District. *See Brinker v. Normandin's*, 2017 U.S. Dist. LEXIS 25670, at *6 (N.D. Cal. Feb. 23, 2017) (citing *Theme Promotions, Inc. v. News America Marketing FSI, Inc.*, 731 F. Supp. 2d 937, (N.D. Cal. 2010)). *See also In re HPL Techs., Inc., Sec. Litig.*, 366 F. Supp. 2d 912, 921 (N.D. Cal. 2005) (using the locality pay tables for the federal judiciary to adjust the *Laffey* Matrix).

These rates are the current rates charged by Plaintiffs' Counsel, which is appropriate given the deferred and contingent nature of counsel's compensation. *See LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2nd Cir. 1998) ("[C]urrent rates, rather than historical rates, should be applied in order to compensate for the delay in payment….") (citing *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989)); *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1305 (9th Cir. 1994) ("The district court has discretion to compensate delay in payment in one of two ways: (1) by applying the attorneys' current rates to all hours billed during the course of litigation; or (2) by using the attorneys' historical rates and adding a prime rate enhancement.").

In any event, Plaintiffs' Counsel's attorneys' fee request of $1,888,388 ($2,150,000 minus costs and expenses of $261,611.11 discussed in Section III.B3, *infra*), comes in well *below* the fee amount of $2,441,293.83 calculated using the lodestar method. Thus, far from any "upward" multiplier, Plaintiffs' Counsel's requested fee actually results in a negative multiplier of 22.65%. Therefore, it is eminently appropriate to award Plaintiffs' Counsel attorneys' fees of $1,888,388. *See, e.g.*, *Schuchardt v. Law Office of Rory W. Clark*, 314 F.R.D. 673, 690-91 (N.D. Cal. 2016)

---

[16] Spangenberg Shibley is based in Cleveland, Ohio. According to the recent federal government locality pay tables, its cost of living is approximately 6.3% less than the District of Columbia. See https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2018/saltbl.pdf (last accessed Jan. 22, 2019).

(holding negative lodestar multiplier to be indication of reasonableness of fee request); *Johnson v. Triple Leaf Tea Inc.*, at *6 (N.D. Cal. Nov. 16, 2015) (finding where "Class Counsel's lodestar exceeded the negotiated award" to be "well within the range courts have allowed in the Ninth Circuit"); *Lusby v. GameStop Inc.*, 2015 WL 1501095, at *4 (N.D. Cal. Mar. 31, 2015) ("Class Counsel's lodestar . . . result[s] in a negative multiplier of approximately .54. This is below the range found reasonable by other courts in California."); *Covillo v. Specialtys Café*, 2014 WL 954516, at *7 (N.D. Cal. Mar. 6, 2014) ("Plaintiffs' requested fee award is approximately 65% of the lodestar, which means that the requested fee award results in a so-called negative multiplier, suggesting that the percentage of the fund is reasonable and fair."); *Walsh v. Kindred Healthcare*, 2013 WL 6623224, at *3 (N.D. Cal. Dec. 16, 2013) ("The Court concludes that, on the facts of this case, the lodestar is reasonable, especially in light of the fact that Settlement Class Counsel have applied a negative multiplier, and seek an award that is less than their base lodestar."); *Wehlage v. Evergreen at Arvin LLC*, 2012 WL 4755371, at *1 (N.D. Cal. Oct. 4, 2012) ("Class Counsel do not seek a multiplier on their lodestar, and in fact the requested fee is a negative multiplier (-.79). The Court finds that this award is appropriate here."); *Lymburner v. U.S. Fin. Funding, Inc.*, 2012 WL 398816, at *6 (N.D. Cal. Feb. 7, 2012) ("[T]he negative multiplier in this case supports the reasonableness of the fee request."); *In re Portal Software, Inc. Sec. Litig.*, 2007 WL 4171201, at *16 (N.D. Cal. Nov. 26, 2007) ("Even if the court accepted the unadjusted lodestar from plaintiffs' counsel ($922,884.75), the correlating multiplier of 0.74 would still reflect a negative multiplier, further suggesting that the requested percentage based fee is fair and reasonable.").

### 2. Cross-Check.

The Court may, but is not required to, cross-check the lodestar award against the value of the benefit provided to the class. In the Ninth Circuit, the benchmark for an attorney fee is 25% of the total settlement value, including the monetary and non-monetary recovery. *See Six Mexican Workers v. Arizona Citrus Workers*, 904 F.2d 1301, 1311 (9th Cir. 1990); *see also Glass*, 2007 WL 221862 at *14 ("The Ninth Circuit has repeatedly held that 25% of the gross settlement amount is the benchmark for attorneys' fees awarded under the percentage method . . ."). However, many cases have found that between 30% and 50% of the common fund is an appropriate range

when the settlement fund is less than ten million. *See Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 297-98 (N.D. Cal. 1995) (collecting cases); *see also Johnson v. Gen. Mills, Inc.*, 2013 WL 3213832, at *6 (C.D. Cal. June 17, 2013) (awarding a fee award of 30% of the settlement fund in a food labeling class action).

Moreover, Ninth Circuit precedent requires courts to award fees based on the total benefits being made available to class members rather than the amount actually claimed. *Young v. Polo Retail, LLC*, 2007 WL 951821, at *8 (N.D. Cal. Mar. 28, 2007) (citing *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026 (9th Cir. 1997) ("district court abused its discretion in basing attorney fee award on actual distribution to class" instead of amount being made available)).[17] And where there is injunctive relief that is not easily valued, the district court has the discretion to make an award solely on the basis of the lodestar. *See Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 547-48 (9th Cir. 2016) (explaining that where all the classwide benefits are "not easily monetized, a cross-check is entirely discretionary"). If reasonably possible, the Court should make findings as to the value of the injunctive relief obtained in the settlement. *Allen v. Bedolla*, 787 F.3d 1218, 1225 (9th Cir. 2015) (remanding where it appeared that the injunctive relief was "valuable," but no specific findings as to that value was made).

Here, the requested fee of 1,888,388 is only 4.22 % of the total possible settlement value of $44.7 million (74.5 eligible units at 60 cents per package), which does not include the value of changed practices. Thus, the requested fee comes in well below the benchmark.

### 3.      Plaintiffs' Counsel Should Be Awarded Costs.

Plaintiffs' Counsel requests that, in addition to reasonable attorneys' fees, the Court grant

---

[17] *See also Nwabueze v. AT&T, Inc.*, 2014 WL 324262, at *3 (N.D. Cal. Jan. 29, 2014) (calculating overall value of settlement to be $100 million if all class members requested billing summaries provided in settlement); *Glass v. UBS Fin. Servs., Inc.*, 2007 WL 221862, at *16 (N.D. Cal. Jan. 26, 2007) ("The Ninth Circuit has held, however, that the district court must award fees as a percentage of the entire fund, or pursuant to the lodestar method, not on the basis of the amount of the fund actually claimed by the class.") (citing *Williams*), *aff'd*, 331 F. App'x 452 (9th Cir. 2009); *Dennings v. Clearwire Corp.*, No. 2013 WL 1858797, at *7 (W.D. Wash. May 3, 2013) ("Under Ninth Circuit law, there is strong support that, when a court conducts a percentage fee analysis, it is the amount or value made available to the class, not the amount actually claimed, that is relevant.") (citing *Williams* and *Stern v. Gambello,* 480 F. App'x 867, 870 (9th Cir.2012)) *aff'd* (Sept. 9, 2013).

its application for reimbursement of $261,611.11 in costs and expenses incurred by it in connection with the prosecution of this litigation. The expenses incurred are itemized in Counsel's declarations. (Gutride Decl., ¶ 60, Ex. 2; Zavareei Decl., ¶ 35, Ex. A.; Scott Decl., ¶ 27, Ex. A.) Plaintiffs' Counsel is typically entitled to reimbursement of all reasonable out-of-pocket expenses and costs in prosecution of the claims and in obtaining a settlement. *See Vincent v. Hughes Air West*, 557 F.2d 759, 769 (9th Cir. 1977). Here, since the requested sum of $2,150,000 is inclusive of both attorneys' fees *and* costs, should the Court choose to calculate the two totals separately, it should subtract the $261,611.11 in costs from that number and award $1,888,388 in attorneys' fees.[18]

### C.   The Class Representative Payments Are Reasonable.

This Court should also approve Class Representative Payments of $5,000 to Pettit, $3,000 to each Ramcharitar Plaintiff, and $1,000 to each of the other Plaintiffs as it is just, fair and reasonable. In deciding whether to approve such an award, a court should consider: "(1) the risk to the class representative in commencing suit, both financial and otherwise; (2) the notoriety and personal difficulty encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation and; (5) the personal benefit (of lack thereof) enjoyed by the class representative as a result of the litigation." *Van Vranken,* 901 F. Supp. at 299 (N.D. Cal. 1995). As a matter of public policy, these awards are necessary to encourage consumers to challenge perceived false advertising and unfair business practices.

Plaintiffs subjected themselves to notoriety and the risk of being viewed negatively in future employment and business situation. (Gutride Decl., ¶¶ 44-46.) They also agreed to release their claims for damage to their personal property, which are in the hundreds or thousands of dollars. *See* section II.B.4.b, *supra*. Pettit and the Ramcharitar Plaintiffs also worked with counsel throughout the three-year litigation. (*Id.*) Pettit also responded to interrogatories and requests for production, attended her deposition, and permitted an inspection of her home plumbing. (*Id.*) They

---

[18] Should the Court deem any of the requested costs to not be reimbursable, Plaintiffs request that the Court increase the attorneys' fee award such that the net amount of $2,150,000 provided via the Settlement Agreement is awarded, as any increase to the attorneys' fee award would still result in a significant negative lodestar multiplier and, therefore, be reasonable.

conducted searches of their personal records. (*Id.*) All Plaintiffs also remained actively involved in the litigation prior to and after settlement. (*Id.*)

Plaintiffs' Counsel respectfully requests that the Court approve each Class Representative Payment, which is reasonable in light of the Plaintiffs' respective efforts and the relief to the Settlement Class resulting from this litigation. *See* Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. Rev. 1303, 1333 (2006) (an empirical study of incentive awards determined average aggregate award in consumer class case is $29,055.20, and average individual award is $6,358.80); *see also In re Mego Fin. Corp Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000) (awarding the named plaintiff $5,000 involving a class of 5,400 people and a total recovery of $1.725 million); *Smith v. CRST Van Expedited, Inc.,* 2013 WL 163293, *6 (S.D. Cal. Jan. 14, 2013) (finding $15,000 incentive within the range awarded in similar cases); *Embry v. Acer America Corp.*, Dkt.# 218 (N.D. Cal. Feb. 14, 2012) (awarding $15,000 incentive award); *Gibson & Co. Ins. Brokers, Inc. v. Jackson Nat. Life Ins. Co.*, 2008 WL 618893 (C.D. Cal. Feb. 27, 2008) (awarding $5,000 incentive fee).

## III.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs request that the Court enter final judgment certifying the settlement class and approving the settlement, granting Plaintiff Pettit's application for a Class Representative Payment of $5,000, granting Plaintiffs Ramcharitar, Wiltrakis and Senko's applications for Class Representative Payments of $3,000 each, awarding the other Plaintiffs $1,000 each, and awarding Plaintiffs' Counsel $2,150,000 in attorneys' fees and costs.

Dated: January 24, 1018                            Respectfully submitted,

**GUTRIDE SAFIER LLP**
 _/s/ Adam J. Gutride_____

Adam J. Gutride (State Bar No. 181446)

**TYCKO & ZAVAREEI LLP**
Hassan A. Zavareei (State Bar No. 181547)

**SPANGENBERG SHIBLEY & LIBER LLP**
STUART E. SCOTT (*pro hac vice* admission)